[ORAL ARGUMENT NOT YET SCHEDULED]
**No. 24-1007**
(consolidated with No. 24-1262)

---

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

MSC MEDITERRANEAN SHIPPING COMPANY S.A.,

*Petitioner*

v.

FEDERAL MARITIME COMMISSION,

*Respondent*

MCS INDUSTRIES, INC.

*Respondent-Intervenor*

---

On petition for review of orders of the Federal Maritime Commission

---

**BRIEF OF PETITIONER
MSC MEDITERRANEAN SHIPPING COMPANY S.A.**

---

Michael F. Scanlon
John Longstreth
Christiana K. Goff
K&L Gates LLP
1601 K Street, NW
Washington, D.C. 20006
(202) 778-9000
michael.scanlon@klgates.com
john.longstreth@klgates.com
christi.goff@klgates.com

*Counsel for MSC Mediterranean
Shipping Company S.A.*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Petitioner submits the following:

### A. Parties, Intervenors, and Amici

The parties to this proceeding are:

1. Petitioner

   MSC Mediterranean Shipping Company, S.A.

2. Respondent

   Federal Maritime Commission

3. Intervenor for Respondent

   MCS Industries, Inc.

### B. Rulings Under Review

*Order Affirming Initial Decision on Remand*, FMC Dkt. No. 21-05 (Federal Maritime Commission, served July 16, 2024)

*Order Partially Affirming Initial Decision on Default and Remanding for Further Proceedings*, Dkt. No. 21-05 (Federal Maritime Commission, served Jan. 3, 2024)

## C. Related Cases

Petitioners are unaware of any cases related to the current consolidated case.

*/s/ Michael F. Scanlon*

Michael F. Scanlon
John Longstreth
Christiana K. Goff
K&L Gates LLP
1601 K Street, NW
Washington, D.C. 20006
(202) 778-9000
michael.scanlon@klgates.com
john.longstreth@klgates.com
christi.goff@klgates.com

*Counsel for MSC Mediterranean Shipping Company S.A.*

December 18, 2024

## PETITIONER'S CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, and District of Columbia Circuit Rule 26.1, Petitioner MSC Mediterranean Shipping Company S.A. ("Mediterranean Shipping") states that it is a fully owned subsidiary of MSC Mediterranean Shipping Company Holding S.A., which is not publicly held.

Pursuant to the requirement of Circuit Rule 26.1(b) that it provide a statement of general nature and purpose relevant to the litigation, MSC states that it is a Vessel Operating Common Carrier organized under the laws of Switzerland and with its principal place of business in Geneva, Switzerland, that provides ocean shipping services worldwide, including to and from the United States.

*/s/ Michael F. Scanlon*

Michael F. Scanlon
John Longstreth
Christiana K. Goff
K&L Gates LLP
1601 K Street, NW
Washington, D.C. 20006
(202) 778-9000
michael.scanlon@klgates.com
john.longstreth@klgates.com
christi.goff@klgates.com

*Counsel for MSC Mediterranean Shipping Company S.A.*

December 18, 2024

## TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION ..................................................................1

STATEMENT OF ADDENDUM ......................................................................1

STATEMENT OF ISSUES ...............................................................................1

INTRODUCTION ..............................................................................................2

STATEMENT OF THE CASE .........................................................................6

      A.     The Claims in the Underlying Agency Proceeding ...........................6

           1.     The Original Complaint ............................................................6

           2.     The Motion to Compel and Amended Complaint ....................8

      B.     Mediterranean Shipping's Motion to Dismiss the Amended
           Complaint and Initiation of Arbitration ................................................9

      C.     The Discovery Order Triggers the Swiss Blocking Statute ..............10

      D.     The ALJ Orders Use of the Hague Procedures to Address the
           Swiss Blocking Statute .......................................................................11

      E.     MCS Industries' Submission of the Letter of Request and the
           Resulting Court Decision ...................................................................12

      F.     The Order Requiring Production of Discovery Notwithstanding
           the Absence of Consultations or Required Procedures .....................14

      G.     Mediterranean Shipping's Continuing Efforts to Eliminate Its
           Criminal Exposure, Resulting in Advice From the Swiss Justice
           Office that the Hague Procedures Were Likely Available ................14

**TABLE OF CONTENTS**
(continued)

Page

H.  Mediterranean Shipping's Request for a Waiver of Article 271 to Allow Compliance and the Formal Decision of the Swiss Minister of Justice that the Hague Procedures Were Available and Must Be Used ...................................................................................16

I.  The ALJ Ignores the Ruling of the Swiss Government and Issues a Default Judgment ................................................................17

J.  The Commission's Decision Affirming the Default ..........................20

SUMMARY OF ARGUMENT ...........................................................22

ARGUMENT ...................................................................................23

I.  STANDARD OF REVIEW ...........................................................23

II.  THE COMMISSION LACKED JURISDICTION OVER THIS ACTION .................................................................................24

A.  MCS Industries' Claims Are Inherently Contractual in Nature and Jurisdiction Over Them is Accordingly Barred by 46 U.S.C. § 40502(f). ...........................................................24

B.  MCS Industries' Claims Are Separately Barred by the Federal Arbitration Act as the Parties Agreed to Arbitration as the Exclusive Forum for "[A]ny Disputes Arising Out of or in Connection With" Each of their Service Contracts ..........................31

III.  THE COMMISSION ERRED IN HOLDING THAT THE AMENDED COMPLAINT STATED VALID SHIPPING ACT CLAIMS .................................................................................34

A.  The Commission Erred in Holding That the Act Allows a Claim of Discrimination Against a Shipper for Carriage Under a Service Contract ................................................................35

B.  The Commission Erred in Holding That the Complaint Stated a Refusal to Deal Claim ..........................................................39

ii

# TABLE OF CONTENTS
(continued)

Page

IV.   CONSULTATION UNDER 41108(C)(2), NOT DEFAULT, IS THE PROPER COURSE FOR RESOLVING THE DISCOVERY ISSUE THAT UNDERLAY THE INITIAL DECISION ....................................40

V.   THE COMMISSION'S AWARD OF A JUDGMENT BY DEFAULT MISAPPLIED THE LAW AND WAS AN ABUSE OF DISCRETION ............................................................44

    A.   No Commission or Judicial Precedent Supports Award of a Default Judgment on the Facts Presented Here...................44

    B.   The Commission Misapplied the Precedent on Which it Purported to Rely ...............................................................46

        1.   The Commission's Findings as to Prejudice to MCS Industries Were Erroneous and Inadequate ............................47

        2.   The Commission's Findings as to Prejudice to the Tribunal Were Erroneous and Inadequate ...............................................51

        3.   The Commission's Findings as to Alleged Bad Faith Were Erroneous and Inadequate........................................................52

    C.   The Commission Erred in Finding That the Delay Sanction in 46 U.S.C. § 41302(d) is an Additional Basis for a Default Judgment....53

VI.   CONCLUSION ............................................................55

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anchor Shipping Co. v. Aliana Navegãao E Logística Ltda.*,
  2006 WL 2007808 (FMC May 10, 2006).....................................................20, 33

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..........................................................................................34

*AT&T Technologies, Inc. v. CWA*,
  475 U.S. 643 (1986)..........................................................................................33

*Bradshaw v. Vilsack*,
  286 F.R.D. 133 (D.D.C. 2012) .........................................................................49

*Cargo One, Inc. v. Cosco Container Lines Co. Ltd*,
  2000 WL 1648961 (FMC Oct. 31, 2000) ..............................20-21, 24-26, 28-30

**Chilean Nitrate Sales Corp. v. San Diego Unified Port District*,
  24 S.R.R. 1314 (1988) .....................................................................................39

*Cine Forty–Second St. Theatre Corp. v. Allied Artists Pictures Corp.*,
  602 F.2d 1062 (2d Cir. 1979) ...........................................................................46

*DIRECTV, Inc. v. Hoa Huynh*,
  503 F.3d 847 (9th Cir. 2007) ............................................................................37

*DNB Exports LLC, and AFI Elektromekanik Ve Elektronik San. TIC.
  Ltd. STI v. Barsan Global Lojistiks Ve Gumruk Musavirligi A.S.,
  Barsan Int'l, Inc., and Impexia, Inc.*,
  2011 WL 7144017 (ALJ July 7, 2011) ..............................................................30

*Dubicz v. Commonwealth Edison Co.*,
  377 F.3d 787 (7th Cir. 2004) ............................................................................49

*Duke Power Co. v. FERC*
  864 F.2d 831 (D.C. Cir. 1989)...................................................................... 33-34

iv

*Federal Maritime Commission v. South Carolina State Ports Authority*,
535 U.S. 743 (2002).................................................................42

*Flaks v. Koegel*,
504 F.2d 702 (2d Cir. 1974) .................................................46

*Genesco, Inc. v. T. Kakiuchi Co.*,
815 F.2d 840 (2d Cir. 1987) .................................................32

\*Global Link Logistics, Inc. v. Hapag-Lloyd AG,
2014 WL 5316345 (ALJ April 17, 2014)................................28, 30, 36

*Greatway Logistics Group, LLC v. Ocean Network Express PTE, Ltd.*,
2021 WL 3090768 (ALJ July 16, 2021).......................................30, 31

*Hartford Acc. and Indem. v. Swiss Reinsurance*,
246 F.3d 219 (2d Cir. 2001) .................................................33

\*JLM Indus., Inc. v. Stolt-Nielsen SA,
387 F.3d 163 (2d Cir. 2004) .............................................. 21, 32-33

*Koon v. United States*,
518 U.S. 81 (1996)..............................................................24

\*Loper Bright Enterprises v. Raimondo,
144 S. Ct. 2244 (2024).........................................................23, 42

*Maher Terminals, LLC v. Port Authority of New York and New Jersey*,
2015 WL 435475 (FMC Jan. 30, 2015)...................................39

*MAVL Capital Inc. v. Marine Transport Logistics, Inc.*,
2020 WL 13512925 (FMC Oct. 29, 2020) ....................................39, 53

*Mehler v. Terminix Int'l Co.*,
205 F.3d 44 (2d Cir. 2000) ..................................................32

\*\*New Orleans Stevedoring Company v. Port of New Orleans,
29 S.R.R. 345 (I.D. 2001), *adopted* 29 S.R.R. 1066, 1071 (FMC 2002), *aff'd mem.*, 80 Fed. App'x 681 (D.C. Cir. 2003) ......................................39

*Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.,*
  369 F.3d 645 (2d Cir. 2004) .............................................................31

*Petra Pet, Inc. (a/k/a Petrapport) v. Panda Logistics Limited; Panda Logistics Co., Ltd. (f/k/a Panda Int'l Transportation Co., Ltd.); and Rdm Solutions, Inc.,*
  2012 WL 11914702 (ALJ April 20, 2012) .......................................45

*Rana v. Franklin, d/b/a/ "The Right Move," Inc.,*
  2022 WL 1744905 (FMC May 25, 2022)..........................................44

*Rdm Solutions, Inc.,*
  2012 WL 11914702 (ALJ April 20, 2012) .......................................45

*Shea v. Donohoe Construction Co.,*
  795 F.2d 1071 (D.C. Cir. 1986)..................................................44, 47

*Shepherd v. American Broadcasting Companies,*
  62 F.3d 1469 (D.C. Cir. 1995)...................................................44, 50

*Société Internationale Pour Participations Industrielles Et Commerciales v. Rogers,*
  357 U.S. 197 (1958)...................................................................5, 46

*Société Nationale Industrielle Aérospatiale v. U.S. District Court,*
  482 U.S. 522 (1987)........................................................................53

**Tak Consulting Eng'rs v. Bustani,*
  Docket No. 98-13, 28 S.R.R. 581 (ALJ 1998) ................................44

*Tractors and Farm Equipment Limited v. Cosmos Shipping Co., Inc.,*
  1992 FMC LEXIS 86 (ALJ Nov. 23, 1992) ................................ 30-31

*United States v. McGoff,*
  831 F.2d 1071 (D.C. Cir. 1987)......................................................26

*United Steelworkers of Am. v. Warrior & Gulf Nav. Co.,*
  363 U.S. 574 (1960)........................................................................33

*Wash. Metro. Area Transit Comm'n v. Reliable Limousine Serv., LLC,*
  776 F.3d 1 (D.C. Cir. 2015).....................................................45. 50

vi

*Webb v. District of Columbia,
   146 F.3d 964 (D.C. Cir. 1999)........................................................ 24, 44, 47-48

**Western Overseas Trade and Dev. Corp. v. ANERA,
   26 S.R.R. 874 (FMC 1994)..................................................................24, 25, 31

**Statutes and Regulations**

5 U.S.C. § 706(2)(A)............................................................................................23

46 U.S.C. §§ 40101-41310 .................................................................................1

46 U.S.C. § 40102(18) .........................................................................................6

46 U.S.C. § 40102(21) .........................................................................................6

*46 U.S.C. § 40502(f)..............................................................................2, 24, 29

46 U.S.C. §§ 41104(a)(4) and (8) ......................................................................35

46 U.S.C. § 41104(a)(5)......................................................................................35

46 U.S.C. §§ 41104(a)(5) and (9) ..................................................................36, 38

46 U.S.C. § 41104(a)(9)......................................................................................35

*46 U.S.C. § 41108(c)(2)...............................................4-5, 11, 13, 21, 40-43, 54

Federal Arbitration Act, 9 U.S.C. §§ 1, et seq....................................................3

Hobbs Administrative Orders Review Act, 28 U.S.C. §§ 2342(3)(B),
   2344....................................................................................................................1

Ocean Shipping Reform Act of 1998, Pub. L. 105-258 .........................................36

46 C.F.R. § 502.12 ..............................................................................................44

46 C.F.R. § 502.150(d) .........................................................................................8

**Other Authorities**

144 Cong. Rec. 6109 (April 21, 1998) ...............................................................37

*Convention of 18 March 1970 on the Taking of Evidence Abroad in
   Civil or Commercial Matters ...........................................................................4

Restatement (Second) of Contracts § 347.................................................29

Restatement (Second) of Contracts § 344(a) ........................................29

S. Rep. No. 61, 105th Cong., 1st Sess. (1998)........................................37

*\* Authorities upon which we chiefly rely are marked with one asterisk.*

*\*\* Authorities published in the Pike & Fischer Shipping Regulations Reports (S.R.R.), which are not readily available on an electronic database such as Westlaw or Lexis, are marked with two asterisks. These cases have been attached in an addendum to this brief.*

# <u>GLOSSARY</u>

| | |
|---|---|
| Act or Shipping Act | Shipping Act of 1984, as amended, 46 U.S.C. §§ 40101-41310 |
| ALJ | Chief Administrative Law Judge of the Federal Maritime Commission Erin Wirth |
| Commission or FMC | Federal Maritime Commission |
| Geneva Court | Court of First Instance in Geneva, Switzerland |
| Hague Convention | Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters |
| Hague Procedures | Government-to-government procedures under the Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters |
| Swiss Authority | Federal Department of Justice and Police of Switzerland |
| Swiss Justice Office | Federal Office of Justice of Switzerland |
| 1998 Act | Ocean Shipping Reform Act of 1998, Pub. L. 105-258 |

## STATEMENT OF JURISDICTION

Petitioner MSC Mediterranean Shipping Company S.A. ("Mediterranean Shipping") seeks review of final orders of Respondent Federal Maritime Commission ("Commission" or "FMC"), reviewable in this Court under the Hobbs Administrative Orders Review Act, 28 U.S.C. §§ 2342(3)(B), 2344. The orders awarded money damages against Mediterranean Shipping, making its standing self-evident.

## STATEMENT OF ADDENDUM

Pertinent statutes and regulations and copies of agency cases not available online are set forth in an addendum to this brief.

## STATEMENT OF ISSUES

1. Did the Commission err in holding that it had jurisdiction over this action premised on Mediterranean Shipping's alleged failure to meet its contract commitments, when (a) the Shipping Act of 1984 as amended ("Shipping Act" or "Act"), 46 U.S.C. §§ 40101-41310, precludes Commission jurisdiction over breach of contract claims, and (b) the parties agreed to resolve by binding arbitration any disputes arising out of or in connection with the contracts at issue?

2. Did the Commission err in affirming a finding of default based on Mediterranean Shipping's inability to comply with discovery due to Swiss blocking statutes without engaging in government-to-government consultations as required

by the Act or giving any weight to the stated position of the Swiss government providing a means to resolve the conflict?

      3.     Did the Commission err in finding that the Amended Complaint stated valid claims under the Shipping Act?

      4.     Did the Commission err under its precedent, judicial precedent, and a delay provision of the Shipping Act it raised sua sponte in (a) affirming a finding of default where Mediterranean Shipping made diligent efforts to resolve the discovery conflict, (b) failing to make any meaningful assessment of the importance of the disputed discovery to the issues in the case in light of the extensive discovery already provided, and (c) failing to meaningfully consider whether sanctions short of default would be adequate to resolve the case on the merits?

## INTRODUCTION

The Commission ignored a number of clear and explicit statutory limitations on its jurisdiction and authority in adjudicating a private damages claim (known in Commission parlance as a "reparations" action) against Mediterranean Shipping premised on allegations that it breached contracts to carry cargoes for Intervenor MCS Industries, Inc. ("MCS Industries").

*First*, the Shipping Act plainly and expressly bars the Commission from adjudicating claims for breach of contract by providing that "the exclusive remedy for a breach of a service contract is an action in an appropriate court." *See* 46 U.S.C.

§ 40502(f).  The Commission disregarded this limitation, holding it could decide the claims if they are characterized as violations of the Shipping Act.  The Commission's own precedent recognizes that this approach renders the statutory prohibition meaningless, and the Commission failed entirely to perform the analysis its precedent requires as to whether the claims were nonetheless inherently contractual in nature.  MCS Industries' claims were expressly premised on alleged contractual breaches, and a veneer of Shipping Act verbiage does not give the Commission jurisdiction over them.

*Second*, the Commission's exercise of jurisdiction violated the Federal Arbitration Act, 9 U.S.C. §§ 1, *et seq*., because it failed to give effect, or even any weight, to the express agreement of the parties that all claims arising out of their contracts were to be arbitrated.   Again, the Commission started and stopped its analysis by announcing a supposed duty to decide any allegation of a Shipping Act violation, ignoring abundant precedent that arbitration clauses encompass federal claims and cannot be ignored by federal agencies.

*Third*, faced with Mediterranean Shipping's assertion, supported by the advice of Swiss counsel and the analysis of Swiss legal scholars, that it was prevented under the criminal law of Switzerland from complying with a discovery order without the authorization of the Swiss government, the Commission ignored the express requirement of the Shipping Act that in such a case "the Commission *shall*

3

immediately notify the Secretary of State," who "*shall* promptly consult" with that country "for the purpose of assisting the Commission in obtaining the information or documents." 46 U.S.C. § 41108(c)(2).  The Administrative Law Judge overseeing the case ("ALJ") initially agreed to government-to-government procedures under the Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters ("Hague Procedures") to implement the statutory mandate and resolve the conflict.   JA _____ [ROA 44 at 1].   And after a Swiss court, based on incomplete information provided by MCS Industries, ruled erroneously that the Hague Procedures did not apply, JA ____ [ROA 47 at 1, 7-8], leaving Mediterranean Shipping in criminal jeopardy under Swiss law if it were to produce the documents without proper authorization from the Swiss government, *see* JA _____ [ROA 63 at 3-4], *both* parties agreed that the statute required further governmental consultations to resolve the conflict.   JA _____ [ROA 48 at 8].

The Commission, however, affirmed the ALJ's decision rejecting the positions of the parties and the Swiss government and ordering immediate production without any consultative procedures.   It did so even though Mediterranean Shipping had obtained conformation at the highest levels of the Swiss government that the Hague Procedures could and should be used.  JA ____ [ROA 59 at 6].  The Commission did not follow the mandatory language of the statute on the basis it was "reasonable" to read into it a precondition that Congress did not enact.

4

*Fourth*, disregarding the plain language of the Shipping Act requiring some form of mandatory consultations, the Commission affirmed a finding that Mediterranean Shipping was in default for not providing the discovery. It did so even though the United States Supreme Court has expressly held that a party's failure to provide discovery due to a foreign blocking statute is not a legitimate basis for defaulting a party that has no choice but to comply with the foreign laws to which it is subject. *Société Internationale Pour Participations Industrielles Et Commerciales v. Rogers*, 357 U.S. 197, 212 (1958). The Commission did not acknowledge the substantial production not subject to the Swiss blocking statute that Mediterranean Shipping had made before the order issued or make any assessment of the value of the outstanding discovery to assess if a lesser sanction than default was warranted. The default judgment was contrary to law and an abuse of discretion.

This Court should grant the petition for review, vacate the default judgment, and order the Commission to dismiss the underlying proceeding for lack of jurisdiction. If the Court determines that the Commission does have jurisdiction, it should likewise vacate the default judgment and order the Commission to undertake consultations under 46 U.S.C. § 41108(c)(2) or use the Hague Procedures. The Court should also rule that the Shipping Act does not provide a cause of action for discrimination between shippers as to service contracts.

## STATEMENT OF THE CASE

**A.**    **The Claims in the Underlying Agency Proceeding**

**1.**    **The Original Complaint**

Mediterranean Shipping, a vessel operating "ocean common carrier" under the Shipping Act, 46 U.S.C. § 40102(18), transports goods by sea in container vessels it owns, charters, and operates.  MCS Industries and Mediterranean Shipping entered into a "service contract" as defined by the Act, 46 U.S.C. § 40102(21), that was effective as of May 1, 2021 (the "2021 Contract").  JA ____ [ROA 1 at ¶ 40]. Under the 2021 Contract, MCS Industries committed to offer a certain minimum quantity of cargo for shipment by Mediterranean Shipping from China to the United States at the contract rate.  JA ___ [*Id.* at ¶ 41]. The 2021 Contract provides that "[a]ny disputes arising out of or in connection with" the contract were to be resolved by binding arbitration.  JA ___ [ROA 31 at 12-13].[1]

In late July 2021, when international ocean shipping was subject to significant disruptions due to the Covid pandemic, MCS Industries filed a private damages ("reparations") action at the Commission alleging that Mediterranean Shipping had violated the Shipping Act by improperly refusing between May and July 2021 to provide "more than approximately one-third... of the allotted space" for carriage of

---

[1] The Amended Complaint added to the case a service contract from May 2020 to April 2021 (the "2020 Contract") that contains an identical clause.  JA ____ [ROA 38 at 6].

its cargo under the 2021 Contract.   JA _____ [ROA 1 at ¶ 42].   The Complaint

invoked the Shipping Act, but its central allegation was that Mediterranean Shipping

breached the contract so it could sell space at higher spot market rates.   JA _____ [*Id.*

at 11-12].   The Complaint alleged that Mediterranean Shipping had colluded with

other carriers to force MCS Industries to ship its cargo at higher rates, claims that

were later dropped entirely.   JA _____ [ROA 1 at ¶¶ 4, 7, 11, 16-17].

On investigation Mediterranean Shipping found that MCS Industries had not

attempted to book the cargo it claimed Mediterranean Shipping had not carried,

except for a handful of bookings made too late or under the wrong contract.

Mediterranean Shipping thus decided to defend the suit vigorously.   It answered the

complaint and provided all the documents it had concerning the negotiation of the

2021 Contract and the disputed shipments, with the goal of obtaining a prompt

disposition of the case.   After the exchange of initial discovery, MCS Industries

agreed that the alleged non-carriage underlying its claims was limited to a total of

59 containers—20 containers from the port of Tianjin in May and June 2021, and 39

containers from the port of Qingdao from May through July 2021, *see* JA ___ [ROA

23 at 5-6 & nn. 6-7] (citing Master Dep. at 46:12-20, 47:4-23, 52:4-53:11), and that

it was "getting acceptable service" after July.   JA ___ [*Id.* at 5 n. 9] (citing Master

Dep. at 141:7-8).

## 2.    The Motion to Compel and Amended Complaint

Although Mediterranean Shipping had provided all the documents in its possession as to its dealings with MCS Industries and the very narrow carriage dispute that remained, after settlement negotiations failed MCS Industries filed a motion to compel seeking information as to a wide variety of matters *unrelated* to MCS Industries and its cargo.    JA ____ [ROA 21 at 2].    These included Mediterranean Shipping's contracts and dealings with other shippers, its methods of loading and unloading vessels, and highly sensitive  financial and ownership information, that is kept strictly confidential as it is a nonpublic company.  JA ____ [ROA 23 at 40-41, 46-47, 60-63, 66-67, 71-74].  Mediterranean Shipping opposed the motion, but the ALJ granted it in full in an Order dated December 8, 2021.  JA _____ [ROA 23; 27].  That Order became a final order of the Commission on December 18, 2021, by operation of 46 C.F.R. § 502.150(d).

On December 23, 2021, MCS Industries sought leave to file an amended complaint.  JA ____ [ROA 32].  The proposed Amended Complaint dropped the collusion allegations against Mediterranean Shipping and other carriers, focusing the dispute on the bilateral contractual relationship between the parties.  JA ____ [ROA 38].  MCS Industries also changed its theory of the case to claim that Mediterranean Shipping was breaching the contracts to force MCS Industries to pay a "peak season surcharge."  JA ____ [*Id.* at ¶¶ 42-44, 47, 51-71, 87-106].  The Amended Complaint

expanded these allegations to cover the 2020 Contract, which was materially identical to the 2021 Contract except that it provided for a higher volume commitment and covered one additional port.  JA ____ [*Id.* at ¶¶ 22(a), 23-31].[2]

### B.  Mediterranean Shipping's Motion to Dismiss the Amended Complaint and Initiation of Arbitration

Mediterranean Shipping had moved to dismiss the Complaint and filed a reply that addressed new allegations in the Amended Complaint as well.  JA ____ [ROA 36].  Mediterranean Shipping noted that by expressly abandoning the earlier conspiracy and collusion allegations the Amended Complaint now inarguably raised only breach of contract claims, over which the Commission lacks jurisdiction.  JA ____ [ROA 36 at 1-2].  The ALJ denied the motion, holding that the Amended Complaint stated claims under the Shipping Act, but not addressing whether those claims were nonetheless inherently contractual and outside the Commission's jurisdiction.  JA ____ [ROA 37 at 5-6].

Pursuant to the arbitration clauses in each contract, Mediterranean Shipping thereupon commenced arbitration against MCS Industries for breach of the

---

[2] The original Complaint included a claim that Mediterranean Shipping had engaged in a "refusal to deal" claim by providing a smaller minimum quantity guarantee under the 2021 Contract than the 2020 Contract.  JA____ [ROA 1 at ¶ 30]. Discovery revealed that Mediterranean Shipping had offered nearly twice the volume MCS Industries accepted, and the Amended Complaint recasts the refusal to deal claim as a contract administration claim.  JA ____ [ROA 38 at ¶¶ 88, 97, 100-101, 104-105, 110, 112, 116-117].

minimum quantity commitments.    JA ____ [ROA 39 at 3].    In defense, MCS Industries rehashed its Shipping Act claims largely verbatim.[3]    The Arbitration was ripe given that the Commission's assertion of jurisdiction over inherently contractual claims was now clear, and because the contract year had been completed, confirming that the annual minimum quantity commitment had not been met.

### C.    The Discovery Order Triggers the Swiss Blocking Statute

Prior to the motion to compel, Mediterranean Shipping had provided full discovery as to the cargo and related bookings MCS Industries claimed Mediterranean Shipping had not carried, including identification of the persons most directly involved in these issues.    JA ____ [ROA 23 at 11].    MCS Industries conceded that this discovery covered the issues "that go to the heart of the conduct alleged," JA ____ [*Id.* at 34, 37-38, 62, 67, 73, 82], but sought to compel production as to other matters.    The ALJ ordered full production in an Order dated December 8, 2021 ("Discovery Order"), JA ____ [ROA 27].    The ALJ asked the parties for a status report, and Mediterranean Shipping advised that because the Discovery Order compelled a Swiss company to produce business records from Switzerland, it triggered Article 271 of the Swiss Criminal Code, making Mediterranean Shipping's

---

[3] JA ____ [ROA 56 at 27-28].    The arbitration also covers the 2017 and 2019 contract years; there was no contract in 2018.

compliance with the order without authorization impossible without risking criminal exposure.  JA _____ [ROA 28 at 1].

Mediterranean Shipping thereafter provided the opinion of Swiss counsel confirming that a request from the Commission to the relevant Swiss authority was necessary to allow Mediterranean Shipping to simultaneously comply with the Discovery Order and with Article 271.  JA _____ [ROA 40 at 1].  Swiss counsel advised that the use of the Hague Procedures to make this request was the best means for obtaining discovery in civil cases to assure compliance with the Swiss law, and Mediterranean Shipping requested that the Commission initiate these inter-governmental processes necessary to proceed.  JA _____ [*Id.* at 2].

### D.    The ALJ Orders Use of the Hague Procedures to Address the Swiss Blocking Statute

After receiving Mediterranean Shipping's submission, the ALJ requested a Joint Status Report.  JA _____ [ROA 43].  In that report, both parties specifically referenced the mandatory consultation process set forth in 46 U.S.C. § 41108(c)(2) for use when a carrier "has alleged that information or documents located in a foreign country cannot be produced because of the laws of that country."  JA _____ [*Id.* at 6-7].  The parties identified the use of the Hague Procedures as an efficient process to resolve the issue.  JA _____ [*Id.* at 8].  On May 4, 2022, the ALJ issued an Order authorizing the parties "to utilize the Hague Convention in seeking discovery in this case in order to comply with Swiss law and directing MCS Industries' counsel to

prepare and serve a Letter of Request to the Swiss authorities to invoke the Hague Procedures." JA _____ [ROA 44 at 1].

### E. MCS Industries' Submission of the Letter of Request and the Resulting Court Decision

Following the advice of Swiss counsel, Mediterranean Shipping advised the ALJ and MCS Industries that the Letter of Request should be directed to the Swiss Justice Office to ensure that the Swiss body that routinely handles requests under the Hague Procedures would have primary jurisdiction. JA _____ [ROA 43 at 13]. However, MCS Industries prepared and served the Letter of Request on the Court of First Instance in Geneva ("Geneva Court") nearly four weeks later, on May 31, 2022, and on the Swiss Justice Office the next day. JA _____ [ROA 45 at 1].

The request did not provide any detail regarding the nature of Commission proceedings and failed to cite directly applicable U.S. law equating them with civil judicial proceedings of the type to which the Hague Procedures apply. Because MCS Industries sent the request to the Geneva Court first, the Swiss Justice Office could not intervene and guide the Geneva Court.

On June 29, 2022, the Geneva Court denied the Letter of Request because it was sought for an administrative proceeding and thus "does not relate to a civil or commercial case and thus does not fall within the scope of application of [the Hague Convention]." JA _____ [ROA 48 at 3]. The Geneva Court decision did not rule that Mediterranean Shipping could provide any of the ordered documents without facing

criminal exposure under the Swiss blocking statute. It ruled only, based on the incomplete information on the nature of Commission proceedings provided to it, that it could not assist through the use of the Hague Procedures because it understood the Commission proceeding not to be a "civil or commercial case." JA _____ [*Id.* at 8]. The ruling thus did not address or resolve the impossible position in which Mediterranean Shipping found itself—that compliance with the order to provide documents would place it in criminal jeopardy. It merely held, erroneously, that it could not assist in resolving that jeopardy through the Hague Procedures.

On July 15, 2022, the parties filed a Joint Status Report addressing the Geneva Court Decision. JA_____ [ROA 48]. The parties agreed that further inter-governmental processes were required to resolve the criminal jeopardy Mediterranean Shipping would face if it complied with the order compelling production. The parties requested the ALJ invoke the 46 U.S.C. § 41108(c)(2) consultation procedures or direct the parties to re-submit to the Swiss Justice Office a properly supported request under the Hague Procedures. JA _____ [*Id.* at 2-8]. Mediterranean Shipping also detailed directly applicable and binding precedent of the U.S. Supreme Court demonstrating that the Geneva Court erred in considering a private Commission reparations proceeding not to be a "civil or commercial case" to which the Hague Procedures for judicial assistance apply. JA _____ [*Id.* at 3-8].

## F.    The Order Requiring Production of Discovery Notwithstanding the Absence of Consultations or Required Procedures

On July 29, 2022, the ALJ, contrary to the requests of both parties, issued an Order requiring production of the discovery.  JA ____ [ROA 50].  Despite the unchallenged advice of Swiss Counsel that the Swiss Blocking Statute applied to the ordered discovery, the ALJ suggested that Mediterranean did not face legal jeopardy in Switzerland because the *Commission* proceeding could not impose criminal sanctions and because the Geneva Court had ruled the Hague Procedures were inapplicable.  JA ____ [*Id.* at 3].  The July 29 Order did not address or acknowledge that the criminal exposure Mediterranean Shipping faced was under *Swiss* criminal law, and that the inapplicability of the Hague Procedures did not ameliorate Mediterranean Shipping's exposure under that law.   Nor did it address Mediterranean Shipping's showing that the Geneva Court decision was directly contrary to binding U.S. law holding that Commission reparations proceedings are equivalent to civil judicial proceedings for the relevant purposes.

## G.    Mediterranean Shipping's Continuing Efforts to Eliminate Its Criminal Exposure, Resulting in Advice From the Swiss Justice Office that the Hague Procedures Were Likely Available

On August 15, 2022, the parties filed a Joint Status Report pursuant to the ALJ 's July 29 Order.  JA ____ [ROA 51].  In this report, Mediterranean Shipping, supported again by the advice of Swiss counsel, confirmed that the Geneva Court's decision did not resolve its legal jeopardy under Swiss law.  Swiss counsel explained

14

the risk comes from the production itself and that the ALJ was thus incorrect to suggest it did not exist if the underlying proceeding is not criminal or cannot impose criminal sanctions.  JA ____ [*Id.* at 4-5].  Indeed, the Hague Procedures required to avoid this risk apply only to "civil or commercial" proceedings.

Mediterranean Shipping advised the ALJ and MCS Industries that Swiss counsel had contacted the Swiss Justice Office to obtain authoritative confirmation that the Hague Procedures were in fact available.  JA ___ [*Id.* at 5].  Mediterranean Shipping committed to revert immediately upon receiving advice from that Office and to consult with MCS Industries as to how best to move forward in accordance with that advice.  JA ___ [*Id.*].

On August 25, 2022, Mediterranean Shipping sought an extension of time to comply with the discovery order while it continued its attempts to obtain prompt advice from the Swiss authorities, which included contacting the International Mutual Legal Assistance Division of the Swiss Justice Office to stress the urgency of the matter, and so that it could comply with the procedures necessary for production.  JA ____ [ROA 52 at 2].  Less than two weeks later, Mediterranean Shipping filed a notice advising the ALJ and MCS Industries that the Swiss Justice Office had issued the advice it had requested, attaching the advice along with a translation.  JA ____ [ROA 54].

15

The advice directly supported Mediterranean Shipping's proposal that the request for judicial assistance should be resubmitted to the Swiss Justice Office to obtain a correct assessment that the Hague Procedures were available, and stated that a formal ruling would be forthcoming. JA _____ [*Id.* at 1-2]. Two days later the ALJ denied the extension request, stating no weight would be given to the Swiss authorities' position because it was inconclusive, and ordered Mediterranean Shipping to show cause why a default decision should not be issued for failure to produce discovery. JA_____ [ROA 55].

### H. Mediterranean Shipping's Request for a Waiver of Article 271 to Allow Compliance and the Formal Decision of the Swiss Minister of Justice that the Hague Procedures Were Available and Must Be Used

Faced with the ALJ's refusal to accept the initial advice of the Swiss Justice Office and allow use of the Hague Procedures, Mediterranean Shipping tried another means of compliance, requesting a waiver to allow it to comply with the Commission's order compelling discovery without use of the Hague Procedures. Such waiver requests must be filed with the Swiss Federal Department of Justice and Police ("Swiss Authority"). Mediterranean Shipping provided notice to the ALJ and to MCS Industries that it had submitted a waiver application. JA _____ [ROA 56 at 4-7].

On October 18, 2022, Mediterranean Shipping notified the ALJ that the Swiss Authority had denied the waiver request because the "mutual legal assistance route

16

is open," and that providing discovery pursuant to the order "must therefore be made in accordance with the rules of the 1970 Hague Convention." JA ____ [ROA 59 at 6].

On November 7, 2022, the Swiss Authority issued its decision signed by the Swiss Minister of Justice, a cabinet member and one of the highest officials in the Swiss federal government. It stated unambiguously that "mutual legal assistance under the Hague Convention on the Taking of Evidence Abroad . . . is open. Contrary to the decision of 29th June 2022 of the Geneva Court of First Instance, the case is in fact a civil and commercial matter… the rejection of the request for mutual legal assistance by the Court of First Instance has no material effect (*res judicata*). A request for mutual legal assistance may be refiled in an improved form." JA ____ [ROA 63 at 3-4]. Mediterranean Shipping notified the ALJ of the decision the next day. JA ____ [ROA 61-63]. Mediterranean Shipping noted that the decision presented a path forward, and that a default judgment against it remained inappropriate for this reason and other reasons detailed in its prior response and reply with respect to the Order to Show Cause. JA ____ [*Id.*].

## I.    The ALJ Ignores the Ruling of the Swiss Government and Issues a Default Judgment

On January 13, 2023, the ALJ issued an Initial Decision defaulting Mediterranean Shipping for failure to produce the subject discovery. JA ____ [ROA 64]. The Initial Decision gave no weight to the decision signed by the Swiss Minister

17

of Justice that the Hague Procedures were available and were required to be followed to assure compliance with Article 271 of the Swiss Criminal Code. JA _____ [*Id.* at 17]. It incorrectly stated that Mediterranean Shipping has made "statements that it will not produce the required discovery," JA _____ [*Id.* at 13], when in fact Mediterranean Shipping had consistently stated it was required to obtain authorization before doing so. It also stated that Mediterranean Shipping failed to respond to discovery orders, JA _____ [*Id.* at 20-21], despite Mediterranean Shipping having diligently responded to each with efforts to identify a solution that would allow it to simultaneously comply with the Discovery Order and with Article 271 and thus avoid legal jeopardy in either forum.

The Initial Decision did not address the problem of Mediterranean Shipping's exposure to criminal sanctions under the Swiss Blocking Statute, and cited to the Geneva Court's ruling even though it had been rejected by an official ruling issued at the highest levels of the Swiss government. Rather than taking issue with the reasoning or conclusions of the written decision of the Swiss Minister of Justice, the ALJ suggested for the first time that it was the result of improper ex parte contacts, and that it was improper for Mediterranean Shipping to have sought advice from the Swiss Executive Branch. JA_____ [*Id.* at 17]. Mediterranean Shipping had repeatedly disclosed without objection its efforts to obtain the necessary clarification

from the relevant Swiss authorities and had followed the advice of Swiss counsel as to how to proceed.  *See* pp. 14-17, *supra*.

The Initial Decision did not discuss or address the statutory consultation process required under the Shipping Act, or acknowledge that MCS Industries itself had asked it be used even after the Geneva Court's ruling.  JA _____ [ROA 64 at 17]. It also incorrectly stated that the ALJ had been asked "to resolve a conflict between the judicial and executive branches in Switzerland," JA _____ [*Id.*], but the ruling of the Geneva Court in no way precluded complying with the ruling of the Swiss Minister of Justice.

The Initial Decision did not discuss any alternative sanctions short of default or analyze in any meaningful way the importance of the discovery at issue to the issues in the case.  It incorrectly stated that Mediterranean Shipping "failed to respond at all" to twelve categories of evidence or provide answers to certain interrogatories when in fact much of that evidence had been provided, that Mediterranean Shipping sought to "relitigate the relevance of the discovery ordered," when it instead sought to show under the legal standard applicable to default judgments that default was not warranted given the substantial discovery it had provided.

The Initial Decision assumed that MCS Industries was prejudiced by delay, but there was no evidence of prejudice in the record.  Mediterranean Shipping had

19

obtained a correction of the Geneva Court's ruling as promptly as possible. Had the Letters of Request been properly submitted to begin with in May 2022, or resubmitted in July 2022 as Mediterranean Shipping proposed, the following months could have been spent obtaining authorization and providing the discovery rather than litigating a default.

Finally, the Initial Decision did not require MCS Industries to provide any proof as to its claimed damages, instead awarding them based solely on the allegations in the Amended Complaint. JA ____ [*Id.* at 22-23].

### J.    The Commission's Decision Affirming the Default

The Commission adopted the ALJ's findings and conclusions as to the default in all material respects, adding very little reasoning of its own except to reject contentions that Mediterranean Shipping had waived various arguments including as to jurisdiction. JA ____ [ROA 68 at 11]. On the jurisdictional issue, without further analyzing the nature of the claims at issue the Commission stated that it has "an obligation to address Shipping Act claims, even if the relevant facts may also give rise to other claims between the parties" or there is an arbitration clause, or a related proceeding is underway. JA ____ [*Id.* at 11-13] (citing *Cargo One, Inc. v. Cosco Container Lines Co. Ltd*, 2000 WL 1648961, at *14-15 (FMC Oct. 31, 2000) and *Anchor Shipping Co. v. Aliana Navegãao E Logística Ltda.*, 2006 WL 2007808, at *10-11 (FMC May 10, 2006)). It did not assess whether the Shipping Act claims

were nonetheless "inherently contractual" under its own *Cargo One* decision, or address any of the precedent cited by Mediterranean Shipping as to arbitrability. *See, e.g., JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163 (2d Cir. 2004) (requiring arbitration of federal antitrust claims arising out of a contract). It adopted the ALJ's conclusions as to whether the Amended Complaint stated a claim without any further analysis. JA ____ [ROA 68 at 13-14].

The Commission likewise adopted the ALJ's analysis as to the default, even while noting at various points that Mediterranean Shipping's objections had force and that it was unclear how the ALJ had addressed various parts of the three-part test for default the Initial Decision purported to apply. JA ____ [*Id.* at 16-23]. The Commission did not address Mediterranean Shipping's showing that it remained in jeopardy under Swiss criminal law after the Geneva Court's decision, or the ruling of the Swiss Minister of Justice that the Hague Procedures were available and should be used. JA ____ [*Id.* at 21]. The Commission declined to address the text of the statute and gave no weight to the fact that both parties had consistently maintained that further intergovernmental consultations were required by section 41108(c)(2) via the Hague Procedures or otherwise. JA ____ [*Id.* at 24]. The Commission sidestepped the issue by stating "it is reasonable to interpret the statute to require a more specific and developed showing that the documents sought actually are located in a foreign country," despite the fact that no party contested that Mediterranean

Shipping, a Swiss company based in Geneva, Switzerland, maintained its business records in Switzerland, and that the statute requires only an "allegation" not a "detailed and developed showing."  JA _____ [*Id.*].

The Commission found that the ALJ had not properly assessed damages and remanded on that issue and as to whether the default could be upheld on an alternative statutory ground.   JA _____ [*Id.*].  Following remand, the Commission held that the alternative ground supported the default, based on the same facts that supported its prior determination, and affirmed the damages award.

## SUMMARY OF ARGUMENT

The Commission lacked jurisdiction over the underlying proceeding because MCS Industries' claims, though styled in Shipping Act language, are fundamentally breach of contract claims, and the Shipping Act expressly states that the Commission has no jurisdiction over such claims.   The Commission did not apply its own precedent requiring that it analyze whether claims alleging Shipping Act violations are nonetheless "premised on the obligation to meet one's contract commitments" and thus outside its jurisdiction.   The Commission also improperly failed to give effect to the parties' agreement that claims arising out of their contract should be arbitrated, and misread the Shipping Act to hold that the Complaint stated claims for discrimination and refusal to deal.

Even assuming that it had jurisdiction, the Commission erred in entering a default on the basis of Mediterranean Shipping's inability to produce documents due to a foreign blocking statute. The Shipping Act expressly requires intergovernmental consultations to resolve the conflict in these circumstances and does not provide an exception to the mandatory statutory requirement based on asserted uncertainty as to the location of the documents. In addition to this statutory error, the Commission abused its discretion by ignoring the uncontested evidence in the record, in the form of authoritative statements of the Swiss government, that the Hague Procedures were available to resolve the impasse, and by imposing the severe sanction of default without the specific, reasoned findings this Court's precedent requires.

## ARGUMENT

## I.     STANDARD OF REVIEW

Courts must hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A). The court reviews "all relevant questions of law" de novo without deference to the agency, and must apply the "best reading" of a statute and not merely a "permissible" one "[i]n an agency case as in any other." *Loper Bright Enterprises v. Raimondo,* 144 S. Ct. 2244, 2261, 2266 (2024). The Commission's interpretations of the Shipping Act are thus reviewed de novo.

23

An order of default is reviewed for an abuse of discretion and the review must be "a thorough, not a cursory, one." *Webb v. District of Columbia*, 146 F.3d 964, 971-72 (D.C. Cir. 1999). There must be "a specific, reasoned explanation for rejecting lesser sanctions." *Id.*   An error of law is "by definition" an abuse of discretion. *Koon v. United States*, 518 U.S. 81, 100 (1996).

## II.    THE COMMISSION LACKED JURISDICTION OVER THIS ACTION

### A.    MCS Industries' Claims Are Inherently Contractual in Nature and Jurisdiction Over Them is Accordingly Barred by 46 U.S.C. § 40502(f).

46 U.S.C. § 40502(f), formerly Section 8(c) of the Act, provides that "[u]nless the parties agree otherwise, the exclusive remedy for a breach of a service contract is an action in an appropriate court."  The parties here have not agreed otherwise; to the contrary, they have expressly agreed to arbitration of "[a]ny disputes arising out of or in connection with" their service contracts.  Commission precedent required it, when applying this jurisdictional limitation, to examine "whether a complainant's allegations are inherently a breach of contract, or whether they also involve elements peculiar to the Shipping Act and thus rebut the presumption that the claim is no more than a simple contract breach claim."  *Cargo One*, 2000 WL 1648961, at *14; *see also Western Overseas Trade and Dev. Corp. v. ANERA*, 26 S.R.R. 874, 884 (FMC 1994) (barring claims "couched in terms of alleged violations of the 1984 Act" that are "really breach of contract claims").  In *Cargo One*, the Commission held that

"for [46 U.S.C. § 40502(f)] to have meaning, it must have been intended to preclude the filing of some complaints of Shipping Act violations, and not just breach of contract claims, as such claims would not be actionable before the Commission in any event." 2000 WL 1648961, at *14. The Commission has thus held that claims "premised on the obligation to meet one's contract commitments" are "outside its jurisdiction." JA ____ [*Id.*].

The Commission's decision in this case directly violates the statutory command and fails to follow its own *Cargo One* precedent. It does not analyze whether the claims are inherently contractual, but simply recites the truism that conduct that might be a breach of a service contract can also be a violation of the Shipping Act. *See* JA ___ [ROA 68 at 13-14] (stating that "this FMC matter is not a breach of contract action," and referring to the Commission's "obligation to address Shipping Act claims, even if the relevant facts may also give rise to other claims"). The Initial Decision likewise simply referred to allegations of "practices that violate the Shipping Act." JA ____ [ROA 64 at 15-16]. But this is the beginning of the inquiry, not the end of it: Under *Cargo One*, even if allegations state a Shipping Act claim, they are outside the Commission's jurisdiction if they are nonetheless inherently contractual, and a complainant cannot avoid the jurisdictional bar by dressing up contractual claims in "Shipping Act verbiage." 2000 WL 1648961, at *14; *Western Overseas Trade and Dev. Corp.*, 26 S.R.R. at 1248. If all

25

that were needed was to plead a Shipping Act claim, the statutory bar would have no independent meaning, as the Commission itself noted in *Cargo One*.  2000 WL 1648961, at \*14.  This result is contrary to law.  *See*, *e.g., United States v. McGoff*, 831 F.2d 1071, 1080 (D.C. Cir. 1987) (courts must "assume that Congress intended that language which it chose to employ actually was to have meaning.").

Had the Commission undertaken the required analysis to determine whether MCS Industries' claims were "premised on" contractual obligations, it should readily have concluded that those claims fall squarely within the jurisdictional prohibition.  Each is expressly based on alleged breaches of contract.  The unreasonable practices claim of Count I alleges that Mediterranean Shipping breached its contracts to carry MCS Industries' cargo as a "condition" of an improper purpose, stated in the original complaint as forcing MCS Industries to pay spot market prices and in the amended complaint as coercing the payment of peak season surcharges.[4]  Mediterranean Shipping's alleged failure to perform its contractual duties to achieve these results was both central and necessary to these claims, as

---

[4] *See* JA ___ [ROA 32 at ¶ 9 (describing the peak season surcharges as an effort by Mediterranean Shipping to allegedly "condition its compliance with its contractual service commitments on extracting additional payments from Complainant."); ¶ 42 (alleging a supposed "practice of demanding a premium as a precondition to performing its contractual obligations."); ¶ 55 ("scheme to condition Mediterranean Shipping's performance under the Service Contracts upon Complainant's agreement to pay PSS"); ¶ 104 (same)].

shown by the repeated allegations that the contractual breaches were a "condition" or "precondition" of the violations.[5]  Count II claims that Mediterranean Shipping failed to provide service pursuant to filed agreements, i.e. the service contracts, because it allegedly breached them.[6]  The claim thus on its face alleges nothing other than breach of the filed agreements.  Counts III and IV allege that Mediterranean Shipping discriminated against MCS Industries in the performance of the contract as those breaches did not exist for other shippers, and Count V alleges that Mediterranean Shipping unlawfully refused to deal with MCS Industries by refusing to carry cargo it was contractually obligated to carry and by certain acts of contract administration.[7]  The Commission cannot exercise jurisdiction over claims so inherently based on alleged breach of contract whether or not they also state Shipping Act claims.

The original complaint could have been construed as going beyond a simple breach of contract in making repeated allegations of concerted, collusive, and parallel activity among carriers.  JA ___ [ROA 1 at ¶¶ 4-7, 11, 15-17].  However, the Amended Complaint drops all such allegations, and thus makes clear that it is based solely on the parties' contractual relationship.  MCS Industries has described

---

[5] *Id.*

[6] *See* JA ___ [ROA 32 at ¶¶ 109-110].

[7] *See* JA ___ [*Id.* at ¶¶ 115-116].

Mediterranean Shipping as engaging in "a course of unjust and unreasonable conduct in which it failed to provide the agreed space for [MCS Industries'] cargo on its ships and unreasonably refused to deal or negotiate with MCS Industries in that connection, in violation of the Shipping Act." JA ___ [ROA 23 at 14]. All of these claims depend fundamentally on allegations of breach of contract and are thus outside the Commission's jurisdiction.

A closely analogous case, *Global Link Logistics, Inc. v. Hapag-Lloyd AG*, 2014 WL 5316345, at *20 (ALJ April 17, 2014), held that claims alleging a "failure to address the [minimum quantity commitment] shortfall under the service contract" and other contract administration issues, were "inherently contract claims reserved for the arbitrator and are not within the Commission's jurisdiction to decide." MCS Industries' claims are likewise directly based on Mediterranean Shipping's alleged failure to carry cargo it was contractually committed to carry. Mediterranean Shipping cited *Global Link* to both the ALJ and the Commission, and each failed to mention, much less distinguish, the case.

The service contracts are not merely background or incidental to MCS Industries' allegations; they are fundamental to the claim that Mediterranean Shipping was "coercing surcharges" by otherwise refusing to perform its contractual obligation and "preferring higher priced cargo" by allegedly not carrying cargo at lower contract rates. These are claims directly "premised on the obligation to meet

28

one's contract commitments" and expressly barred by *Cargo One*. *See Cargo One*, 2000 WL 1648961, at \*14-15 (dismissing claims on that ground).

Nor is this a case in which the service contracts between MCS Industries and Mediterranean Shipping are merely referenced in the Amended Complaint, or where Mediterranean Shipping argued that merely having a contractual relationship with MCS Industries precluded any Shipping Act claim arising out of that relationship. *See id.* at \*5 (noting the argument that the claims "only incidentally are couched in the context of a service contract"). Here the Shipping Act claims cannot be maintained absent the allegation that Mediterranean Shipping did not fulfill its contractual commitments. Allowing the claims to go forward in this posture would read 46 U.S.C. § 40502(f) entirely out of the Act.

The inherently contractual nature of MCS Industries' claims is further supported by the fact that its reparations claim is calculated as the difference between (a) the rates it alleges it would have paid had contractually allocated space been provided and (b) the higher rates it allegedly had to pay in the spot market when that space was not provided. This is the classic measure of damages for breach of contract. *See* Restatement (Second) of Contracts § 347 (stating that "[c]ontract damages are ordinarily based on the injured party's expectation interest"); *and id.* at § 344(a) (defining "expectation interest" as the "interest in having the benefit of his

29

bargain by being put in as good a position as he would have been in had the contract been performed").

Finally, this case is unlike those in which the Commission has held that a claimant successfully rebutted "the presumption that the claim is no more than a simple contract breach claim." *See Cargo One*, 2000 WL 1648961, at *14. Those cases either held that conduct beyond a simple allegation of breach could also independently serve as the basis for a Shipping Act violation or sought to invalidate the exercise of a contract provision as unreasonable. *See*, *e.g.*, *Tractors and Farm Equipment Limited v. Cosmos Shipping Co., Inc.*, 1992 FMC LEXIS 86, at *36-37, 42 (ALJ Nov. 23, 1992) (complaint included allegations of improperly preparing shipping documents and altering bills of lading with false information); *Greatway Logistics Group, LLC v. Ocean Network Express PTE, Ltd.*, 2021 WL 3090768 at *1 (ALJ July 16, 2021) (independent claims related to "actions undertaken . . . to collect certain freight, demurrage, and storage charges from a non-party" to the contract). Here, as in *Global Link Logistics*, the claims are predicated on contract violations and not on the asserted invalidity of the contract provisions themselves. *See also DNB Exports LLC, and AFI Elektromekanik Ve Elektronik San. TIC. Ltd. STI v. Barsan Global Lojistiks Ve Gumruk Musavirligi A.S., Barsan Int'l, Inc., and Impexia, Inc.*, 2011 WL 7144017 at *1, 4-5 (ALJ July 7, 2011) (same). MCS Industries does not allege improper preparation and falsification of shipping

30

documents as in *Tractors and Farm Equipment* or require interpretation of demurrage and detention practices for adherence to Shipping Act requirements as in *Greatway* or similar cases. The claims are simply breach of contract claims "couched in terms of alleged violations of the 1984 Act," which, as held in *Western Overseas Trade and Dev. Corp.*, are outside the Commission's jurisdiction.

### B. MCS Industries' Claims Are Separately Barred by the Federal Arbitration Act as the Parties Agreed to Arbitration as the Exclusive Forum for "[A]ny Disputes Arising Out of or in Connection With" Each of their Service Contracts

There is no dispute that each of the service contracts that underlie this action contains a valid arbitration clause that requires "[a]ny disputes arising out of or in connection with" the contracts at issue to be resolved by binding arbitration. Indeed, MCS Industries and Mediterranean Shipping are currently arbitrating the contractual issues on which the Shipping Act claims the Commission has improperly exercised jurisdiction over depend. Federal appellate precedent establishes that noncontractual claims, including claims for violation of a federal statute, fall within such a broad arbitration clause if they arise out of or are in connection with a contract. The Commission thus wholly ignored the limitations placed on its jurisdiction by the "federal policy favoring the liberal enforcement of arbitration clauses," which "applies with particular force in international disputes." *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 654 (2d Cir. 2004).

31

In *JLM Indus. v. Stolt-Nielsen*, the Second Circuit held that antitrust claims that depended on a showing of breach of contract were required to be arbitrated pursuant to a clause that, like the clause in the contracts at issue in this proceeding, required arbitration of "any dispute, controversy or claim arising under or in connection with" the agreement.  387 F.3d at 172.  Arbitration was ordered in that case despite the strong federal policies expressed in the antitrust laws; indeed, the claims in that case arose out of a price fixing conspiracy that the Justice Department prosecuted criminally.

Recognizing and giving force to an arbitration clause as required under the Federal Arbitration Act thus in no way suggests that Shipping Act claims that may overlap with contractual claims are unimportant; it merely requires that these claims be considered in the proper forum.  *See also Mehler v. Terminix Int'l Co.*, 205 F.3d 44, 50 (2d Cir. 2000) ("[I]t is clear that we have not limited arbitration claims to those that constitute a breach of the terms of the contract at issue."); *Genesco, Inc. v. T. Kakiuchi Co.*,815 F.2d 840, 846 (2d Cir. 1987) ("If the allegations underlying the claims 'touch matters' covered by the parties' sales agreements, then those claims must be arbitrated, whatever the legal labels attached to them.") (citation omitted).

*Stolt-Nielson* required arbitration of antitrust claims arising out of the parties' contractual relationship even though the plaintiff in that case contended that it was damaged by a "conspiracy which was formed *independently* of the specific

32

contractual relations between the parties." *Stolt-Nielsen*, 387 F.3d at 175.  The plaintiff "could not have suffered these damages if it had not entered into the . . . contracts," and therefore the claims were arbitrable.  That is exactly the case here, where MCS Industries' allegations all depend on allegations of breach of contract.

Finally, where claims are asserted to be subject to arbitration, any ambiguity must be resolved in favor of arbitration.  *Hartford Acc. and Indem. v. Swiss Reinsurance*, 246 F.3d 219, 227 (2d Cir. 2001); *see also AT&T Technologies, Inc. v. CWA*, 475 U.S. 643, 650 (1986) (arbitration "should not be denied "unless it may be said with *positive assurance* that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute"") (emphasis added) (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582-583 (1960)).

The Commission did not address any of this precedent, and simply referred to its "obligation to address Shipping Act claims."  JA ___ [ROA 68 at 12] (citing *Anchor Shipping*, 2006 WL 2007808, at *10-11).  But just as a federal court's jurisdiction over federal antitrust claims yields to the Federal Arbitration Act when those claims arise out of or are in connection with a valid arbitration agreement, so too may parties agree to arbitrate contractual claims that may also implicate Shipping Act claims.  In *Duke Power Co. v. FERC*, an agency was permitted to address a claim that contract terms themselves violated the agency's rules, but this Court cautioned that in recognizing that exception "we do not give the Commission a

license to disregard mandatory arbitration clauses in routine contract disputes." 864 F.2d 823, 831 (D.C. Cir. 1989). Here, the Commission did just that in assuming jurisdiction over claims arising out of the allegation that contract terms of unquestioned validity were breached.

## III.   THE COMMISSION ERRED IN HOLDING THAT THE AMENDED COMPLAINT STATED VALID SHIPPING ACT CLAIMS

In addition to the jurisdictional bar, a default judgment is not proper if no claim has been properly stated. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss," and determining whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The implausibility of MCS Industries' claims is confirmed by the fundamental incompatibility of its two basic theories. It has alleged that Mediterranean Shipping breached its contracts in order to force MCS Industries into the spot market or, alternatively, to coerce MCS Industries to pay peak season surcharges. Under the terms of the service agreements, however, Mediterranean Shipping cannot impose a peak season surcharge unless both parties agree to it, and the contract may be terminated on 30 days' notice if a surcharge is proposed and not agreed to. *See* JA _____ [ROA 65 at 33].

If Mediterranean Shipping wanted to force MCS Industries out of the contract it could have simply terminated the agreement after the surcharge was not agreed to.

34

MCS Industries would then have had to pay spot market prices for that volume, to Mediterranean Shipping or another carrier, or enter into a new contract with Mediterranean Shipping or another carrier.  There would have been no need for the elaborate "scheme" MCS Industries hypothesizes.  And given the differential between spot and contract prices at the time referenced in the Amended Complaint, that strategy would have been far more remunerative than "coercing" a surcharge.

The Amended Complaint fails to state a claim on specific statutory grounds as well.

### A.    The Commission Erred in Holding That the Act Allows a Claim of Discrimination Against a Shipper for Carriage Under a Service Contract

The plain language of the Shipping Act establishes that, as to contract carriage as opposed to carriage under a tariff, the Shipping Act does not permit claims of discrimination among shippers.  As to service contracts it only recognizes claims of discrimination directed against ports.  For service pursuant to a service contract, 46 U.S.C. § 41104(a)(5) prohibits discriminatory practices *only* "in the matter of rates or charges with respect to any port," and the plain language of § 41104(a)(9) prohibits "any undue or unreasonable preference or advantage" or "any undue or unreasonable prejudice or disadvantage" *only* "with respect to any port."  Claims of discrimination among shippers can be pursued only for carriage under a tariff, not a service contract.  *Compare* 46 U.S.C. §§ 41104(a)(4) and (8) (for tariffs, prohibiting

"any" discrimination and "any" unreasonable preference or disadvantage) *with* 46 U.S.C. §§ 41104(a)(5) and (9) (for service contracts, prohibiting discrimination and unreasonable preference or disadvantage only "with respect to any port").

Limiting discrimination claims under service contracts to ports only, and not to shippers, was a key part of the deregulatory reforms enacted by the Ocean Shipping Reform Act of 1998, Pub. L. 105-258 ("1998 Act"), which amended the Shipping Act to allow shippers to enter into confidential individual contracts with differing, and thus inherently discriminatory, terms. The legislative history confirms this deregulatory limitation to protect only ports, and not shippers, from unjust discrimination and undue or unreasonable preference, advantage, prejudice, or disadvantage as a result of common carrier service contracts. *See Global Link Logistics*, 2014 WL 5316345, at *2 (ALJ April 17, 2014) ("The Act permits a common carrier to charge different rates to similarly situated shippers in service contracts"); *id.*, at *59-63 (discussing the legislative and regulatory history). As explained in the Senate report accompanying the final bill:

> [t]he Committee intends the application of these prohibitions to a locality to be limited to circumstances in which the prohibited actions are **clearly targeted at a locality, not to circumstances where the actions are targeted at a particular shipper or ocean transportation intermediary which happens to be associated with that locality."**

S. Rep. No. 61, 105th Cong., 1st Sess., at 28 (1998) (emphasis added). The lead sponsor of the bill in the Senate confirmed the point during the Senate floor consideration:

> The most significant benefit of S. 414 is that it will provide shippers and common carriers with greater choice and flexibility in entering into contractual relationships for ocean transportation and intermodal services. It accomplishes this through seven specific changes to the Shipping Act of 1984. . . It eliminates the requirement that similarly situated shippers be given the same service contract rates and service conditions. **It eliminates the current restrictions on individual common carriers engaging in discriminatory, preferential, or advantageous treatment of shippers…**

144 Cong. Rec. 6109, 6124 (April 21, 1998) (statement of Sen. Hutchinson) (emphasis added).

The Amended Complaint asserts an unfair disadvantage "with respect to the ports for which MCS [Industries] contracted with [Mediterranean Shipping]," JA ___ [ROA 38 at ¶¶ 19-20], but these allegations merely parrot the language of the statute, which is not enough. *See DIRECTV, Inc. v. Hoa Huynh*, 503 F.3d 847, 854 (9th Cir. 2007) (allegations "parrot[ing] the language" of the relevant statute were "not well-pleaded facts" but simply "legal conclusions"). MCS Industries does not allege or provide any facts in support of any allegation of discrimination directed at ports, but merely alleges that it was disadvantaged as a shipper at certain (non-U.S.) ports. *See* JA ____ [ROA 34 at 14] ("Respondent undertook a practice of failing to

provide contracted space allocations **to MCS [Industries**], and, upon information and belief, **to other shippers**, at certain of the ports identified in its service contracts in order to be able to sell that space from those ports on a spot-market basis at higher prices.")(emphasis added). *See* also JA ___ [ROA 38 at ¶ 90] (alleging Mediterranean Shipping engaged in unlawful discrimination "in connection with" multiple ports, not directed at multiple ports).

The Commission nonetheless allowed the discrimination claims to go forward in this case on the basis that the alleged discrimination involved voyages over particular ports, without requiring that the discrimination be directed against a port. Allowing discrimination claims involving service contracts to proceed simply because a port is involved would negate the limitations imposed by 46 U.S.C. §§ 41104(a)(5) and (9), a key reform in the 1998 Act, because a U.S. port is necessarily involved in every matter under the Commission's jurisdiction.

The Commission's error on this point is significant to the default finding because much of the discovery that is subject to the blocking statute dispute seeks information as to supposedly more favorable treatment given to other shippers. Under a proper reading of the statutory prohibitions, that discovery is not relevant and could not properly be considered in assessing sanctions.

**B.    The Commission Erred in Holding That the Complaint Stated a Refusal to Deal Claim**

The Amended Complaint alleges that Mediterranean Shipping refused to deal by refusing to carry MCS Industries' cargo and as to various matters of contract administration.  Again, these allegations simply state breaches of contract outside the Commission's jurisdiction.  The Amended Complaint also alleges that Mediterranean Shipping did not contract for the minimum cargo quantity MCS Industries "needed," *see* JA ___ [ROA 38 at ¶ 7], but the Shipping Act does not guarantee the right to enter into a contract to begin with, much less a contract with any specific terms. *See New Orleans Stevedoring Company v. Port of New Orleans*, 29 S.R.R. 345, 352 (I.D. 2001), *adopted* 29 S.R.R. 1066, 1071 (FMC 2002), *aff'd mem.*, 80 Fed. App'x 681 (D.C. Cir. 2003).  "A refusal to deal allegation requires more than that a request is denied." *Maher Terminals, LLC v. Port Authority of New York and New Jersey*, 2015 WL 435475, at *23 (FMC Jan. 30, 2015).  *See MAVL Capital Inc. v. Marine Transport Logistics, Inc.*, 2020 WL 13512925, at *9 (FMC Oct. 29, 2020) (Commission affirmance of dismissal of unsupported refusal to deal claim).  And here of course Mediterranean Shipping did enter into two contracts with MCS Industries. *See Chilean Nitrate Sales Corp. v. San Diego Unified Port District*, 24 S.R.R. 1314, 1318 (1988) (dismissing unsupported refusal to deal claim and

39

holding that the Commission did not have to address whether the refusal to deal or negotiate was unreasonable if there was no refusal).[8]

## IV. CONSULTATION UNDER 41108(C)(2), NOT DEFAULT, IS THE PROPER COURSE FOR RESOLVING THE DISCOVERY ISSUE THAT UNDERLAY THE INITIAL DECISION

There is no dispute in the record that under Swiss law use of the Hague Procedures is required for compliance with Section 271 of the Swiss Criminal Code, and that without use of these procedures Mediterranean Shipping would be in criminal jeopardy under Swiss law if it complied with the discovery order. Mediterranean Shipping provided several opinions of Swiss counsel to that effect, and the conclusion has been confirmed at the highest levels of the Swiss government. When such a "blocking statute" is alleged in response to an order compelling discovery, the Shipping Act requires government-to-government consultations. *See* 46 U.S.C. § 41108(c)(2). MCS Industries itself has repeatedly submitted that these consultation procedures are the mandatory and proper avenue for addressing the discovery at issue. *See*, *e.g.*, JA ___ [ROA 43 at 7] (Mediterranean Shipping's

---

[8] In addition, MCS Industries' transportation manager admitted in deposition testimony, and MCS Industries' own documents confirm, that MCS Industries took only about half of the contractual space Mediterranean Shipping offered it for the 2021 contract year, choosing instead to contract with other carriers, so the allegation the Mediterranean Shipping unreasonably refused to deal or negotiate in good faith to give MCS Industries the volume of service contracts that it "needed," is contrary to a known and incontrovertible fact in the record before the Commission. *See* JA ____ [ROA 31 at 11-12].

"invocation of Swiss law in defense of its failure to comply with the December 8 Order necessarily implicates Section 41108(c)(2), which *requires* the Commission to 'immediately notify the Secretary of State of the failure to comply and of the allegation relating to foreign laws' so that 'the Secretary of State shall promptly consult with the government of the nation within which the information or documents are alleged to be located for the purpose of assisting the Commission in obtaining the information or documents.") (emphasis in original).

The Initial Decision did not address § 41108(c)(2), incorrectly considered use of the Hague Procedures to have been precluded by the Geneva Court decision, and incorrectly disregarded the ruling of the Swiss Minister of Justice on the basis that it was a decision of the Swiss Executive Branch, not the judicial branch, even though the Shipping Act expressly requires government-to-government consultations when a foreign blocking statute is at issue. In adopting these conclusions, the Commission found it "reasonable" not to engage in consultations because Mediterranean Shipping had supposedly not made a sufficient showing that the documents were in Switzerland or made its position clear. JA ____ [ROA 68 at 24]. The Commission also suggested obliquely that Mediterranean Shipping had waived the issues by not appealing the scope of the discovery order. JA ____ [*Id.* at 23].

The Commission's conclusion was not based on the language of the statute, which it barely referenced. The statute states plainly and expressly that the

41

Commission "**shall** immediately notify the Secretary of State" whenever a carrier "alleges" that information or documents located in a foreign country cannot be produced because of the laws of that country" and that "the Secretary of State **shall** promptly consult with the government" of that country. 46 U.S.C. § 41108(c)(2) (emphasis added). The word "shall" is mandatory, and it is not "reasonable" to construe it otherwise, even assuming agencies still had the authority to adopt "reasonable" or "permissible" constructions of statues rather than the best ones, and that courts were still required to defer to them. *See Loper Bright*, 144 S. Ct. at 2266.

Nor is there any requirement in the statute that the carrier do more than "allege" the conflict, or any basis in the statute for the Commission's suggestion that Mediterranean Shipping was somehow required to do more. In any event it did do much more. It sought a waiver from the Swiss government that was denied. It supported the allegation of a conflict with multiple opinions of Swiss counsel and respected legal academics. Faced with an erroneous decision that a Commission reparations action was not a civil proceeding under the Act, it provided an analysis based on the Supreme Court's decision in *Federal Maritime Commission v. South Carolina State Ports Authority*, 535 U.S. 743, 759 (2002) ("the similarities between FMC proceedings and civil litigation are overwhelming") that convinced the Swiss government that the Hague Procedures were available, and required to be used.

42

The Commission also referred to the "burdens that implementation of the [consultation] provision would impose on both the U.S. and foreign governments," but did not explain these in any way. Any "burdens" are compelled by the statute requiring consultation. There was no suggestion that the Swiss government was improperly burdened. To the contrary it advised that the Hague Procedures should be used, and having gone to the trouble to issue that ruling would surely have been ready to handle a resubmitted Letter of Request had the Commission authorized one.

Nor did MCS Industries argue or demonstrate that any delay resulting from the consultation procedures would be burdensome or prejudicial. To the contrary, it too urged they be used even after the Geneva Court decision, and no party requested the order requiring immediate production that the ALJ issued. The Commission simply termed as burdensome any further attempt to comply with the procedures the Swiss were requiring. Only the ALJ, and then the Commission, sought to rush things along without the proper consultation.

Were there any doubt that re-submission of a Letter of Request, as the Swiss advised, would have resolved the matter, the consultation procedure required under § 41108(c)(2) would have been the proper way to remove it. Those consultations could have readily confirmed what was apparent after the ruling of the Swiss Justice Minister, that the Swiss considered the Hague Procedures to be the proper way forward. And were they not, the consultations could have led to another solution.

43

What the statute does not permit is what the Commission did instead—impose a default judgment without following the path the Swiss advised, or consulting as to some other method of accommodating the interests of a sovereign foreign country as the Shipping Act requires.

## V.    THE COMMISSION'S AWARD OF A JUDGMENT BY DEFAULT MISAPPLIED THE LAW AND WAS AN ABUSE OF DISCRETION

### A.    No Commission or Judicial Precedent Supports Award of a Default Judgment on the Facts Presented Here

"[B]ecause disposition of cases on the merits is generally favored . . . a default judgment must be a 'sanction of last resort . . .'" *Webb v. District of Columbia*, 146 F.3d at 971 (*quoting Shea v. Donohoe Construction Co.*, 795 F.2d 1071, 1075 (D.C. Cir. 1986)).[9]  A district court may enter a default judgment only if it finds, first, by clear and convincing evidence—a preponderance is not sufficient—that the abusive behavior occurred; and second, that a lesser sanction would not sufficiently punish and deter the abusive conduct while allowing a full and fair trial on the merits." *Shepherd v. American Broadcasting Companies*, 62 F.3d 1469, 1471–1472 (D.C. Cir. 1995); *see also Tak Consulting Eng'rs v. Bustani*, Docket No. 98-13, 28 S.R.R. 581, 583 (ALJ 1998) ("The reluctance to decide by default judgments is consistent

---

[9] In considering discovery sanctions the Commission looks to the Federal Rules of Civil Procedure to supplement its own rules. *See* 46 C.F.R. § 502.12.  "Federal Rule of Civil Procedure 37(b) is the corollary to the Commission's rule on discovery sanctions (46 C.F.R. § 502.150)." *Rana v. Franklin, d/b/a/ "The Right Move," Inc.*, 2022 WL 1744905 at *4 (FMC May 25, 2022).

with the underlying philosophy regarding proceedings before administrative agencies like the Commission… to decide cases based on evidence rather than on defaults and technicalities").

Default judgments are reserved for the most extreme cases "on the spectrum of discovery misconduct," involving a complete failure to participate or a willful disobedience evidenced by the lack of any "plausible excuse for [the] failure to participate in discovery," and a "history of self-directed discovery misconduct." *Wash. Metro. Area Transit Comm'n v. Reliable Limousine Serv., LLC*, 776 F.3d 1, 6 (D.C. Cir. 2015); *Petra Pet, Inc. (a/k/a Petrapport) v. Panda Logistics Limited*; *Panda Logistics Co., Ltd. (f/k/a Panda Int'l Transportation Co., Ltd.); and Rdm Solutions, Inc.*, 2012 WL 11914702, at *2 (ALJ April 20, 2012) (default where Respondent entirely failed to participate in the proceedings). Here, by contrast, Mediterranean Shipping appeared and defended the case and participated in all proceedings, made a good faith and amply supported showing that it was unable to provide certain discovery without risking criminal jeopardy under Swiss law unless the Hague Procedures or some other authorization or waiver was obtained, and diligently attempted to invoke those procedures, culminating in a ruling by the Swiss Minister of Justice that the procedures were available and should be used. Rather than allowing them to be used however, the ALJ and the Commission peremptorily ordered Mediterranean Shipping to do what it could not do and then defaulted it.

The Commission cited no precedent issuing a default under circumstances even remotely applicable to these. To the contrary, it ignored directly applicable precedent cited to it holding that it is inappropriate to base a default on a party's inability to comply with a discovery order due to a foreign blocking statute. *See Cine Forty–Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1066-68 (2d Cir. 1979) (distinguishing circumstances where a party "makes good faith efforts to comply, and is thwarted by circumstances beyond his control for example, a foreign criminal statute prohibiting disclosure of the documents at issue" and concluding that "an order dismissing the complaint would deprive the party of a property interest without due process of law."); *Societe Internationale* 357 U.S. at 212 ("[i]t is hardly debatable that fear of criminal prosecution constitutes a weighty excuse for nonproduction, and this excuse is not weakened because the laws preventing compliance are those of a foreign sovereign."). This failure alone warrants vacatur of the default judgment. *See also Flaks v. Koegel*, 504 F.2d 702, 709 (2d Cir. 1974) (dismissal for failure to comply with discovery overturned as an abuse of discretion where "due to inability, and not to willfulness, bad faith, or any fault").

## B. The Commission Misapplied the Precedent on Which it Purported to Rely

Rather than look to any remotely analogous circumstances, the ALJ and the Commission addressed out of context the "three basic justifications [to] support the

46

use of dismissal or default judgment as a sanction for misconduct" set out in *Webb*:

(1) whether the conduct "has severely hampered the other party's ability to present

its case," (2) whether the conduct has placed "an intolerable burden" on the tribunal

in the form of delay or other accommodation; and (3) the bad faith or contumacious

nature of the conduct, making the severe sanction of dismissal or default necessary

to deter such conduct in the future.  146 F.3d at 971 (citing *Shea*, 795 F.2d at 1074-

75, 1077).  The Commission and the ALJ borrowed these terms to characterize

Mediterranean Shipping's actions, but they do not fit the facts.

### 1.    The Commission's Findings as to Prejudice to MCS Industries Were Erroneous and Inadequate

The Commission largely adopted the ALJ's conclusions on this factor, and

did not undertake any meaningful analysis of the importance of the outstanding

discovery to the resolution of the issues in the case, as would be necessary to support

a finding of "actual prejudice" to MCS Industries.  *See Shea*, 795 F.2d at 1075.  The

Commission conceded that the ALJ's discussion "about the prejudice to MCS does

not itself discuss specific types of information," JA _____ [ROA 68 at 18], but did

not undertake that analysis either.   It noted the ALJ's "exhaustive review earlier in

the Decision of more than a dozen specific categories of outstanding discovery that

she had ordered produced but Mediterranean never provided," *id.*, but that review

simply listed, incorrectly in many cases, the evidence that had not been produced

without making any effort to tie it to the specific issues in the case, discuss whether

47

sanctions short of default would suffice to cure any prejudice, or assess the effect of the substantial discovery Mediterranean Shipping had provided as to the issues MCS Industries characterized as the "heart" of its case.

For many of the "categories" referenced, Mediterranean Shipping demonstrated that it had already produced what it believed to be all responsive, non-privileged documents, other categories were mooted by the amended complaint that was filed after the discovery order, and many of the categories related to information on administrative matters of such tangential relevance such as document retention and insurance coverage policies. *See* JA _____ [ROA 56 at 13-24; ROA 58 at 10-13]. The Commission, like the ALJ, failed to deal with any of this, and thus failed to support its conclusion that the discovery at issue so "severely hampers" MCS Industries that "it would be unfair to require [it] to proceed further with its case." *See Webb*, 146 F.3d at 971.

Even more fundamentally, far from refusing to provide the discovery, Mediterranean Shipping worked diligently to provide a path forward to allow it to be provided consistent with Swiss law. The Commission complained about "delay," but Mediterranean Shipping was able to get confirmation at the highest level of the Swiss government only three months after the Geneva Court's erroneous decision that the Hague Procedures were available. The delay past that point was the result of the ALJ and the Commission's refusal to use those procedures.

48

Any claim that delay in using the procedures prejudiced MCS Industries was further undermined by MCS Industries' consistent insistence that the mandatory consultation procedures be used after the Geneva Court's ruling. The Commission brushed this off on the basis that it was not bound by MCS Industries' position and was free to disagree. JA ____ [ROA 68 at 18-19]. That may be so, but the Commission had the obligation to explain why it disagreed. Instead, it simply asserted without any support that MCS Industries was prejudiced by a delay that it itself sought. JA ____ [*Id.*]. The assertion is illogical on its face.

The ALJ and the Commission erred in relying on Mediterranean Shipping's failure to comply with the discovery order as evidence in and of itself of prejudice; that is the predicate for any discovery sanction. Again, there must be a "clear and convincing" demonstration that the outstanding discovery is essential to the claims at issue. *See Bradshaw v. Vilsack*, 286 F.R.D. 133, 141 (D.D.C. 2012) (denial of default judgment in the absence of specific, factually supported allegations of prejudice); *cf. Dubicz v. Commonwealth Edison Co.*, 377 F.3d 787, 792-93 (7th Cir. 2004) (declining to find prejudice where "case for prejudice is stated…only in the most conclusory terms" and no "particular witnesses or documents are identified").

The only category of information for which Mediterranean Shipping has not produced substantial discovery is with respect to information on cargo capacity, costs and carriage or non-carriage of cargo *unrelated* to MCS Industries. The

49

Commission made no effort to show that this information was essential to Shipping Act claims premised on Mediterranean Shipping's alleged failure to provide carriage to MCS Industries at its contracted rates. The Commission's failure to thoroughly assess the discovery already produced by the parties or the importance of the outstanding discovery also meant there was no basis for a finding that no lesser sanction could have served as an effective remedy under the "clear and convincing evidence" standard required. *Shepherd*, 62 F.3d at 1471-1472.

Finally, the delay could not, as a matter of law, have caused prejudice because "delay that merely prolongs litigation is not a sufficient basis for establishing prejudice." *See Reliable Limousine,* 776 F.3d 1 at 6-7. The Commission found this argument to "have some force," but accepted the ALJ's finding that there could be prejudice because the violations were alleged to be "continuous and ongoing." JA ____ [ROA 68 at 18-19]. However, on remand the ALJ rejected outright MCS Industries' claim for reparations beyond August 2021 on the basis they had never been sought or pled in the case, so that there was no notice of any claims after the first three months of the 2021 service contract period. JA ____ [ROA 75 at 15]. There were thus inarguably no ongoing violations in the case to be prejudiced by any delay.

### 2. The Commission's Findings as to Prejudice to the Tribunal Were Erroneous and Inadequate

The Commission found that Mediterranean Shipping caused a "burden to the system," "diverted FMC resources," and "harm[ed] the FMC's adjudicatory system" by pursuing its position that the Hague Procedures or some other means of consultation were necessary to protect it from liability under the blocking statutes. JA ____ [ROA 68 at 19-20]. The Commission concedes that Mediterranean Shipping should not be held responsible for the six-month period until the Geneva Court's ruling in July 2022 when the ALJ and the parties were pursing the Hague Procedures. JA ____ [*Id.*]. It thus faults Mediterranean Shipping for seeking to extricate itself over the next three months from the bind that ruling put it in. Mediterranean Shipping was fully open about these efforts and diligent in pursuing them. Substantial authority holds that it is inappropriate to base a default on inability to comply with a discovery order due to a foreign blocking statute, *see* pp. 44-46, *supra*, and the Commission cited no precedent to the contrary. Commission proceedings regularly stretch on well past statutory and case management deadlines, and the Commission cites no reason this action seeking damages for a limited past period required any special expedition. This factor does not support the sanction of default.

### 3.    The Commission's Findings as to Alleged Bad Faith Were Erroneous and Inadequate

The Commission found that Mediterranean Shipping acted in bad faith by not providing the ordered discovery after the Geneva court "reject[ed] the Hague Convention request as inappropriate," and by going "around the court to the Swiss executive branch" rather than seeking further judicial review in Switzerland.  JA ___ [ROA 68, at 21].  As Mediterranean Shipping has repeatedly shown, supported by the opinions of Swiss counsel and independent legal scholars, the Geneva court decision in no way resolved its criminal jeopardy under Swiss law.  The Commission never explains why there was anything improper in remedying that promptly through the Swiss Justice Minister, or why Mediterranean Shipping was obliged under Swiss law or for any other reason to appeal instead.

The Commission states that Mediterranean Shipping did not adequately support its claim that the blocking statute prevented is compliance, but it did so numerous times with authoritative opinions of Swiss counsel and Swiss legal scholars that the Commission never addressed, much less contradicted.  Nor is there any basis for the Commission's suggestion that Mediterranean Shipping's failure to take interlocutory appeals is somehow evidence of its bad faith.  The issue was not the scope of the discovery order; it is that Mediterranean Shipping cannot comply with any order compelling production without the use of the proper procedures.  Again, substantial authority holds that penalizing a party that is acting in good faith

to comply with a foreign blocking statute is an inappropriate basis for a default, and the Commission cites no authority to the contrary.

It may well be that the Commission views any invocations of foreign blocking statues as "obstructive tactics." JA _____ [ROA 68 at 22] (citing *Marine Transport Logistics*, 2023 WL 7328874, in which it likewise refused to allow use of the Hague Procedures, and in which two Commissioners issued separate statements expressing hostility to the invocation of blocking statutes). The Shipping Act is to the contrary, however. It expressly recognizes such statutes and requires consultations, of which the Hague Procedures are a form, when they are invoked. And even if the Shipping Act had not already resolved the matter by requiring consultations, the Commission's approach was far from the "delicate task of adjudication" of competing comity concerns that the Supreme Court required in *Société Nationale Industrielle Aérospatiale v. U.S. District Court*, 482 U.S. 522, 546 (1987), a case the Commission did not even reference much less deal with. The Commission's impatience with the result is not evidence of Mediterranean Shipping's bad faith.

## C.    The Commission Erred in Finding That the Delay Sanction in 46 U.S.C. § 41302(d) is an Additional Basis for a Default Judgment

The Commission cited as an alternative ground for its decision a provision of the Shipping Act allowing it to sanction parties for delaying proceedings. JA _____ [ROA 78 at 19-25]. This provision, originally designed to cover delays in investigations, has never previously been cited or used by the Commission and was

raised by the Commission sua sponte on appeal from the ALJ's default finding. There is no evidence in the text or history of the provision that it is intended to provide the Commission broad authority to order default on bases other than those that have been developed in judicial precedent.  In any event, the Commission's analysis under this provision tracks its other default analysis and is contrary to law and an abuse of discretion on the same grounds.

## VI.    CONCLUSION

The Court should grant the petition for review, vacate the default judgment, and order the Commission to dismiss the underlying proceeding for lack of jurisdiction.   If the Court determines that the Commission does have jurisdiction, it should vacate the default judgment and order the Commission to undertake consultations under 46 U.S.C. § 41108(c)(2) or the Hague Procedures as to the discovery at issue.  The Court should also rule that the Shipping Act does not provide a cause of action for discrimination between shippers.

Respectfully submitted,

*/s/ John Longstreth*

Michael F. Scanlon
John Longstreth
Christiana K. Goff
K&L Gates LLP
1601 K Street, NW
Washington, D.C. 20006
(202) 778-9000
michael.scanlon@klgates.com
john.longstreth@klgates.com
christi.goff@klgates.com

*Counsel for MSC Mediterranean*
*Shipping Company S.A.*

December 18, 2024

55

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(e)(1) because this brief contains 12,925 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

I further certify that this document complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in Times New Roman 14-point font using Microsoft Word.

*/s/ John Longstreth*
John Longstreth

Addendum

Index

| Page | Description |
|------|-------------|
| Add-1 | 5 U.S.C. § 706(2)(A) |
| Add-2 | Hobbs Administrative Orders Review Act, 28 U.S.C. §§ 2342(3)(B), 2344 |
| Add-3 | 46 U.S.C. § 40102(18) and (21) |
| Add-4 | 46 U.S.C. § 40502(f) |
| Add-5 | 46 U.S.C. §§ 41104(a)(4)-(5) and (8)-(9) |
| Add-6 | 46 U.S.C. § 41108(c) |
| Add-7 | 46 C.F.R. § 502.12 |
| Add-8 | 46 C.F.R. § 502.150(d) |
| Add-9 | *Western Overseas Trade and Dev. Corp. v. ANERA*, 26 S.R.R. 874 (FMC 1994) |
| Add-23 | *New Orleans Stevedoring Company v. Port of New Orleans*, 29 S.R.R. 345 (I.D. 2001), *adopted* 29 S.R.R. 1066 (FMC 2002), *aff'd mem.*, 80 Fed. App'x 681 (D.C. Cir. 2003) |
| Add-35 | *New Orleans Stevedoring Company v. Port of New Orleans*, 29 S.R.R. 1066 (FMC 2002), *aff'd mem.*, 80 Fed. App'x 681 (D.C. Cir. 2003) |
| Add-43 | *Chilean Nitrate Sales Corp. v. San Diego Unified Port District*, 24 S.R.R. 1314 (1988) |
| Add-50 | *Tak Consulting Eng'rs v. Bustani*, Docket No. 98-13, 28 S.R.R. 581 (ALJ 1998) |

5 U.S.C. § 706(2)(A)

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

Hobbs Administrative Orders Review Act, 28 U.S.C. §§ 2342(3)(B), 2344

§ 2342

The court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—

\*\*\*

(3) all rules, regulations, or final orders of—

\*\*\*

(B) the Federal Maritime Commission issued pursuant to section 305,[1] 41304, 41308, or 41309 or chapter 421 or 441 of title 46;

§ 2344

On the entry of a final order reviewable under this chapter, the agency shall promptly give notice thereof by service or publication in accordance with its rules. Any party aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies. The action shall be against the United States. The petition shall contain a concise statement of—

(1) the nature of the proceedings as to which review is sought;

(2 )the facts on which venue is based;

(3) the grounds on which relief is sought; and

(4) the relief prayed.

The petitioner shall attach to the petition, as exhibits, copies of the order, report, or decision of the agency. The clerk shall serve a true copy of the petition on the agency and on the Attorney General by registered mail, with request for a return receipt.

46 U.S.C. §§ 40102(18) and (21)

(18) Ocean common carrier.—

The term "ocean common carrier" means a vessel-operating common carrier.

\*\*\*

(21) Service contract.—

The term "service contract" means a written contract, other than a bill of lading or receipt, between one or more shippers, on the one hand, and an individual ocean common carrier or an agreement between or among ocean common carriers, on the other, in which—

    (A) the shipper or shippers commit to providing a certain volume or portion of cargo over a fixed time period; and

    (B) the ocean common carrier or the agreement commits to a certain rate or rate schedule and a defined service level, such as assured space, transit time, port rotation, or similar service features.

46 U.S.C. § 40502(f)

(f) Remedy for Breach.—

Unless the parties agree otherwise, the exclusive remedy for a breach of a service contract is an action in an appropriate court. The contract dispute resolution forum may not be controlled by or in any way affiliated with a controlled carrier or by the government that owns or controls the carrier.

46 U.S.C. §§ 41104(a)(4)-(5) and (8)-(9)

(a) In General.—A common carrier, either alone or in conjunction with any other person, directly or indirectly, shall not—

\*\*\*

(4) for service pursuant to a tariff, engage in any unfair or unjustly discriminatory practice in the matter of—

    (A) rates or charges;

    (B) cargo classifications;

    (C) cargo space accommodations or other facilities, with due regard being given to the proper loading of the vessel and the available tonnage;

    (D) loading and landing of freight; or

    (E) adjustment and settlement of claims;

(5) for service pursuant to a service contract, engage in any unfair or unjustly discriminatory practice against any commodity group or type of shipment or in the matter of rates or charges with respect to any port;

\*\*\*

(8) for service pursuant to a tariff, give any undue or unreasonable preference or advantage or impose any undue or unreasonable prejudice or disadvantage;

(9) for service pursuant to a service contract, give any undue or unreasonable preference or advantage or impose any undue or unreasonable prejudice or disadvantage with respect to any port;

46 U.S.C. § 41108(c)

(c) Failure To Provide Information.—

(1) Penalties.—If the Commission finds, after notice and opportunity for a hearing, that a common carrier has failed to supply information ordered to be produced or compelled by subpoena under section 41303 of this title, the Commission may—

(A) suspend any or all tariffs of the carrier or the carrier's right to use any or all tariffs of conferences of which it is a member; and

(B) request the Secretary of Homeland Security to refuse or revoke any clearance required for a vessel operated by the carrier, and when so requested, the Secretary shall refuse or revoke the clearance.

(2) Defense based on foreign law.—

If, in defense of its failure to comply with a subpoena or discovery order, a common carrier alleges that information or documents located in a foreign country cannot be produced because of the laws of that country, the Commission shall immediately notify the Secretary of State of the failure to comply and of the allegation relating to foreign laws. On receiving the notification, the Secretary of State shall promptly consult with the government of the nation within which the information or documents are alleged to be located for the purpose of assisting the Commission in obtaining the information or documents.

46 C.F.R. § 502.12

In proceedings under this part, for situations which are not covered by a specific Commission rule, the Federal Rules of Civil Procedure will be followed to the extent that they are consistent with sound administrative practice. [Rule 12].

46 C.F.R. § 502.150(d)

(d) Persons and documents located in a foreign country. Orders of the presiding officer directed to persons or documents located in a foreign country must become final orders of the Commission unless an appeal to the Commission is filed within 10 days after date of issuance of such orders or unless the Commission on its own motion reverses, modifies, or stays such rulings within 20 days of their issuance. Replies to appeals may be filed within 10 days. No motion for leave to appeal is necessary in such instances and no orders of the presiding officer must be effective until 20 days from date of issuance unless the Commission otherwise directs. [Rule 210.]

*Western Overseas Trade and Dev. Corp. v. ANERA*, 26 S.R.R. 874 (FMC 1994)



DECISION OF FEDERAL MARITIME COMMISSION

administratively final. (See 46 CFR 502.253.) Attorney's fees may also be awarded to the extent they are not already included in the amount of reparations set forth above, under the procedure prescribed in 46 CFR §502.254, if this decision and judgment are affirmed or finalized by the Commission.[6]

---

FMC
Dkt. Nos. 92-06, 92-07, 92-17, 92-18

WESTERN OVERSEAS TRADE AND DEVELOPMENT CORP. )

v. )

ASIA NORTH AMERICA EASTBOUND RATE AGREEMENT )

ALLSTATE TRADING COMPANY, *et al.* )

v. )

ASIA NORTH AMERICA EASTBOUND RATE AGREEMENT )

THAI AGRI FOODS CO., LTD., *et al.* )

v. )

ASIA NORTH AMERICA EASTBOUND RATE AGREEMENT )

PACIFIC MOTIF, INC. )

v. )                                                    Served:  April 26, 1993
                                                         Corrected:  May 13, 1993
ASIA NORTH AMERICA EASTBOUND RATE AGREEMENT )        Further Corrected:  July 9, 1993

**[10:8[8]]  Jurisdiction to determine validity of service contract.**

The FMC may determine whether a service contract is void for failure to contain meaningful service commitments. Although Section 8(c) of the Shipping Act of 1984 prohibits the FMC from considering disputes under such a contract, its determination of the contract's existence accords both with FMC precedent and with policy considerations grounded in the ramifications that a determination concerning the contract at issue could have for other, similar contracts. **Western Overseas Trade and Development Corp. v. Asia North America Eastbound Rate Agreement, 26 SRR 874 [FMC, 1993].**

**[324:8, 526:103]  Validity of service contract.**

A service contract is not entirely void even though it appears to violate the requirements of Circular Letter 1-89 by restricting the shippers' remedies to adjustment of their minimum quantity commitments. In order to avoid the chaos that would result from declaring existing contracts void *ab initio*, the Circular Letter applies only prospectively, and the FMC's implementing regulations require that rejection of service contracts occur within twenty days of their filing. The contract at issue predated both the Circular Letter and the regulations, which are therefore not applicable, and the FMC will accordingly refer the dispute to an arbitrator as the contract provides. **Western Overseas Trade and Development Corp. v. Asia North America Eastbound Rate Agreement, 26 SRR 874 [FMC, 1993].**

**[10:4[1]g, 10:8[7], 324:7, 340:5]  Validity of independent action.**

There was no unjust discrimination where individual members of the Asia North America Eastbound Rate Agreement set individual action tariff rates which were lower than the conference's service contract rates. Under the Shipping Act of 1984 and FMC precedent, members of ANERA have an absolute right to take independent action on tariff rates for commodities which are subject to ANERA service contracts. Moreover, the FMC's service contract regulations at 46 CFR §572.802(c) do not demonstrate an

---

5.    I am advised that on March 4, 1993, respondent Euro Car filed a petition seeking liquidation under the Bankruptcy Code before the United States Bankruptcy Court in Los Angeles. Although generally this filing would stay proceedings against Euro Car under 11 USC sec. 362(a)(1), in recent years the Supreme Court and various courts of appeals have held that administrative proceedings involving the exercise of police or regulatory powers and not enforcement of money judgments in courts are exempt from the cited law pursuant to 11 USC sec. 362(b)(4) and 362(b)(5).  This is so even if the agency decides in favor of a private party seeking monetary compensation.  Accordingly, in recent years three Commission proceedings were allowed to move to judgment notwithstanding respondents' bankruptcies. See Docket No. 81-57, *TAFE v. Cosmos;* Docket No. 91-50, *Robert Barry et al.;* Docket No. 92-54, *Frata Shipping PTE, Ltd. v. U.S. Eurasia Lines,* 26 SRR 666 (ALJ 1992), FMC notice, December 21, 1992.  The cases cited in these rulings are *Board of Governors v. MCorp Financial, Inc.,* 112 S Ct 459, 463-464 (1991); *U.S. v. Nicolet, Inc.,* 857 F2d 202, 207-210 (3rd Cir 1988); *N.L.R.B. v. Edward Cooper Painting, Inc.,* 804 F2d 934 (6th Cir 1986); and *E.E.O.C. v. Rath Packing Co.,* 787 F2d 318 (8th Cir 1986).  It should be noted that the instant Commission proceeding is not merely one involving a private party seeking damages but one involving enforcement of the prohibited practices provisions of the 1984 Act applicable to regulated common carriers.

WESTERN OVERSEAS TRADE AND DEVELOPMENT CORP. v. ANERA    pf

intent to treat such independent action on commodities as if it were independent action on service contracts. Differences between the rates in tariffs and service contracts do not of themselves establish unjust discrimination under the 1984 Act, as service contracts are fundamentally different from tariff rates: service contracts fix rates, whereas rates are free to fluctuate under tariffs. Further, no common source of discrimination existed (an essential element of a claim of discrimination) since the service contracts were offered by ANERA and the IA rates were not. As to the contracts at issue, complainants failed to argue persuasively either that they were entitled to the lowest possible rate absent a "most favored shipper" clause or that independent action by ANERA members rescinded the contracts. Western Overseas Trade and Development Corp. v. Asia North America Eastbound Rate Agreement, 26 SRR 874 [FMC, 1993].

**[1:22[7], 10:11[1]]** Statute of limitations.

Where certain shippers claim that they are entitled to reparations under the Shipping Act of 1984 because of individual carriers' independent action in setting tariffs applicable to commodities subject to conference service contracts, the Act's statute of limitations began running at the time of the independent action. Similarly, as to the carriers' claims for dead freight, the statute of limitations began running when the shippers failed to consign their minimum quantities of cargo under the contracts. The FMC would treat the 1984 Act's statute of limitations as jurisdictional and not subject to waiver in order to accord with its interpretation of the analogous provision in the Shipping Act of 1916. Western Overseas Trade and Development Corp. v. Asia North America Eastbound Rate Agreement, 26 SRR 874 [FMC, 1993].

*Stephen M. Uthoff* and *Terry J. Coniglio* for complainants.

*Jeffery F. Lawrence* and *David F. Smith* for respondent, Asia North America Eastbound Rate Agreement.

REPORT AND ORDER

**By the Commission:** *(William D. Hathaway, Chairman; Ming Chen Hsu[1] and Francis J. Ivancie, Commissioners.)*

These consolidated proceedings were instituted by complaints filed with the Federal Maritime Commission ("Commission" or "FMC") by various shippers ("Complainants")[2] against the Asia North America Eastbound Rate Agreement ("ANERA") alleging violations of the Shipping Act of 1984 ("1984 Act"), 46 USC app. §1709. In February and March of 1988, ANERA entered into service contracts ("Contracts") with Complainants. Pursuant to each of these Contracts, Complainants agreed to ship a certain minimum quantity of cargo in the Far East/U.S. Trades with ANERA and ANERA agreed to supply sufficient space and equipment to carry the cargo at certain fixed rates. Complainants tendered cargo under the Contracts and were assessed the contract rates therefor.

None of the Complainants met their minimum quantity commitments and ANERA, accordingly, sought payment of liquidated damages (dead freight) pursuant to Article 9(i) of the Contracts. When Complainants refused to pay the liquidated damages (dead freight), ANERA sought arbitration, pursuant to Article 17 of the Contracts.[3] Rather than accede to ANERA's arbitration demand, Complainants initiated these proceedings before the Commission.

The complaints contain three different claims: first, that the Contracts are not "service contracts" as defined by section 3(21) of the 1984 Act, 46 USC app. §1702(21), because they do not contain a meaningful service commitment on the part of ANERA;[4] second, that the filing of independent action ("IA") rates during the course of the Contracts that were lower than the rates contained in the Contracts violated sections 10(b)(6), (10), (11) and (12) of the 1984 Act, 46 USC app. §§1709(b)(6), (10), (11); and third, that ANERA's attempts to collect liquidated damages violated section 10(b)(1) of the Act, 46 USC app. §1709(b)(1).

---

1.    Commissioner Hsu's concurring opinion is attached.

2.    The complainant in Docket No. 92-06 is Western Overseas Trade and Development Corp. The complainants in Docket No. 92-07 are: Allstate Trading Company, Big Roc Tools, Inc., Coaster Company of America, 1st Oriental Food, Inc., Greenball Corporation, and Hanstai International, Inc. The complainants in Docket No. 92-17 are: Thai Agri Foods Co., Ltd., Thai World Import & Export Co., Ltd., Good World Company Limited, Savoy Enterprise Ltd. Part., Tapioca Products, Ltd., United Asian Foods Co., Ltd. and Tesana Ltd. The complainant in Docket No. 92-18 is Pacific Motif, Inc. They will be collectively referred to as "Complainants." At the request of Complainants, these complaints have been consolidated because they involve substantially the same issues.

3.    Article 17 states:
      Any and all disputes arising out of or in connection with this Contract, including any failure by the Shipper to pay or by the Agreement to perform as required hereunder, shall be resolved by arbitration in Hongkong, or such other place as the parties to the dispute may mutually agree.

4.    Article 9(ii) of the Contracts states:
      If the Agreement fails to fulfill its service commitment in Article 7 hereof during the Contract term, the Shipper's sole remedy shall be a reduction in the Minimum Quantity Commitment specified in Appendix A by the quantity of cargo tendered but not carried as provided in Article 7 and the Agreement and its Members shall not be liable to Shipper for any direct, consequential or other damages, nor shall any liabilities or obligations of Shipper to the Agreement or its Members be subject to any offset or credit therefor.

DECISION OF FEDERAL MARITIME COMMISSION

ANERA subsequently filed a Motion to Dismiss and to Compel Arbitration in Docket Nos. 92-06 and 92-07, to which Complainants replied. By order served April 21, 1992 ("First Order"), the Presiding Administrative Law Judge, Frederick M. Dolan, Jr. ("ALJ") granted ANERA's motion in part, dismissing Complainants' allegation that the subject service contracts are void *ab initio*. He retained jurisdiction, however, over the allegations relating to the use of IS rates. Complainants filed an Appeal and Exceptions to the First Order and ANERA filed a reply thereto.

ANERA filed a second Motion to Dismiss with respect to the IA issues in Docket No. 92-17. By ruling of August 28, 1992, ("Second Order") the ALJ granted this Motion and dismissed the claim that ANERA acted unlawfully in failing to prevent its members from taking independent action to reduce tariff rates on commodities covered under the service contract below the level of the rates in the service contract. Complainants filed an Appeal and Exceptions to the Second Order and ANERA filed a reply thereto.[5]

The parties have stipulated that the Commission's ultimate decision on appeal in Docket Nos. 92-06 and 92-07 will be binding in Docket Nos. 92-17 and 92-18 and vice versa.

## THE ALJ'S ORDERS

### The First Order

As indicated above, the ALJ partially granted ANERA's Motion to Dismiss in Docket Nos. 92-06 and 92-07. He noted initially that section 8(c) of the 1984 Act provides that the exclusive remedy for a breach of a service contract is an action in an appropriate court, unless the parties agree otherwise. He found that a court is also the correct forum to decide whether a contract exists between the parties or whether it was void *ab initio*. However, because the parties agreed to arbitrate, he concluded that to be the proper forum to determine the question of the validity of the Contracts.

The ALJ recognized that service contracts are a form of public contract subject to regulation by the Commission to prevent abuses. However, because of the exclusive remedy language of section 8(c) and the fact that the parties agreed to arbitrate any disputes, he ruled that the question of whether the contract is void *ab initio* is one to be answered by an arbitrator. He found that many of the cases cited by Complainants are inapposite because they were decided prior to passage of the 1984 Act and did not face the exclusive remedy language of section 8(c).

The ALJ noted Complainants' argument that where a contract is void *ab initio*, public policy dictates that no party may attempt to enforce any provision, including an arbitration clause. He again concluded that section 8(c) bars the Commission from interpreting the terms of the Contracts or their viability and that, therefore, Complainants must resort to another forum (*i.e.* an arbitrator) to obtain a ruling on the validity of the contract. The ALJ found support for his position in *Cleveland-Cliffs Iron Co. v. I.C.C.*, 664 F2d 568 (6th Cir 1981), in which the court held that the Interstate Commerce Commission ("ICC") did not have the authority to determine the existence and validity of service contracts under the Interstate Commerce Act. He rejected the two *Ivarans*[6] cases cited by Complainants, on the ground that they relate to the Commission's authority over pooling agreements and not service contracts subject to the exclusive remedy provision of section 8(c).

The ALJ recognized the existence of FMC Circular Letter No. 1-89, which addressed service commitments in service contracts. He concluded, however, that this is a matter for consideration by the arbitrator and not the Commission, given the parties' election of forum.

With respect to the allegations concerning the filing of independent action rates, the ALJ found them to be separate and distinct from the service contracts. He accordingly refused to dismiss those claims.

### The Second Order

The ALJ found that after ANERA entered into service contracts with Complainants, a number of the member lines of ANERA took IA on tariff rates applicable to commodities subject to the Contracts. He rejected Complainants' contention that by taking this action ANERA and its member lines violated the 1984 Act.

---

5.    On October 27, 1992, Complainants filed a Motion for Leave to Reply to Respondent's Reply to Complainants' Appeal. It said "The primary purposes of Complainants' reply are to inform the Commission of a recent ruling [*Vinmar*] which is applicable to the appeal initially filed in Docket Nos. 92-06 and 92-07 and also clarify certain points in ANERA's reply to the appeal in Docket Nos. 92-17 and 92-18." Motion at 2. The Motion will be denied. Rule 74(a)(1) of the Commission's Rules of Practice and Procedure, 46 CFR §502.74(a)(1), prohibits a reply to a reply and Complainants have given no cogent reason why Rule 74(a)(1) should be waived. The Administrative Law Judge's decision in *Vinmar* was served on January 17, 1992, long before Complainants here filed their appeal of the ALJ's First Order on May 12, 1992. The Commission's affirmance of the Initial Decision in *Vinmar* was served on July 29, 1992 and was cited by Complainants in their appeal of the ALJ's Second Order. Appeal at 29. Complainants have had ample time in which to make arguments based on *Vinmar*. A reply to ANERA's reply is not justified by *Vinmar*. Nor is there any justification for allowing a reply to "clarify certain points in ANERA's reply to the appeal in Docket Nos. 92-17 and 92-07." Motion at 2. This is nothing more than a procedural attempt to get the last word.

Complainants' request for oral argument is also denied. The issues have been briefed at length by all parties, and further argument would be repetitive and would not add to the Commission's understanding of the issues. Procedural due process does not require an oral argument in every case. *Federal Communications Commission v. WJR, The Goodwill Station, Inc.*, 337 US 265 (1949).

6.    *A/S Ivarans Rederi v. United States*, 895 F2d 1441 *[25 SRR 783]* (DC Cir 1990) and *A/S Ivarans Rederi v. United States*, 938 F2d 1365 *[25 SRR 1582]* (DC Cir 1991).

WESTERN OVERSEAS TRADE AND DEVELOPMENT CORP. v. ANERA                    

The ALJ explained the 1984 Act permits a conference to regulate or prohibit the use of service contracts by its member lines. But he found that section 5(b)(8) of the 1984 Act gives the individual member lines of a conference the right to take IA with regard to any rate or service item required to be filed in a tariff. Thus, he reasoned, the member lines of ANERA were free to take IA on any tariff rate, including rates applicable to commodities that could move under service contracts. He concluded that because section 5(b)(8) authorizes the member lines of ANERA to take IA on rates applicable to commodities that could be moved under service contracts, there can be no ground for finding that such rates are unjustly discriminatory. Accordingly, he granted ANERA's Motion to Dismiss with respect to this issue.

The ALJ also rejected Complainants' contention that service contract signatories are entitled to the lowest possible rate because they are committing a fixed volume of cargo. He noted that this would only be the case if the service contract contained a "most favored shipper" provision. *See Service Contracts -- "Most Favored Shipper" Provisions,* ___ FMC ___ (1988), 24 SRR 1351 and 46 CFR §581.5(a)(3)(viii) and 581.5(b)(1). To find otherwise, he stated, would impute, without warrant, a "most favored shipper" provision into every service contract.

He also rejected Complainants' contention that they were unreasonably restricted from taking advantage of the IA rates because they were committed to tender a minimum amount of cargo under the Contracts or pay liquidated damages. The ALJ observed that the Complainants were free to use the rates established by IA and did so. He stated that while the Complainants may be disappointed that tariff rates dropped below those in the service contracts, the shipper must accept both the benefits and risks of service contracts. The shipper signatory to a service contract, he said, receives benefits which are unavailable to the shipper using a tariff rate. The ALJ pointed out that the rate in the service contract is guaranteed over the life of the contract, while a shipper using a tariff rate has no assurance that the rate will not be increased. The fact that Complainants' estimate of the future direction of rates was faulty was not found to provide grounds for relief under the 1984 Act.

The ALJ also ruled on ANERA's contention that the complaint should be dismissed on the grounds that it is barred by the 3-year statute of limitations contained in section 11(g) of the 1984 Act, 46 USC app. §1710(g). He found that the gravamen of the complaint is that the rates established pursuant to IA that were below the rates shown in the Contracts were violative of the 1984 Act. This being the case, he concluded that the alleged wrongful act was the filing of those rates, not ANERA's later demand for liquidated damages under the Contracts. Because the filing of the rates established pursuant to IA occurred more than three years before the filing of the Complaints, the ALJ concluded that the complaint was barred by the 3-year statute of limitations contained in section 11(g) of the 1984 Act. The ALJ determined that *Seatrain Gitmo, Inc. v. PRMSA,* 18 SRR 1079, 1081 (I.D. 1978), adopted by the F.M.C. January 1, 1979) ("*Seatrain Gitmo*"), a case cited by Complainants for the proposition that the cause of action only accrues when the alleged violation causes injury, actually held that the statute of limitations begins to run at the time of the allegedly wrongful act, not the injury.

The ALJ was satisfied that Complainants had actual knowledge of the filing of the rates established pursuant to IA and knew, or should have known, that they would be liable for liquidated damages under the Contracts if they failed to tender the minimum quantity of cargo specified. Complainants were found to have no reason to assume that the Contracts had been rescinded at the time the IA rates were filed. Noting that the Contracts were between Complainants and ANERA, the ALJ explained that the individual member lines of ANERA allegedly had no authority to unilaterally rescind the Contracts.

POSITIONS OF THE PARTIES ON APPEAL OF THE ALJ'S ORDERS

*The First Order*

    *Complainants*

Complainants contend that the basis of the ALJ's decision is unclear in that he appears to have combined an analysis of the policy issues relating to arbitration clauses with jurisdictional issues under section 8(c). Complainants believe that these are separate issues and that the Commission should first determine whether it has jurisdiction under section 8(c) and, if it does, it should then decide whether it should retain jurisdiction in light of the arbitration clauses.

Complainants maintain that the exclusive remedy language of section 8(c) only concerns breaches of service contracts entered into under the 1984 Act. They contend that this provision presupposes the existence of a valid contract, *i.e.*, one "entered into under this subsection." The Commission is said to have broad authority under section 11 of the Act, 46 USC app. §1710, to remedy wrongs under the 1984 Act.

Complainants allege that the Commission has dealt with certain allegations related to service contracts notwithstanding the exclusive remedy language of section 8(c). They note that the ALJ retained jurisdiction over their claims of discriminatory use of IA rates on service contract commodities. They claim that the Commission has the power to prevent sham contracts and argue that the Contracts at issue are indeed such contracts.

Complainants submit that since the Commission is charged with administering the 1984 Act, it is the appropriate body to determine the legality and validity of service contracts. Complainants maintain that they are not asking the Commission to rule on the common law validity of the Contracts, but rather whether they meet the requirements of sections 3(21), and 8(c) of the Act. They note that in Circular Letter No. 1-89, the Commission



DECISION OF FEDERAL MARITIME COMMISSION

clarified what service requirements are necessary for a service contract. They claim that the carriers here have failed to meet those requirements and that the Commission should rule that the Contracts are void *ab initio*. This, they assert, does not involve a breach of contract and thus section 8(c)'s exception is not implicated.

Complainants argue that the Commission should retain jurisdiction to hear their claim even in light of the arbitration clause contained in the Contracts. General principles in favor of arbitration are said to be not applicable here. Complainants note that the Commission has a duty to investigate and adjudicate violations of the 1984 Act and contend that this power is not divested by the presence of an arbitration clause in any maritime contract. They argue that the authority generally favoring arbitration is not relevant to the instant cases because they involve statutorily created service contracts and not simply commercial contracts.

ANERA

ANERA takes the position that the ALJ correctly concluded that the exclusionary language of section 8(c) prohibits the Commission from hearing this claim. It states that section 8(c) requires actions based on service contracts to be brought in a court or other forum agreed to by the parties. ANERA maintains that even though Complainants have couched their claim with respect to the illusory nature of ANERA's service commitment as a violation of the 1984 Act, it is in reality nothing more than a defense to ANERA's dead freight claim. ANERA points out that this action was initiated by Complainants one month after ANERA's arbitration demands. Complainants' claim is said to have no independent virtue apart from the dead freight claim. ANERA argues that because the allegation of insufficiency is so intertwined with the dead freight claim, the only reasonable way to resolve it is through arbitration of all issues.

ANERA disputes Complainants' suggestion that section 8(c)'s applicability depends in the first instance upon the existence of a valid service contract. Rather, ANERA views section 8(c) as a broad limitation on the Commission's jurisdiction to resolve service contract disputes generally. ANERA points out that courts have routinely sent parties to arbitration, even where the validity of the contract was in issue. In such instances, ANERA notes that courts have found that the arbitration clause is severable from the remainder of the contract.

ANERA also questions Complainants' contention that FMC Circular Letter No. 1-89 renders the Contracts at issue inadequate under the 1984 Act. ANERA points out that this was a general circular and did not address a specific contract. In addition, ANERA notes that the circular was issued after the Contracts expired and that the Commission's Press Release stated that the circular was to apply prospectively. ANERA questions the legal force and effect of the circular in any event.

ANERA believes that Complainants are ignoring the broad and unconditional language of the arbitration clause to which they agreed. It notes that the Contracts call for arbitration of all disputes "arising out of or in connection with" the Contracts. ANERA contends that Complainants' claims here so arise out of, or are in connection with, the Contracts.

ANERA also contends that a long line of Commission and court cases reflects a strong policy favoring arbitration. This policy is said to require the Commission to send the parties to arbitration before hearing the claim. ANERA notes the general purposes of arbitration -- expediting the resolution of contractual disputes and conserving time and resources -- and contends that a Commission decision on the merits would frustrate these purposes. ANERA also claims that the Federal Arbitration Act, 9 USC §§1-14, mandates enforcement of arbitration provisions such as the ones before the Commission. ANERA suggests that the recent passage of the Administrative Dispute Resolution Act, 5 USC app. §581 *et seq.*, further supports the federal policy favoring arbitration.

ANERA concedes that the Commission may retain jurisdiction to review Shipping Act issues decided in an arbitral decision. However, ANERA argues that in such cases, arbitration is appropriate before the Commission gets involved in substantive review of the issues; the Commission will then have the benefit of a factual record and the arbitrator's decision. Lastly, ANERA argues that several cases cited by Complainants do not in fact support their position.

The Second Order

Complainants

Complainants take the position that although the ALJ correctly recognized that, in ruling on a motion to dismiss, the complaint should be construed in the light most favorable to complainants, in fact he did not so construe the complaint here. They argue that throughout the Second Order the ALJ failed to accept the allegations made by Complainants as true nor did he rule on the basis of the liberal standards accorded administrative complaints. The following statement from the Second Order is cited as an example of the ALJ's erroneous analysis:

> In conclusion, since the allegations in the complaint cannot be substantiated, as a matter of law, Respondent's motion to dismiss will be granted.

Complainants' Appeal of Second Order at 6, citing Second Order at 23.

Complainants contend that the ALJ's Second Order is inconsistent with his First Order. The following passage is cited from the First Order:

WESTERN OVERSEAS TRADE AND DEVELOPMENT CORP. v. ANERA 

> Complainants also contend that the filing by ANERA's member of independent action tariffs for rates lower than agreed upon in the service contracts was a violation of [the Act]. The allegations concerning filing of the independent action rates are separate and apart for these service contracts, *and if proven*, would be independent violations of the Shipping Act of 1984. (Emphasis added by Complainants.)

Complainants' Appeal of Second Order at 7, citing First Order at 8. The underscored passage is argued to constitute a ruling that the allegations concerning the filing of the IA rates, if proven, would establish a violation of the 1984 Act. Complainants claim that the ALJ's determination in the Second Order that allegations concerning filing of the IA rates, if proven, would *not* establish a violation of the 1984 Act is inconsistent with his ruling in the First Order. Complainants acknowledge that in the Second Order the ALJ explained his prior statement but state that they are unable to understand his explanation.

It is also contended that the ALJ has improperly defined "independent action on service contracts" as used in FMC regulations pertaining to agreements, 46 CFR §572.502(a)(5)(iii) (currently at 46 CFR §572.802(c) (1992)).[7] Complainants argue that the ALJ erroneously assumed that the authority of a conference to prohibit its member lines from taking IA on service contracts was limited to preventing member lines from entering into individual service contracts. Complainants claim that the FMC's rules at 46 CFR §572.802(c) (1992) draw a distinction between permitting member lines from entering into individual service contracts and taking IA on service contracts. The power to prohibit member lines from taking IA on service contracts is said to include the power to prevent member lines from taking IA on tariff rates applicable to commodities subject to service contracts.

Complainants take issue with the ALJ's belief that section 5(b)(8) of the 1984 Act[8] gives member lines of a conference the absolute right to take IA on rates in effect in a service contract by filing IA rates in tariffs. Complainants argue that section 5(b)(8) did not come into play when member lines of ANERA took IA on tariff rates for commodities subject to the Contracts because such rates, "although filed in the conference tariff, were actually taken on service contract rates at issue, not on a 'rate or service item that is required to be filed in a tariff'." Complainants' Appeal of Second Order at 14. Complainants argue that "once the subject commodity rate goes below the service contract rate level the member carrier(s) are then factually taking independent action on a service contract rate." Complainants' Appeal of Second Order at 17. Complainants maintain that by agreeing to a service contract, the conference is also agreeing that it will not depress its rates below the service contract level.

Even if ANERA's action does not constitute taking IA on service contracts, Complainants contend that the actions taken were unjustly discriminatory as to Complainants and are thus violative of the 1984 Act. The ALJ is said to have erred in ruling that because of section 5(b)(8) of the 1984 Act authorized the member lines of ANERA to take IA, any alleged discrimination caused by rates taken pursuant to IA cannot be unjust or unreasonable. Complainants claims that the unjust and unreasonable discrimination arises because, although Complainants were free to utilize the rates established by IA, they were penalized under the service contracts for failing to tender the minimum cargo specified.

Complainants cite *Atlantis Line Ltd. v. Australia New Zealand Direct Line*, 24 SRR 1494 (1988) for the proposition that the conduct alleged in the complaint is at least a *prima facie* violation of the 1984 Act. The administrative law judge in that case characterized the complaint as alleging:

> * * * that the publication of a lower rate than available to the complainant under the service contract for essentially the same transportation constitutes a violation of the Shipping Act * * *.

The respondent in *Atlantis* moved to dismiss the complaint on the grounds that it was based on a breach of contract and was barred by section 8(c) of the 1984 Act. The administrative law judge denied respondent's motion finding that the complaint was based on an alleged violation of the 1984 Act that did not involve a breach of contract.

Complainants continue to argue that the solicitation by members of ANERA of cargo to be carried under rates established by IA constituted a mutual termination of the Contracts. Complainants believe that the individual member lines of ANERA act as ANERA's agents and could have rescinded the Contracts. The refusal of ANERA to re-rate cargo carried under the Contracts allegedly constitutes a violation of the 1984 Act.

Complainants also argue that the ALJ erred in not addressing the issue of whether ANERA is violating the 1984 Act by attempting to collect dead freight on allegedly illegal contracts. The ALJ stated that the issue was before the Commission in the appeal of the First Order. Complainants state:

---

7.    Section 802(c) states:

     For the purposes of this section, conference provisions regulating or prohibiting the use of service contracts include, but are not limited to, those which permit or prohibit conference service contracts; permit or prohibit individual service contracts; permit or prohibit independent action on service contracts; permit or prohibit individual members to elect not to participate in conference service contracts; impose restrictions or conditions under which individual service contracts may be offered.

8.    Section 5(b)(8) states, in pertinent part:

     Each conference agreement must * * * provide that any member of the conference may take independent action on any rate or service item required to be filed in a tariff under section 8(a) of the Act * * *.



DECISION OF FEDERAL MARITIME COMMISSION

[T]he issue of legality of the service contract with regards to violations of the Act is not on appeal in Docket Nos. 92-06 and 92-07 since the ALJ ruled he was without jurisdiction to make such a ruling. However in the interim between the ALJ's ruling on Docket Nos. 92-06 and 92-07, and the current motion the Commission handed down the *Vinmar*[9] decision. The threshold issue of legality of the service contract must now be resolved by the Commission as required by the *Vinmar* ruling. Thus these issues were improperly disregarded.

Alternatively, if the Contracts are found valid, Complainants claim that ANERA's attempt to collect dead freight is violative of the 1984 Act because it discriminates against Complainants. In this regard, Complainants argue that:

It is fundamentally unfair as well as a violation of the Act to allow the Respondent to allow independent actions on the service contracts while at the same time demanding the Complainants to ship under service contract rates or suffer deadfreight.

Complainants' Appeal of Second Order at 31.

Complainants allege that the ALJ ruled that, because service contracts were excluded from sections 10(b)(6) and (11) of the 1984 Act, Congress intended the discriminatory effects alleged in the complaint. Complainants argue that the legislative history of the 1984 Act shows that it was intended that service contracts would confer a benefit on the shipper signatories, not be used as a method of discriminating against them.

Complainants take the position that the ALJ erred in concluding that the complaint is barred by the 3-year statute of limitations contained in section 11(g) of the 1984 Act. They state:

Complainants contend that they were not actually injured during the course of the service contract since Respondent had allowed Complainants to ship under the lower IA rates. Rather, Complainants contend that the harm done was the attempts to collect deadfreight including the Respondent's refusal to re-rate the previous cargo shipped and the unjust discriminatory impact thereof.

Complainants' Appeal of Second Order at 36. Thus, it is argued that the statute of limitations should run from the time ANERA attempted to collect dead freight, not from the time the IA rates were filed. Complainants maintain that during the life of the Contracts they did not know nor should they have known of the possibility that ANERA would attempt to collect dead freight.

First, Complainants maintain that the contracts are illegal, and unenforceable and therefore no deadfreight would lie. Second, Complainants reasonably believed that the Respondent conference and its member lines had abandoned and mutually terminated the contract by filing lower independent action rates. Third, the carrier members actively solicited Complainants' business and persuaded the Complainants to ship under the lower independent action rates with the representations that the contracts were indeed void and the cargo previously shipped thereunder would be rerated.

Complainants' Appeal of Second Order at 38.

Complainants contend that if the ALJ believed that the complaints were deficient in any respect, he should have given Complainants the opportunity to amend them. In particular, Complainants believe they should have been permitted to amend their complaints to allege fraud in the inducement to sign the Contracts. In support of this position Complainants cite Rules 12(b)(6) and 15(a) of the Federal Rules of Civil Procedure, which permit the amendment of complaints. *See Allen v. Beverly Hills*, 911 F2d 367 (9th Cir 1990).

Finally, Complainants seek clarification regarding the appeals. They state a violation is alleged in Docket No. 92-06 that is not present in the other complaints; i.e. in Docket No. 92-06 ANERA is alleged to have unilaterally changed the calculation of dead freight from $49 per forty-foot container to $49 per metric ton without Complainants' knowledge. Complainants claim that this issue has not been addressed in either of ANERA's motions to dismiss, and thus it remains viable.

### ANERA

ANERA's position is that the ALJ correctly applied the standard of review regarding its second Motion to Dismiss. ANERA states that Complainants do not point to a single fact alleged by them which the ALJ failed to accept as true.

The ALJ, it is said, did not take a position in the Second Order on the issue of whether the filing of IA tariff rates was violative of the 1984 Act that was inconsistent with his First Order. ANERA believes that the ALJ's explanation of his prior ruling makes it clear that the ruling in the First Order dealt exclusively with jurisdiction and did not purport to address the merits. The ALJ's explanation to which ANERA refers is as follows:

---

9.    *Vinmar, Inc. v. China Ocean Shipping Co.*, No. 91-43 *[26 SRR 420]* (FMC July 29, 1992).

WESTERN OVERSEAS TRADE AND DEVELOPMENT CORP. v. ANERA

Complainants have misread the April 21, 1992, decision in Docket No. 92-06, et al. They believe it has already been ruled that ANERA's members took IA on service contracts; that, if proven, this would be a violation of the Act; that complainant here has alleged the same thing and that a valid cause of action has been pled. The April 21, 1992, decision held that certain allegations were properly within the jurisdiction of this Commission to rule on, namely, whether the filing by ANERA's members of IAs for rates lower than agreed upon in service contracts violated the Act. That ruling denied ANERA's motion to dismiss in that respect.

ANERA Reply at 5-6 citing Second Order at 8, n. 1.

ANERA contends that the member lines of ANERA have a statutory right to take IA on rate or service items that must be published in a tariff and the conference may not infringe on that right. In support of this contention ANERA cites section 5(b)(8) of the 1984 Act, 46 USC app. §1704(b)(8), and the FMC's decision in *Independent Action -- Notice and Meeting Provisions in Conference Agreements*, 23 SRR 1022, 1026 (1986).

It is ANERA's position that the Commission has already rejected the position now taken by Complainants in *Modification to the Trans-Pacific Freight Conference of Japan Agreement*, 23 SRR 1390 (1986) ("*TPFCJ*"). ANERA states that in *TPFCJ*, the conference had a provision in its agreement which prohibited its member lines from taking IA with regard to any tariff matter "associated with negotiating *or providing* any service contracts". ANERA Reply at 7. (Emphasis added by ANERA.) The Commission explained the provision there as follows:

> As construed by the Conference, Article 13(a) of their agreements prohibits a member line from exercising independent action with respect to a shipper *who has signed as a party to a service contract* or when the conference is negotiating such a contract.

ANERA Reply at 7, citing *TPFCJ* at 1398. (Emphasis added by ANERA.) The Commission concluded that this provision unduly restricted the right of IA:

> Such a prohibition unlawfully restricts the right of a member line to take independent action on tariffed rate or service items at any time for any shipper.

*Id.*

ANERA contends that the situation in this case is indistinguishable from that in *TPFCJ* and the Commission should find that ANERA is legally prohibited from placing restrictions on IA.

ANERA states that the Commission's decision in *TPFCJ* is based on the tenet that the right of IA is one of the central and fundamental principles of the 1984 Act. It notes that the right of IA for conference members was seen by Congress as a pro-competitive reform that was critical in inducing Congress to relax the standards for approval of conference agreements. H.R. Conf. Rep. No. 600, 98th Cong., 2d Sess. 33-34 (1984). ANERA Reply at 9.

ANERA argues that if the Commission were to find that ANERA's failure to prevent its members from taking IA constituted discrimination against service contract shippers, the right of IA would be severely restricted. No carrier allegedly could ever take ICA on a commodity covered by a service contract without fear of a claim of discrimination.

ANERA also believes that Complainants' claim must fail as a matter of law because the alleged discriminatory rate actions were not taken by the same parties; the service contracts were offered by ANERA, as a conference, while the IA rates were not ANERA's but were instead the rates of individual members of ANERA, acting independently. Thus, ANERA contends there is no common source of discrimination which is an essential element of a claim of discrimination. *Commodity Credit Corp. and United States Agency for Int'l Development v. Lykes Bros. S.S. Co. et al.*, 18 FMC 50, 54 *[14 SRR 1048]* (1974).

ANERA states that IA on a tariff rate applicable to a commodity subject to a service contract is not the equivalent of IA on a service contract. It argues that the various passages cited by Complainants in support of the opposite conclusion simply recognize that IA on service contracts can take the form of either (1) an individual service contract between a conference member line and a shipper or, (2) a unilateral deviation from (but participation in) a conference service contract by a member line. ANERA explains that a unilateral deviation from a service contract means that a conference member line agrees to offer service to shippers pursuant to the terms of a conference service contract, but with an exception or deviation from one term of that contract. ANERA points out that the Commission has already considered and rejected the contention that IA on service contracts includes IA on tariff rates applicable to commodities subject to service contracts in *TPFCJ*. It also notes that the distinction between IA on service contracts and IA on tariff items was discussed at length in the FMC's Section 18 Report on the Shipping Act of 1984. *Section 18 Report*, at 18. ANERA believes that the issue of what is meant by "IA on service contracts" is not a factual issue as Complainants contend; it is a legal issue that turns on the legislative history and case law discussed above.

ANERA contends that there is no support for Complainants' view that a service contract is a commitment that the contract shipper will receive the lowest rate offered to any shipper of a contract commodity. It is argued that Complainants' view would, in essence, write a "most favored shipper" clause into every service contract.



ANERA claims that Complainants' position would also be disastrous as a matter of policy. ANERA notes that a service contract shipper must accept both the benefits and the risks of service contracts. Allegedly, a contract shipper receives a guarantee of certain rates and service levels over a specified period of time. A tariff shipper receives no such guarantee or protection. ANERA contends that for purposes of proving discrimination, contract carriage and tariff carriage really cannot be compared.

ANERA observes that under Complainants' theory, if a member line took IA on a tariff rate covered by a service contract that resulted in a rate higher than the service contract rate, this would not constitute taking IA on a service contract. Thus, ANERA points out, under Complainants' theory, only if the tariff rate were below the service contract rate would this amount to taking IA on a service contract. This distinction between rates which are above, and those that are below, the service contract rate is said to be wholly unsupported by the law and is irrational. ANERA maintains that Complainants' theory could also lead to absurd results. It points out that IA on a particular commodity might be an IA on one service contract because it is lower than the contract rate but would not be an IA on a second service contract because it is above that contract rate.

Although Complainants now seek to amend their complaints, ANERA maintains that they never hinted in briefs to the ALJ how they would amend their pleadings to cure the defects. ANERA notes that for the first time Complainants are now alleging that some of ANERA's member lines represented to Complainants that their cargo would be re-rated and no penalties would be sought. The Commission is argued to have ruled in the past that a party may not expand the issues in a proceeding at the stage at which the Commission reviews the initial decision. *Carrier Int'l Corp. v. Waterman Steamship Co.*, ___ FMC ___ (1985), 23 SRR 689, 694, n. 5; *Marcella v. ARP Films, Inc.*, 778 F2d 112, 118 (2nd Cir 1985); and *List v. Fashion Park, Inc.*, 340 F2d 457, 461 (2nd Cir 1965). ANERA Reply at 22-23. It is contended that even if such representations were made (which ANERA denies) they are not reflected in the Contracts which, by their terms, contained the complete understanding of the parties. Moreover, ANERA argues that such representations would relate to the claims which the ALJ ruled were subject to arbitration.

ANERA contends that Complainants were free to utilize the tariff rates established by IA or the service contract rate. It points out that the only requirement of the Contracts was that Complainants ship a minimum amount of cargo. ANERA argues that Complainants were free to ship any additional cargo utilizing tariff rates established by IA.

ANERA maintains that Complainants' reliance on *Atlantis Line* and *DSR Shipping Co. Inc. v. Great White Fleet, Ltd. d/b/a Chiquita Brands, Inc.*, 26 SRR 191 (I.D. 1992) is misplaced. First, ANERA states that a final decision on the merits was never rendered in either case. Second, ANERA points out that neither case involved the statutory right of IA.

ANERA contends that Complainants' argument that the Contracts were mutually terminated has no merit. It points out that the member lines of ANERA are *not its agents and therefore cannot unilaterally terminate an* ANERA contract. ANERA's authorized agent is said to be its Secretariat as represented by its Managing Director. ANERA also notes that the FMC's regulations pertaining to the mutual termination of service contracts, 46 CFR §581.7, were not followed nor were the procedures required by the basic conference agreement.

In response to Complainants' contention that the ALJ erred in not addressing the issue of whether ANERA is violating the 1984 Act by attempting to collect dead freight, ANERA argues *that in order to determine whether* there is a violation, it must first be determined if the underlying service contract is lawful. It is pointed out that the ALJ has already dismissed this issue and sent it to arbitration in the First Order. ANERA states that there was no need for the ALJ to address the issue in the Second Order.[10]

Finally, ANERA contends that the ALJ correctly ruled that the complaint is barred by the 3-year statute of limitations contained in section 11(g) of the 1984 Act. It cites *Seatrain Gitmo* for the proposition that the statute of limitations begins to run when an act is committed which causes injury. ANERA contends that Complainants' injury, if any, began, and their cause of action arose, at the commencement of the Contracts or at the time when each IA was taken during the Contracts' terms. ANERA insists that it is the filing of any allegedly discriminatory rates which gives rise to the cause of action. Allegedly, it was at this point when all events necessary to state a claim had occurred and the statute of limitations had begun to run.

ANERA argues that Complainants are charged with knowledge of the IA rates and indeed used the rates. Complainants allegedly should have known that if they abandoned their Contracts for the IA rates they would be subject to liquidated damages under the Contracts. ANERA disputes Complainants' claim that they thought from the outset that the Contracts were unenforceable because they were illegal. It points out that Complainants never raised the issue of the Contracts' legality with either ANERA or the Commission until three years after the Contracts had expired.

---

10.     ANERA takes the position that the issue of whether dead freight should be assessed at $49 per forty-foot equivalent unit or $49 per metric ton is subsumed in the larger dead freight issue which the ALJ dismissed and referred to arbitration. Accordingly, ANERA believes that it should be addressed in arbitration.



## DISCUSSION[11]

**The First Order**

The ultimate issue before the Commission is whether the Commission or the arbitrator should, in the first instance, determine if the subject service contracts are void for failing to contain meaningful service commitments. Section 8(c) of the 1984 Act states in part that:

> The exclusive remedy for a breach of a contract entered into under this subsection shall be an action in an appropriate court, unless the parties otherwise agree.

46 USC app. §1707(c). The question then becomes whether this language simply bars the Commission from hearing complaints regarding alleged conduct that would amount to a breach of contract, or bars the Commission from determining whether a service contract, in fact, exists.

Recently, in *Vinmar* the Commission had before it a situation where a carrier had failed to sign or file a service contract after the shipper signed it. Nevertheless, it was argued that the carrier's failure to perform under the contract was subject to the arbitration clause contained in the service contract as an alternative to "an appropriate court". Although the presiding administrative law judge concluded that section 8(c) barred the Commission from hearing any dispute under it, he did find that a contract existed between the parties. The Commission affirmed his decision. Underlying the *Vinmar* decision is the premise that the Commission has the jurisdiction to determine whether there is a service contract entered into under section 8(c) of the 1984 Act. Following *Vinmar*, the Commission concludes that it has the authority to adjudicate the validity of the Contracts at issue.[12]

Moreover, there are policy reasons in this case which favor the Commission ruling on the issue rather than referring it to arbitration. The adequacy of service commitments is an issue which is not unique to the Contracts at issue here. Many service contracts have similar provisions. Any decision relating to the adequacy of service commitments could have ramifications well beyond these Contracts. Given this possible impact, the Commission will decide the issue itself.

The matter of service commitments in service contracts filed with the FMC was brought into focus by the Commission's Circular Letter No. 1–89, issued April 12, 1989, which advised:

> With respect to carrier or conference commitments in a service contract, the Commission believes that contract provisions made for "regular" or "frequent" service do not meet the 1984 Act's requirement that the carrier or conference commit to a "defined service level." Although the Act does not specifically define the term "service level," it does provide several examples (*e.g.*, assured space, transit time, etc.) sufficient to indicate the scope of the concept. A mere recitation of a common carrier's obligation under common law is not adequate.

> Moreover, the Commission is aware of some contracts where a carrier agrees in one provision to specific service commitments (such as assured space), but in another provision vitiates that commitment by stating that a shipper's exclusive remedy in the event of a breach of a carrier's commitment is a reduction in the shipper's minimum cargo commitment. Under such an arrangement, the carrier is in effect committing to nothing.

Circular Letter No. 1–89 (April, 12, 1989) at 3.

Article 7(a) of the Contracts contained the following service provision:

> The Agreement agrees to make available during the term of this Contract vessel capacity adequate to carry (1) the Minimum Quantity Commitment of cargo and (2) at ANERA's option any additional cargo tendered by the Shipper during the term of this Contract. The Shipper shall be free to select the Agreement Member or Members on whose vessels the Shipper's cargo shall be transported during the term of this Contract, but the movement of cargo on specific vessels shall be on a space available basis only.

This is more than a mere recitation of a common carrier's obligation under common law and would meet the standards imposed by the first paragraph of the Circular Letter quoted above. The problem with the Contracts

---

11. As an initial matter, the Commission will not permit Complainants to amend their complaints with respect to those issues that are now before the Commission on appeal of the ALJ's Orders. Complainants had ample time to amend their complaints while the issues were before the ALJ. They did nothing until they received an adverse ruling from the ALJ. On appeal to the decision of the ALJ Complainants may not inject new issues into the proceeding, particularly those requiring findings of fact to resolve. *Carrier Int'l Corp. v. Waterman Steamship Co.,* __ FMC __ (1985); 23 SRR 689, 694 n. 5.

12. *Cleveland-Cliffs Iron Co. v. I.C.C.,* 664 F2d 568 (6th Cir 1981), upon which the ALJ relies, does not support the proposition that the Commission may not determine whether a service contract has been entered into under section 8(c). Under 49 USC §10713, the ICC has a limited time in which to approve or disapprove a contract that is filed with it. Once a contract is approved by the ICC, it is no longer subject to the Interstate Commerce Act and it may not be challenged by the ICC. 49 USC §10713(i)(1). The exclusive remedy for any alleged breach of an approved contract is an action in the courts unless the parties decide otherwise. 49 USC §10713(i)(2). However, the approval process gives the ICC the opportunity, in the first instance, to determine whether a contract will be subject to the provisions of 49 USC §10713(i)(1) and (2).



DECISION OF FEDERAL MARITIME COMMISSION

was not with the service commitments but with the limitation on the shipper's ability to obtain a meaningful remedy in the event ANERA failed to fulfill its service commitment. Article 9(ii) of the Contracts stated:

> If the Agreement fails to fulfill its service commitment in Article 7 hereof during the Contract term, the Shipper's sole remedy shall be a reduction in the Minimum Quantity Commitment specified in Appendix A by the quantity of cargo tendered but not carried as provided in Article 7 and the Agreement and its Members shall not be liable to Shipper for any direct, consequential or other damages, nor shall any liabilities or obligations of Shipper to the Agreement or its Members be subject to any offset or credit therefore.

Because this provision appears to be contrary to the second paragraph of the Circular Letter quoted above, Complainants contend that the Contracts were void *ab initio*. However, it does not necessarily follow that because a service contract fails to comply with the law or the Commission's regulations in some respect that the entire contract is void *ab initio*. The Circular Letter did not declare all previously filed service contracts that failed to comply with Circular Letter as void *ab initio*; it stated that the Commission would begin taking action against deficient contracts filed 45 days after the date of the Circular Letter. In a news release issued February 7, 1990, the Commission explained:

> It is, therefore, the Commission's intention to reject future service contracts which do not meet statutory and regulatory standards. This advice is prospective only and is not intended to affect existing filed contracts. The Commission will take action against deficient contracts filed on or after March 1, 1990.

F.M.C. News Release (February 7, 1990) at 2.

The procedure for rejection of deficient contracts is contained in 46 CFR §581.8(a)(1).[13] That rule provides that within 20 days after the initial filing of a contract, the Commission may notify the filing party of its intent to reject the contract and provide an explanation of the reasons for the proposed rejection. If, within 20 days notification, the parties remedy the deficiency, the contract can then be accepted. 46 CFR §581.8(a)(2). Using the procedure for rejection, the Commission has prevented new service contracts that contain clauses such as Article 9(ii) from being filed.

By acting prospectively, the Commission avoided the chaos that would have resulted if the Commission declared void *ab initio* any existing contract, including the Contracts at issue, containing a clause purporting to limit the shipper's remedies in the event of the carrier's failure to meet its service commitments. This did not leave the shipper signatories to existing service contracts without remedy. If the carrier failed to meet its service commitments, the shipper could sue for a breach of contract and a court or arbitrator could refuse to enforce a clause such as Article 9(ii).

The court or arbitrator would be exercising the same sort of discretion which the courts exercise in analogous cases brought under the Uniform Commercial Code ("UCC"). Section 302(1) of the UCC states:

> If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, *or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.* (Emphasis added.)

The official comment for section 302(1) explains:

> Under this section the court, in its discretion, may refuse to enforce the contract as a whole if it is permeated by the unconscionability, or it may strike any single clause or group of clauses which are so tainted or which are contrary to the essential purpose of the agreement, or it may simply limit unconscionable clauses so as to avoid unconscionable results.

In sum, the Commission concludes that it has jurisdiction to determine if the Contracts were service contracts entered into under section 8(c) of the 1984 Act. For the reasons discussed above, we find that they were, despite the presence of Article 9(ii).[14] Having so found, we are barred by section 8(c) of the 1984 Act from hearing those claims, which, although couched in terms of alleged violations of the 1984 Act, seek remedies that would otherwise be available in a breach of contract action if the matter were brought before a court.[15] *Vinmar* at 19.

**The Second Order**

The legislative history of the 1984 Act and past decisions of the Commission fully support the ALJ's conclusion that section 5(b)(8) of the 1984 Act grants the member lines of ANERA the absolute right to take IA on tariff rates on commodities that may be moved under ANERA service contracts. *TPFCJ*, 23 SRR 1390, and H.R.

---

13.   It follows that if the Contracts at issue were filed with the FMC today they would be subject to this rejection procedure.

14.   It follows from this conclusion that ANERA is not violating the 1984 Act by pursuing its dead freight claims.

15.   The issues barred include whether dead freight is due and the amount of any dead freight.

Conf. Rep. No. 600.[16]   The member lines of ANERA have a statutory right to take IA on any rate or service item that must be published in a tariff and the conference may not infringe on that right.   There is no exception to the right of IA in the case of tariff rates applicable to commodities that could move under conference service contracts.   Such rates must be published in a tariff and are thus subject to IA pursuant to section 5(b)(8).   Indeed, the Commission so held in *TPFCJ.*

Complainants are incorrect in contending that the distinction made in the FMC's service contract regulations at 46 CFR §572.802(c) (1992) between provisions in conference agreements that "permit or prohibit individual service contracts" and those that "permit or prohibit independent action on service contracts," demonstrates that the Commission understood that IA on tariff rates applicable to commodities covered under service contracts amounts to IA on service contracts.   The FMC's Section 18 Report on the Shipping Act of 1984 describes the possible IA on service contract situations as follows:

> There are two situations where service contracts might be offered by a conference carrier independently of other conference members.   The conference could adopt a policy not to act *concertedly* on service contracts, but allow its members to do so on their own.   Thus, the only service contracts would be those individually secured by conference members through IA.   Alternatively, the conference could have a policy to enter into service contracts, but still permit its members IA on service contracts.

*Section 18 Report* at 678.

The fact that the tariff rate for a given commodity differs from the rate shown in a service contract for the same commodity does not establish unjust discrimination under the 1984 Act.   Service contracts are fundamentally different than tariff rates.   A shipper signatory to a service contract receives a given level of service at a rate which is guaranteed for a fixed period of time.   A tariff rate does not assure a given level of service and generally the rate may be increased at any time on 30 days' notice.   46 CFR §580.10(a)(2).   Moreover, there is no common source of alleged discrimination.   *See Commodity Credit Corp.,* 18 FMC at 54.   The service contracts were offered by ANERA.   The IA rates were not ANERA's; they were the rates of certain of ANERA's member lines, acting independently.

The ALJ correctly rejected Complainants' contention that service contracts signatories are entitled to the lowest possible rate because they are committing a fixed volume of cargo.   Complainants would only be entitled to the lowest possible rate if the Contracts contained a "most favored shipper" provision.   *See Service Contracts -- "Most Favored Shipper" Provisions,* ___ FMC ___ (1988), 24 SRR 1351 and 46 CFR §581.5(a)(3)(viii) and 581.5(b)(1).   The Contracts did not contain such a provision and none can be implied.

We are not persuaded by Complainants' argument that, even if the Contracts were not void *ab initio,* they were rescinded by the member lines of ANERA.   The basic conference agreement does not authorize the individual member lines of ANERA to act as ANERA's agents and no such authority can be implied.   Nor is there anything in the Contracts that suggests that the member lines had such authority.   The Contracts were not mutually terminated in accordance with the FMC's regulations, 46 CFR §581.7, nor were the procedures set forth in the basic conference agreement for the mutual termination of service contracts followed.

Given the fact that the Commission concludes that it is barred by section 8(c) of the 1984 Act from reaching the merits of Complainants' claims, it is unnecessary to address the issue of whether Complainants' claim for *reparations is barred by the 3 year statute of limitations in section 11(g) of the 1984 Act.*[17]   Nevertheless, it may be helpful to the ALJ and the parties to have the Commission's view regarding the application of the statute of limitations in section 11(g) to the facts of this case.   *Seatrain Gitmo* states the general rule that the cause of action accrues and the statute of limitation begins to run when there is the commission of an act which causes injury.   The issue of whether ANERA had an obligation to prevent its members from taking IA arose at the time the member lines took IA.   All of the events upon which Complainants' claim was based had occurred and the statute of limitations began to run.   In regard to the issue of whether ANERA could properly collect dead freight, Complainants' cause an action arose at the point at which they failed to ship the minimum quantities of cargo specified in the Contracts and became liable for dead freight under the Contracts.

The Commission has consistently held that statute of limitation contained in section 22 of the Shipping Act, 1916 ("1916 Act"), (46 USC app. §821), is jurisdictional and cannot be waived.   *Fil-American Trading Co., Inc.,* ___ FMC ___, 22 SRR 1169, 1172 (1984); *Fiat-Allis France Materials De Travaux Publics, S.A. v. Atlantic Container Line,* ___ FMC ___, 19 SRR 1335, 1340-1342 (1980); *Carton-Print, Inc. v. The Austasia Container Express Steamship Company,* 20 FMC 31, 39-40 *[17 SRR 571]* (1977).   We take the same position with respect to section 11(g) of the 1984 Act, which is patterned after section 22 of the 1916 Act.   The doctrine of equitable *estoppel,* which prevents a defendant from pleading the statute of limitations where plaintiff reasonably fails to bring suit in reliance of defendant's statements or conduct, has no application in Commission proceedings.

---

16.     It borders on the frivolous for Complainants to argue that the ALJ in the First Order found that if the member lines of ANERA took IA with respect to tariff rates on commodities subject to service contracts this would constitute a violation of the 1984 Act.   The ALJ has made it clear that his ruling in his First Order dealt only with jurisdiction and did not purport to pass on the merits.   *See Second Order,* at 8, n. 1.

17.     The 3 year statute of limitations in section 11(g) of the 1984 Act applies only to requests for reparations.   It would not prevent the Commission from issuing a cease and desist order in a case brought over three years after the cause of action accrued.

ORDER OF FEDERAL MARITIME COMMISSION

THEREFORE, IT IS ORDERED, That Complainants' Exceptions and Appeal of the Order of April 21, 1992 in Docket Nos. 92-06 and 92-07 are granted to the extent they sought to have the Commission decide whether the Contracts are subject to section 8(c) of the 1984 Act, and denied in all other respects;

IT IS FURTHER ORDERED, That Complainants' Exceptions and Appeal of the Order of August 28, 1992 in Docket No. 92-17 are denied;

IT IS FURTHER ORDERED, That Complainants' Motion for Leave to Reply to Respondent's Reply to Complainants' Appeal in Docket No. 92-17 is denied; and

IT IS FURTHER ORDERED, That Complainants' request for oral argument in Docket No. 92-17 is denied.

### CONCURRING OPINION OF COMMISSIONER MING CHEN HSU

While I concur in the decision reached in the Commission's Order, I am concerned that the advice given in Commission Circular Letter No. 1-89 may, in other, more difficult cases, be unnecessarily intrusive. The Order reaffirms that in exercising jurisdiction to determine the validity of service contracts put before it, the Commission clearly has recourse to the separate requirements of sections 3(21) and 8(c) of the 1984 Act as well as the well accepted principles of contract law. There are certain portions of the Circular Letter which seem to encompass both and certain other provisions which seem to encompass neither. The problem for me arises because the Complainants maintained that they were not asking the Commission to rule on the common law validity of the contracts but rather on the requirements of the Act as interpreted by the Circular Letter. I would hope that the Commission would take the opportunity offered by this case to review the scope of the Circular Letter.

The Commission's Order correctly rules that: "Underlying the *Vinmar* decision is the premise that the Commission has the jurisdiction to determine whether there is a service contract entered into under section 8(c) of the 1984 Act. Following *Vinmar*, the Commission concludes that it has the authority to adjudicate the validity of the contracts at issue." (Order at 29). Moreover, I am comfortable with the steps taken by us as to these particular contracts. Where my concern lies is with the lengths to which the Circular Letter may allow the Commission to go in adjudicating the validity of contracts in less clear-cut cases.

For example, the Circular Letter states that the Commission will "closely scrutinize" liquidated damages provisions to ensure that they are "reasonably related" to potential actual damages. If the parties can agree on a deadfreight penalty which on its face appears to be "reasonable" and which also meets their needs, does the Circular Letter give notice that the Commission will review each individual successfully negotiated and executed contract in order to test that relationship?

---

FMC
Dkt. No. 90-16

SEACON TERMINALS, INC.                    )
                                          )
        v.                                )
                                          )
THE PORT OF SEATTLE                       )     Served: April 14, 1993

[10:3[15], 10:4[2]a, 10:10[1]c, 10:10[2]c, 10:10[2]l, 10:10[4]b, 10:10[4]c, 10:11[1]]
Jurisdiction of Maritime Commission.

The FMC has jurisdiction over a complaint alleging that the Port of Seattle violated Sections 10(a)(3), 10(b)(11), 10(b)(12), 10(d)(1), and 10(d)(3) of the Shipping Act of 1984. The complainant, an individual terminal operator, may properly make such allegations before the Commission because Section 11(a) permits any person to file a complaint alleging violation of the Act. Furthermore, under Section 3(15), the Port is a marine terminal operator subject to FMC regulation under the Act, including the provisions which it allegedly violated. Seacon Terminals, Inc. v. Port of Seattle, 26 SRR 886 [FMC, 1993].

[141:10[9]] Burden of proof.

Having failed to establish a prima facie case of monopoly conditions at the Port of Seattle, a marine terminal operator bore the burden of proving that the Port violated the Shipping Act of 1984 when it terminated the operator's lease on certain terminal facilities. Seacon Terminals, Inc. v. Port of Seattle, 26 SRR 886 [FMC, 1993].

[10:10[2]c, 10:10[2]l] Negotiations with competitor not actionable refusal to deal.

The FMC finds that a terminal operator failed to demonstrate unlawful refusal to deal under the Shipping Act of 1984 on grounds that the Port of Seattle, after negotiating with one of the operator's competitors, terminated the operator's month to month tenancy in certain terminal facilities and leased them to the competitor. Because of uncertainties in its business prospects, the operator itself refused the Port's year-long

*New Orleans Stevedoring Company v. Port of New Orleans*, 29 S.R.R. 345 (I.D. 2001), *adopted* 29 S.R.R. 1066 (FMC 2002), *aff'd mem.*, 80 Fed. App'x 681 (D.C. Cir. 2003)

## NEW ORLEANS STEVEDORING COMPANY

### v.

## BOARD OF COMMISSIONERS OF THE PORT OF NEW ORLEANS

FMC Dkt. No. 00-11
Served: June 27, 2001

**[10:10[2]l, 10:10[4]d]  No undue preference or refusal to deal.**

The Board of Commissioners of the Port of New Orleans neither unreasonably re-
fused to deal with nor unreasonably prejudiced or disadvantaged a stevedore when it
refused to make terminal space available on the Mississippi River.  The Board's insis-
tence on leasing one terminal in its entirety rather than piecemeal was reasonable, as
was its reservation of space for its long-term lessees; its insistence on minimizing the
possibility of interference with a construction project may have been overly conserva-
tive, but it was not unreasonable or unrelated to legitimate transportation considera-
tions.  Moreover, other stevedores did not enjoy an unfair advantage as a result of the
Board's policy, considering that the Board was entitled to attempt to compensate
long-term lessees in order to encourage them to assume the obligations associated
with that status.  The Board was not unreasonable in refusing to make space available
in a Free Trade Zone, given that facility's special purpose and its dependence on cus-
toms clearance, and it did not act unreasonably in refusing to allow the stevedore to
use an unimproved grassy area unsuitable for cargo storage after heavy rain.  **New
Orleans Stevedoring Co. v. Board of Commissioners of the Port of New Orleans, 29
SRR 345 [Init. Dec., 2001].**

### INITIAL DECISION BY PAUL B. LANG, ADMINISTRATIVE LAW JUDGE[1]

*[By Notice served January 25, 2002, the Commission extended the time for issuance of its final decision to May 29, 2002.
By Notice served May 28, 2002, the Commission further extended the date for its final decision to June 21, 2002.  By
Notice served June 20, 2002, the Commission further extended the date for its final decision to June 28, 2002. —Ed.]*

*Joseph A. Klausner* for complainant.

*Paul M. Heylman, Michael C. Griffin, J. Michael Orlesh,*
and *Gerald O. Gussoni, Jr.*, for respondent.

**Paul B. Lang, Administrative Law Judge.**

This proceeding arises out of a complaint in which
New Orleans Stevedoring Company ("NOS") alleges
that it was the victim of unfair and discriminatory
practices by the Board of Commissioners of the Port
of New Orleans ("Board") in the allocation of marine
terminal facilities in violation of sections 10(d)(3) and
10(d)(4) of the Shipping Act of 1984 ("Act"), 46 USC
app. §1709(d)(3) and (4).[2]  In its prayer for relief NOS

seeks the issuance of an order directing the Board to
cease and desist from the alleged violations of the
Act, as well as the award of $1,000,000 or more in
reparations along with interest and attorney's fees.

*Complainant's Direct Case*

The direct case submitted by NOS consists of a brief,
52 numbered exhibits and 10 survey reports with
photographs.  The brief itself contains citations to
portions of the transcripts of the depositions of David
Wagner and Ron Brinson of the Board staff and
Henry Flanagan of NOS.

NOS maintains that it has been forced out of busi-
ness in the Port of New Orleans because of the un-
reasonable refusal of the Board to grant it access to
marine terminal facilities (deep water berths and
storage space for cargo and containers) along the
Mississippi River while providing such access to
certain of its competitors.  The alleged result of this
refusal by the Board was to cause NOS to lose the

---

1.   This decision will become the decision of the
Commission in the absence of review thereof by the Com-
mission (Rule 227, Rules of Practice and Procedure, 46 CFR
502.227).

2.   Section 10(d)(3), in pertinent part, prohibits
marine terminal operators from unreasonably refusing to
deal or negotiate.  Section 10(d)(4), in pertinent part, pro-
hibits marine terminal operators from giving, "... any
undue or unreasonable preference or advantage or [from]

impos[ing] any undue or unreasonable prejudice or disad-
vantage with respect to any person."

opportunity to provide stevedoring services to ocean carriers whose vessels could not be worked satisfactorily at other facilities in the port on account of an insufficient depth of water to accommodate vessels of up to 40 foot draft and because of the lack of access to gantry cranes. NOS also alleges that the ultimate result of the Board's unlawful actions was to force it out of business in New Orleans.

The brief by NOS includes a narrative of its unsuccessful attempts to obtain suitable facilities on the river after it had declined to renew its lease of such a facility. According to NOS each of those attempts was rebuffed by the Board, ostensibly because the facilities were either unsuitable for the use proposed by NOS or were unavailable because of a major renovation project. It is the position of NOS that the reasons given by the Board were pretexts to enable the Board to favor competing companies. In support of its contentions NOS has submitted ten survey reports along with photographs all of which reflect observations by the surveyors and representatives of NOS that facilities to which NOS had been refused access were used by other marine terminal operators, either at the time of the refusal or shortly thereafter, or could have been used by NOS without interfering with the work of the construction contractor.

NOS has also cited portions of FMC Tariff No. 2 ("tariff"), promulgated by the Board,[3] in support of the contention that the violation of its own tariff by the Board is further indication of the unreasonableness of its actions with regard to the allocation of marine terminal facilities.

In support of its claim for reparations NOS has submitted the report of David G. Raboy, Ph.D., Chief Economic Consultant for Patton Boggs LLP (Ex. 49). In his report Dr. Raboy concludes that the fair market value of NOS at the point of termination was at least $5.4 million. NOS has also submitted an auditors' report of its financial data and annual net profit from 1991 through 1999 (Ex. 50).

In further support of its reparations claim NOS has submitted a statement (apparently prepared by or under the direction of Henry Flanagan) of expected revenue, expense and profit associated with the stevedoring of vessels of Mediterranean Shipping Company ("MSC"), Chilean Lines and TBS Shipping, all of whose vessels NOS would allegedly have ser-

viced were it not for the wrongful actions of the Board (Ex. 8). The statement concludes with entries indicating that the total profit lost was estimated at $1,047,104.50. The estimate is based upon the supposition that NOS would have provided stevedoring services to 51 MSC vessels per year from November 1, 1999, to March 30, 2001, and to 41 Chilean and TBS vessels per year from May 29, 2000, to March 31, 2001.

Respondent's Direct Case

The Board's reply brief is accompanied by the verified declarations of Kyle C. Jones, P.E., Manager, Capital Improvement Program of the Board, and David A. Wagner, the Executive Vice President of the Board, and 100 exhibits consisting chiefly of correspondence between the Board, NOS and other users of the port, transcripts of public meetings of the Board, portions of deposition transcripts and affidavits by certain of the Board's executives and employees. The Board's position is that the problems experienced by NOS and its inability to continue operations in the port of New Orleans were largely the result of its own business decision to terminate its status as a long term lessee of port facilities at the Napoleon Avenue terminal which lies along the Mississippi River. The Board further maintains that the actions of which NOS complains were reasonable nondiscriminatory policies designed to strike a balance between the necessity of minimizing interference with a major renovation project and of meeting the Board's obligations to provide facilities to long term lessees who had been adversely affected by the renovation. The crux of this argument is that, in deciding not to renew its lease, NOS knowingly and voluntarily gave up a contractual right to the availability of terminal facilities in exchange for the lower operating cost associated with short term assignments, including relief from the annual guarantee of minimum cargo tonnage which was required of lessees. Therefore, according to the Board, it had no obligation to compromise its policy against minimizing interference with the construction project in order to accommodate NOS. The Board maintains that NOS was treated no differently than any other company without a long term lease and, in fact, was granted numerous concessions, primarily in the form of the postponement of deadlines for exercising options, submitting proposals and for removing equipment and cargo from locations which it was no longer entitled to use. Finally, the Board argues that its actions with regard to the allocation of its facilities were in accordance with its tariff which vests discretion in the Board to manage the port in an efficient and economically viable manner.

---

3.    In spite of its designation as a tariff, the document is actually a marine terminal operator schedule within the contemplation of section 8(f) of the Act, 46 USC app. §1707(f).

**NEW ORLEANS STEVEDORING CO. v. BOARD OF COMMISSIONERS, PORT OF NEW ORLEANS** [pf]

Complainant's Reply Brief

The reply brief of NOS, which is accompanied by three additional exhibits, disputes the Board's recitation of events subsequent to the disruption of cargo operations due to the impact of Hurricane Georges in 1998. Those events are relevant only to the extent that they were cited by representatives of the Board as illustrating the adverse effects of allowing cargo to be stored in locations with insufficient capacity.

NOS also challenges the Board's stated protocol for the assignment of space within the Napoleon Avenue complex. According to NOS the proposition that the Board limited such assignments to lessees is belied by the fact that the recipients of the assignments did not have leases of the space which was assigned and that the Board owed no contractual obligation to the lessees.[4]

Findings of Fact

1.  NOS is a division of James J. Flanagan Shipping Corporation.

2.  NOS was a marine terminal operator in the port of New Orleans, Louisiana from on or before 1993 until on or about May 29, 2000.

3.  The Board is a nongovernmental body authorized by state law to generally operate and allocate facilities in the port for maritime functions including the berthing of vessels, the loading and discharge of cargo onto and off of vessels and the storage of cargo, containers and equipment.

4.  Marine terminal facilities in the port are located along either the Mississippi River or the Industrial Canal. Vessels pass into and out of the canal through the Mississippi River Gulf Outlet ("MRGO").

5.  Marine terminal facilities along the river are able to accommodate vessels of 40 foot draft or more.

6.  Marine terminal facilities along the canal are able to accommodate vessels of no more than about a 35 foot draft.

7.  The Board authorizes marine terminal operators and stevedores to use port facilities either through

long term leases or through short term assignments which are frequently made on a ship-by-ship basis.

8.  Lessees are guaranteed access to and use of the leased facilities during the term of their leases. However, lessees are required to assume financial obligations related to the fixed costs of the leased facilities and are also required to meet minimum requirements for cargo tonnage. Lessees are obligated to make supplemental payments to the Board for any years in which the minimum cargo requirements have not been met.

9.  Assignees are able to use marine terminal facilities at costs lower than those charged to lessees inasmuch as assignees are not obligated for any portion of fixed costs or for minimum tonnage of cargo. Assignees use facilities under the terms of the tariff and do not enjoy preferred access to marine terminal facilities.

10.  On June 12, 1997, NOS became a lessee of marine terminal facilities at the Henry Clay Wharf and Yard and at the Nashville A terminal. Later that year NOS moved to the Napoleon Avenue A/B terminal for which it had a lease which was effective through May 31, 1998, with the option of extending the lease for two successive one year periods. All of the facilities leased by NOS are along the Mississippi River.

11.  NOS met its minimum tonnage requirement for the 1997-98 lease year and renewed its lease for the period from June 1, 1998, to May 31, 1999.

12.  In March of 1999 NOS was uncertain as to whether it wished to renew its lease for an additional year. The uncertainty was due to the fact that NOS was reluctant to commit itself to another minimum tonnage guarantee because Chilean Lines, one of its major customers, was in the process of a reorganization.

13.  On April 19, 1999, the Board[5] agreed to allow NOS a one month extension of the deadline for exercising its option to renew its lease (until June 1, 1999) provided that NOS satisfied its financial obligations under the lease and complied with instructions from

---

4.    According to the record NOS alleged at one time that the Board misled it into failing to renew its lease. That theory has not been advanced in this proceeding.

5.    The word "Board" will be used to designate not only members of the Board of Commissions of the Port of New Orleans but also employees of the Port of New Orleans acting in the course of their employment. Similarly, entities such as NOS, Ceres and MSC will be identified by their company names rather than by the names of individual representatives unless a more specific identification is required for clarity.

the Board regarding water access at the Napoleon Avenue terminal.

14. On April 30, 1999, the Board extended until June 1, 1999, the deadline for NOS to exercise its option to renew the lease. This action was taken after NOS had satisfied its financial obligations; NOS was allowed to delay action with regard to water access until after it had decided whether to exercise the option.

15. On June 1, 1999, NOS requested and was granted an additional two days within which to exercise its option to renew the lease.

16. NOS elected not to renew the lease on the Napoleon Avenue A/B terminal.

17. On June 8, 1999, the Board wrote to NOS confirming its understanding of the decision of NOS not to renew the lease and that the option to renew had expired. The Board further stated that it would cooperate with NOS with regard to its continued operation at Napoleon A/B while the Board sought another lessee and that all cargo activity by NOS after June 30, 1999, would be subject to the terms of the tariff and to the availability of space as determined by the Board.

18. The Board permitted NOS to keep three trailers in the Napoleon A wharf area after June 30, 1999, under a preferential assignment.

19. On June 29, 1999, NOS requested a lease for the Napoleon A portion of the Napoleon Avenue terminal complex. The Board responded to the effect that it preferred to lease the Napoleon Avenue facility as a whole. NOS reiterated its request on August 18, 1999, and received the same reply from the Board.

20. On July 8, 1999, Ceres Gulf, Inc. ("Ceres") expressed interest in leasing the entire Napoleon Avenue complex. The Board responded to the effect that several marine terminal operators had expressed similar interest and that no decision on the lease of that facility would be made for the next several weeks.

21. On August 10, 1999, Ceres advised the Board that MSC, a customer of Ceres at France Road No. 4 terminal (on the canal), wanted to move to a location on the river because of draft limitations in the canal. Ceres again expressed interest in leasing the entire Napoleon Avenue complex.

22. During the period from July 1, 1999, to September 10, 1999, NOS continued to service the vessels of its customers at Napoleon A/B under a preferential assignment. Charges for use of those facilities were assessed by the Board in accordance with the tariff.

23. On September 10, 1999, the Board informed NOS that its preferential assignment at Napoleon A/B would be cancelled as of October 31 and that no vessels would be allowed to berth at the Napoleon Avenue complex after September 30.

24. On September 10, 1999, the Board granted NOS an extension so as to allow it to service a vessel on October 2. The Board informed NOS that subsequent berthing requests would be approved or disapproved depending upon the Board's progress in leasing the Napoleon Avenue complex.

25. On August 19, 1999, MSC informed the Board that it had decided to move to the river but had not yet chosen a marine terminal operator. MSC expressed a preference to continue its relationship with Ceres because it was currently servicing MSC vessels in New Orleans. MSC stated that it also had discussions with TTO and LANCO.

26. On August 27, 1999, NOS informed the Board of its interest in negotiating for the lease of Napoleon A/B and Nashville C (also on the river) and surrounding marshland areas.

27. A letter dated September 22, 1999, from MSC to the Board confirmed the understanding of MSC that the Board would consider a reallocation of the Napoleon Avenue facility at its meeting in October. In its letter MSC further stated that, rather than awaiting the outcome of the October meeting, it intended to influence the Board's decision by urging that the Napoleon Avenue facility be leased or assigned to NOS. The stated reason for the request was that MSC had awarded a contract to NOS to service its vessels on the river in New Orleans.

28. In a letter dated September 23, 1999, the Board informed MSC that it would not make a final decision as to the disposition of the Napoleon Avenue facility until it had considered all of the applicants, including NOS, for that space. The Board further stated that NOS did not have a lease of any facility at that time and might not be chosen for lease negotiations. Finally, the Board stated that it was also considering whether to go forward with a reconstruction project and not lease the Napoleon Avenue facility to any of the applicants.

NEW ORLEANS STEVEDORING CO. v. BOARD OF COMMISSIONERS, PORT OF NEW ORLEANS

29. On October 11, 1999, the Board reminded MSC that the decision as to the future of the Napoleon Avenue facility would be made in accordance with long term objectives for the development of the port rather than to accommodate the immediate concerns of MSC. The Board also stated that it was highly likely that it would decide to develop a new container terminal at Napoleon Avenue rather than leasing the facility in its current condition.

30. By letter of October 11, 1999, to NOS the Board confirmed discussions on that date to the effect that it did not intend to assign space at the Napoleon A/B marshaling yards to any terminal operator for the foreseeable future. The Board further stated that it was considering a major reconstruction project at Napoleon Avenue which could begin as early as January of 2000. During the first phase of the project the wharves, sheds and Field G behind the sheds would be completely demolished. The only available space for handling cargo at this location would be 8.9 acres in the Napoleon A/B marshaling yards. Priority in using that space would be given to entities already operating on the river. The Board advised NOS that it should begin planning for the possible termination of all business activity in the Napoleon A/B sheds and at Field G on or about January 15, 2000.

31. On October 14, 1999, the Board gave written notice to all companies, including NOS, which had expressed interest in leasing the Napoleon Avenue facility. The notice stated that the Board would not commit to the allocation of the facility pending a decision as to its redevelopment as a container terminal.

32. On October 27, 1999, NOS again requested a lease of the Napoleon A/B facility and alleged that the Board had misled it into not renewing its lease.

33. On December 16, 1999, the Board decided to proceed with the redevelopment of the Napoleon Avenue terminal complex.

34. On December 16, 1999, the Board informed NOS that it would have to vacate the Napoleon A/B sheds as of midnight on February 14, 2000, but that it could continue using the marshaling yards on a ship-by-ship basis until that space was needed by the construction contractor. The Board also informed NOS that the only facility that was available for leasing was the Jourdan Road Terminal (on the canal).

35. On December 28, 1999, Henry Flanagan (the Vice President of NOS and its senior representative in New Orleans) requested information on leasing all or part of the Jourdan Road Terminal.

36. On December 30, 1999, the Board confirmed to NOS its understanding that NOS wished to lease half of the shed and approximately five acres of marshaling area at the Jourdan Road Terminal. The Board stated that it would consider a one year lease with a clause allowing the Board to cancel the lease on 90 days notice; there would also be a minimum revenue guarantee to the port. The Board informed NOS that, should NOS decide not to lease a portion of the Jourdan Road Terminal, it would still be able to service vessels according to the tariff at available nonleased facilities.

37. By letter of January 6, 2000, to Tom Flanagan (president of NOS) in Beaumont, Texas the Board confirmed Tom Flanagan's advice that NOS was no longer interested in leasing the Jourdan Road Terminal and stated that the Board would pursue discussions with other companies which had expressed an interest in the facility.

38. On January 13, 2000, Henry Flanagan again expressed the interest of NOS in the Jourdan Road Terminal. He was informed that, in view of the communication from Tom Flanagan, all remaining space at the facility had been leased to another company.

39. On January 14, 2000, the Board confirmed to NOS that the Jourdan Road Terminal was not currently available and would not be for the next 90 days. The Board expressed a willingness to discuss arrangements with NOS after that time.

40. On January 26, 2000, the Board informed NOS that, because of a delay in the award of the demolition contract, NOS would be allowed continued use of the shed at Napoleon A until February 29 and that all cargo and equipment was to be removed from the Napoleon A/B demolition site by midnight on that date. The Board also informed NOS that the Jourdan Road Terminal would become available for lease on March 17 and that other options for leased space were very limited.

41. On February 15, 2000, the Board provided NOS with the major terms of a one year lease of all or part of the Jourdan Road Terminal beginning on or about the middle of March.

42. NOS did not lease any portion of the Jourdan Road Terminal.

43. The Foreign Trade Zone ("FTZ") is a facility adjacent to the river which the Board maintains for the purpose of storing import cargo which has not cleared customs and is intended either for further processing before customs clearance or for transshipment without customs clearance. The facility is operated under authority granted by the U.S. Customs Service.

44. At some time prior to April 19, 2000, NOS made arrangements with the Danzas Corporation to store a quantity of containers and breakbulk cargo from M/V LAJA, which was due to arrive in New Orleans on April 20, in space assigned to Danzas in the FTZ. This arrangement was made without the knowledge or approval of the Board and required the Board to obtain the approval of the U. S. Customs Service.

45. NOS subsequently requested permission of the Board to use the FTZ to store containers and cargo from other vessels. The Board denied such permission on the grounds that the FTZ was not intended to be used for regular cargo operations and was only available for emergency overflow for long term lessees.

46. The Board has eight acres of unimproved land located at the foot of Napoleon Avenue which is commonly known as the "grassy area." The grassy area was only approved for the storage of chassis and similar items of relatively light weight because of its inability to support heavier cargo if its surface were to become muddy. One and a half to two acres of the grassy area is completely unusable due to the presence of cement foundations from demolished structures.

47. At all times pertinent to this proceeding the Board had in effect a document entitled FMC Tariff No. 2 which may be accessed by the public via the internet at *www.portno.com.*

48. Section III of the tariff, entitled "Use of Board Property", generally sets forth guidelines for the use of waterfront facilities by entities including marine terminal operators.

49. At various times relevant to this proceeding representatives of NOS or of Maritech Commercial, Inc., a firm of marine surveyors engaged by NOS, observed and photographed the presence of cargo and/or ongoing cargo operations at facilities to which NOS had been denied access by the Board.

50. At all times relevant to this proceeding P&O Ports and Gateway were lessees of marine terminal facilities owned or controlled by the Board.

51. On or about December 16, 1999, and thereafter the Board announced a policy of not leasing any portion of the Napoleon Avenue complex that was scheduled for renovation. The use of those facilities was limited to short term assignments in order to compensate lessees for the loss of use of or access to leased facilities resulting from the activities of the Board's construction and demolition contractors. The purpose of the policy was to minimize the possibility of delays and cost overruns in the construction project due to interference with the activities of the construction contractor.

52. On May 2, 2000, the Board solicited proposals from marine terminal operators, including NOS, for the use of the Napoleon Avenue complex subsequent to its renovation.

53. The proposal by NOS was submitted three days after the deadline of May 19, 2000, and, unlike the proposals from other interested marine terminal operators, was felt by the Board to be lacking in necessary detail.

54. On May 11, 2000, the Board held a special meeting in an effort to address the concerns of NOS regarding the allocation of marine terminal facilities along the river. The meeting was attended by Tom Flanagan on behalf of NOS. During the course of the meeting the Board offered NOS the use of any available space that it could find, including the Jourdan Avenue Terminal, so long as its use did not infringe upon the rights of long term lessees or interfere with the activities of the construction contractor.

55. On May 12, 2000, the Board asked NOS to submit a written proposal for the use of a portion of the FTZ and the grassy area; the proposal was to be submitted by noon on May 16.

56. NOS did not submit the requested proposal but, at the end of the day on May 16, 2001, requested a meeting to discuss the matter.

57. On May 17, 2000, the Board again requested that NOS submit a proposal.

58. NOS did not submit a proposal but, on May 22, 2000, offered to use the grassy area as is. The Board rejected that offer.

59. NOS ceased doing business in New Orleans at or around the end of May 2000.

**NEW ORLEANS STEVEDORING CO. v. BOARD OF COMMISSIONERS, PORT OF NEW ORLEANS**   pf

Discussion and Analysis

Much of the precedent regarding the portions of the Act cited in the Complaint is to be found in decisions rendered by the Commission prior to the effective date of the Ocean Shipping Reform Act of 1998, 46 USC app. §817d et seq. ("OSRA").[6] One of the effects of OSRA was to transfer language prohibiting an unreasonable refusal to deal or an unreasonable prejudice or disadvantage from section 10(b)(12) to sections 10(d)(3) and (4). The provisions of section 10(b)(12) prior to the enactment of OSRA were virtually identical to those now found in sections 10(d)(3) and (4).[7]

A. Unreasonable Refusal to Deal or Negotiate

The Act does not guarantee the right to enter into a contract, much less a contract with any specific terms; such a right has not existed either before or since the passage of OSRA. All that is required is that common carriers, ocean transportation intermediaries and marine terminal operators refrain from "shutting out" any person for reasons having no relation to legitimate transportation-related factors. For example, in *Seacon Terminals, Inc. v. Port of Seattle*, 26 SRR 886, 899 (1993), it was held that there was no statutory violation where the respondent port authority was shown to have had a reasonable basis for dealing with an entity other than the complainant in view of the complainant's demonstrated reluctance to enter into a long term lease. In *Consumer Electronics Shippers Ass'n v. ANERA*, 26 SRR 766, 774 (1993), the Commission found that the respondent had not acted unreasonably in refusing to offer a "most favored shipper" clause to an ocean carriers' conference with which it had not previously dealt while offering the provision to a conference with which it had a long history.

An example of an unjustified refusal to deal is described in *"50 Mile Container Rules"*, 24 SRR 411, 455 (1987), *affirmed sub nom., New York Shipping Ass'n v. FMC*, 854 F2d 1338 *[24 SRR 1163]* (DC Cir 1988), *cert. denied sub nom., International Longshoremen's Ass'n v.*

*FMC*, 488 US 1041, 102 L Ed 2d 990 (1989), in which it was held that adherence to a collective bargaining agreement did not justify acts of discrimination between shippers based only upon the location of cargo. In so ruling, the Commission found that the contractual obligations of the carriers to the longshoremen's union were not legitimate factors related to transportation.

NOS cites the refusal of the Board to allow it to use a portion of the Napoleon Avenue complex to service vessels of MSC as constituting an unreasonable refusal to deal. The result of that refusal was a cancellation by MSC of its contract with NOS.

NOS maintains that it could have used the requested portion of the Napoleon Avenue complex without interfering with the construction contractor and that, in fact, that portion was used for cargo operations by one of its competitors. NOS has advanced the same rationale in support of the proposition that its competitors enjoyed an unreasonable preference or advantage with regard to the use of various portions of the Napoleon Avenue complex at this and other times.

NOS has not denied that the Board announced and followed a policy of not allowing either leases or short term assignments of the Napoleon Avenue complex after December 16, 1999, or thereabouts pending its decision as to whether to undertake a major renovation of the facility. That policy was apparently adopted on the recommendation of David A. Wagner and was based upon his experience in managing major construction projects in the port of Baltimore and elsewhere. The Board reasoned that the risk of interfering with and delaying the construction contractor, with its attendant costs, outweighed the risk of loss of the income and productivity that could have been derived from allowing marine terminal operators to attempt to "work around" the activity related to the construction project. The policy was relaxed as necessary to compensate lessees for the disruption of their operations by the contractor. (See Wagner declaration, ¶¶73-81.)

During the course of a presentation at a special meeting of the Board on May 11, 2000,[8] Mr. Wagner acknowledged the likelihood that there would be space to carry on cargo operations in the Napoleon Avenue complex during the course of the construc-

---

6. OSRA went into effect on May 1, 1999.

7. Section 10(b)(12) prohibited common carriers, either alone or in conjunction with other persons, directly or indirectly, from ". . . subject[ing] any particular person . . . to an unreasonable refusal to deal or any undue or unreasonable prejudice or disadvantage in any respect whatsoever . . . ." Since the enactment of OSRA those prohibitions have applied to ocean transportation intermediaries and marine terminal operators as well as to carriers.

---

8. The purpose of the special meeting was to address the problems of NOS.

tion project. However, he was adamant in his asser-
tion that the risk of interfering with the construction
contractor, thereby causing delays and cost over-
runs, was not acceptable (Board Exhibit 74). Again,
the Board was willing to undertake the risk to ac-
commodate its lessees but not for other applicants
(such as NOS) for marine terminal facilities.

It is possible to characterize the Board's policy as
overly conservative, inflexible and insufficiently re-
sponsive to the needs of users of the port such as
NOS. Indeed, the opinion of Clovis Morrison, a con-
sulting engineer engaged by NOS, was that cargo
operations could have been allowed to proceed, at
least to a limited extent, without interfering with
construction activity. However, while the Board's
policy might have been debatable it cannot ration-
ally be characterized as unreasonable or as being
unrelated to legitimate transportation considera-
tions.

NOS has suggested that the Board's stated policy
was a pretext to steer the MSC business to P&O
Ports as an inducement to the company to make a
large capital investment in the Napoleon Avenue
renovation project. According to that scenario, the
Board was distressed to learn that NOS had
"landed" the account of a major container carrier
after having declined to renew its lease because of a
downturn in its business activities.

That theory fails for two reasons. In the first place,
there is no evidence to show that the Board did not
apply the policy in a consistent manner. Secondly,
the evidence indicates that MSC was prepared to
give its business to any marine terminal operator
that could service its vessels at a berth along the
river and that it initially expressed a preference to
remain with Ceres which was currently servicing its
vessels along the canal (Board Exhibit 38). MSC later
used its purported relationship with NOS in an ad-
mitted attempt to present the Board with a *fait ac-
compli* so as to induce the Board to immediately lease
or assign riverside space to NOS rather than, as pre-
viously announced, delaying commitments as to the
use of any portion of the Napoleon Avenue complex
until after it had determined whether to proceed
with the contemplated renovation project (NOS Ex-
hibit 1). The Board rejected the approach by MSC
while restating its previously announced intentions
(NOS Exhibits 2, 3). It is significant to note that NOS
applied for a lease of only the Napoleon A portion of
the complex (Board Exhibit 28) while other marine
terminal operators expressed interest in the entire
facility (Board Exhibits 30, 37).

In summary, the evidence clearly shows that, re-
gardless of its desire to attract an investment by
P&O Ports, the Board's refusal to allow NOS to con-
tinue to use the Napoleon Avenue complex was mo-
tivated by a desire to minimize possible interference
with the construction contractor if the renovation
project was eventually approved and, if the project
did not go forward, to lease the entire facility to a
single marine terminal operator. Therefore, in spite
of the harsh consequences to NOS, the Board did not
*unreasonably* refuse to deal within the meaning of
sections 10(b)(10) and 10(d)(3) of the Act.

B. Unreasonable Preference or Advantage

The threshold criterion for the existence of an unrea-
sonable preference or advantage was established in
*Volkswagenwerk v. FMC*, 390 US 261, 279, 19 L Ed 2d
1090 [*8 SRR 20,109*] (1968). Although the issue was
addressed with regard to the meaning of section 16
of the Shipping Act of 1916, the precedent is control-
ling because of the close similarity of section 16 to
section 10(d)(4) of the current Act.[9] The Supreme
Court stated that discriminatory treatment will not
be found to exist in the absence of a determination
that a third party has enjoyed an unfair advantage
over the complainant. The favored entity need not
have been in direct competition with the complain-
ant, but it must have been similarly situated in that
both were seeking the benefit which was denied to
the complainant. This is the so-called "triangular
analysis" which has been applied by the Commis-
sion in cases such as *Credit Practices of Sea-Land Ser-
vice, Inc., etc.*, 25 SRR 1308, 1313 (1990).

The determination of reasonableness, in the context
either of an alleged refusal to deal or negotiate or of
an alleged preference or disadvantage, is largely
dependent upon specific facts rather than broad
generalizations. A review of the factors which have
been considered is to be found in *All Marine Moor-
ings, Inc. v. ITO Corp. of Baltimore*, 27 SRR 539, 545
(1996). They include such considerations as the
maintenance of consistent service and the economic
well-being of the port as in *Petchem, Inc. v. Canaveral
Port Authority*, 23 SRR 974 (1986), *affirmed sub nom.,
Petchem, Inc. v. FMC*, 853 F2d 958 [*24 SRR 1156*] (DC
Cir 1988). The Commission will not substitute its

---

    9.    Section 16 made it unlawful, ". . . . to make or
give any undue or unreasonable preference or advantage
to any particular person, locality, or description of traffic
. . . or to subject any particular person, locality, or descrip-
tion of traffic to any undue or unreasonable prejudice or
disadvantage in any respect whatsoever . . . ."

**NEW ORLEANS STEVEDORING CO. v. BOARD OF COMMISSIONERS, PORT OF NEW ORLEANS** 

own business judgment for that of an entity (such as the Board) that is responsible for the day-to-day operation of a port, nor will it abrogate its responsibility to determine whether the entity violated the Act, *Petchem*, 23 SRR at 989; *James J. Flanagan Shipping Corp. v. Lake Charles Harbor and Terminal District*, 27 SRR 1123, 1130 (1997).

Another factor to be considered is the effect of the challenged actions on competition. However, the Commission has made it clear that a strict antitrust analysis is not appropriate in adjudicating an alleged violation of the Act, *Gulf Container Line v. Port of Houston Authority*, 25 SRR 1454, 1459 (1991). In other words, a respondent will not avoid liability under the Act by showing that it did not violate antitrust statutes.

The Board has argued that the claim by NOS as to unfair preference or advantage fails because of the lack of a threshold showing that it was sufficiently similar to the preferred entities, all of whom held leases to facilities in the port. Neither *Volkswagenwerk* nor subsequent rulings by the Commission give specific guidance as to the standards for determining similarity. It may be rationally concluded that all marine terminal operators, whether or not lessees, were similarly situated with regard to their need for access to facilities along the river. The fact that NOS was not a lessee is relevant to the issue of the reasonableness of the preference or advantage rather than to the existence of comparable preferred entities.

The reasonableness of the Board's policy with regard to the Napoleon Avenue complex has already been discussed with regard to its allegedly unlawful refusal to deal. That rationale is also applicable to the determination that the Board did not act unreasonably in restricting access to the Napoleon Avenue complex and other facilities under its control to lessees whose operations had been disrupted by the activities of the construction contractor.

In its reply brief NOS challenges the preference afforded Gateway and P&O Ports on the grounds that neither company had a lease on any portion of the Napoleon Avenue complex and that the Board owed them no legal duty to provide assigned space. The former argument ignores the fact that the assignments were intended to make up for the use of leased space that was affected by the construction project. The validity of that proposition is not diminished by the location of the space that was leased by the preferred companies. The latter argument has

no relevance to the issue of whether the Board violated the Act in granting preferential treatment to current lessees. Even if the Board had no contractual duty to compensate its lessees for the loss of use of or access to leased premises, it was entitled to attempt to compensate them for such loss if for no other reason than to encourage marine terminal operators to assume the obligations associated with long term leasing. It cannot be seriously maintained that such a motive is not related to transportation concerns.

The allocation of space in the FTZ involved an additional factor in view of its special purpose. NOS has not directly contested the proposition that the FTZ was specially designated with the approval of the U.S. Customs Service for the storage of cargo which would either be transhipped out of the country in its original condition without customs clearance or altered (probably as a component in a manufacturing or assembly process) prior to clearance. On or about April 15, 2000, NOS gained temporary access to a portion of the FTZ by dealing directly with Danzas Corporation, an assignee, rather than with the Board (NOS Exhibit 39). On May 5, 2000, the Board gave Danzas notice of the cancellation of its preferential assignment as of June 5 and offered to replace it with an assignment agreement which specifically prohibited handling, storage or other activity with regard to maritime cargo (NOS Exhibit 40).

The FTZ was not used exclusively for cargo which had not cleared customs. It was also used as a short term storage area for overflow maritime cargo from leaseholds. The Board relaxed its policy in favor of NOS by allowing the storage of about containers from Chilean Lines vessels for which NOS had no other space (Board Exhibit 66). The Board requested and received special permission from the U.S. Customs Service for this arrangement (Board Exhibit 67). NOS was finally denied further use of the FTZ after containers from Chilean Lines vessels had brought the facility to the limit of its storage capacity (Board Exhibit 83).

Although NOS has characterized the modification of the terms of the assignment to Danzas as proof of the Board's animosity towards NOS, that action by the Board can more reasonably be characterized as evidence of its desire to maintain control of the FTZ so as to prevent actions which would jeopardize its special status.

The allegations by NOS concerning the grassy area are the least tenable of all. As the name implies, the grassy area is unimproved land which, after a heavy

rain, cannot support heavy cargo or loaded containers. Clovis Morrison, an engineer engaged by NOS, obtained an estimate of $745,100.00 to prepare the surface to accommodate cargo (Board Exhibit 87). Approximately four acres (of a total of eight) were earmarked as makeup space for Coastal Cargo, a lessee which had been adversely affected by the construction project (Board Exhibit 73). Furthermore, a portion of the grassy area was unusable because of the presence of foundations from demolished buildings. In view of the expressed interest of NOS in using the grassy area, the Board invited it to submit a detailed proposal for improving the facility. No such proposal was ever submitted (NOS Exhibit 38) and NOS eventually proposed that it be allowed to use the grassy area without improving it. Not unexpectedly, that proposal was rejected by the Board.

NOS has cited certain portions of the Board's tariff in support of the proposition that it acted unreasonably in the allocation of marine terminal facilities along the river (NOS Opening Brief, page 29). Specifically, NOS alludes to Items 308, 310 and 312 as establishing the standards which the Board had obligated itself to follow; NOS has not stated the precise manner in which those provisions were allegedly violated nor does the evidence indicate that NOS invoked them in any of its many meetings and correspondence with the Board.

Item 308 is entitled "First Call on Berth Privilege or Preferential Assignments, Groups I, II or III." First Call on Berth Privilege is defined as:

> . . . a prior claim to be assigned the use of a particular public wharf and berth by vessels pursuant to a written grant to *the owners and agents*, and shall not be construed as granting exclusive use or absolute control of a particular wharf and berth (emphasis supplied).

There is no indication that NOS has initiated this proceeding other than as a marine terminal operator or on behalf of vessel owners or agents. Even if that were not so, Item 308 further states that:

> First Call on Berth Privilege *may* be granted upon a particular wharf, *when available*, upon application (emphasis supplied).

NOS maintains that the Board denied it the use of space which at the time either was not being used or which could have accommodated the needs of NOS in addition to those of other users. In retrospect that might have been true. However, the Board was entitled to adhere to its policy, as discussed above, of

reserving certain facilities for lessees who might have been affected by the construction project. Taken in that context, the facilities which were denied to NOS were not available at the time their use had been requested.

Item 310 is entitled, "Preferential Assignment." The item states that:

> Board facilities may be preferentially assigned by the Marine Terminal Superintendent to applicants for other maritime-related activities. **Preferentially Assigned** facilities **may not be** utilized for the receiving or discharging of cargo directly to or from ocean-going vessels. Such maritime-related activities may include, but are not limited to, bagging operations, unitization, shrink-wrap operations, Vac-U-Vator services, container storage and repair, vessel repair, loading and unloading of rail cars and/or barges, fabrication of one-way pallets and other similar maritime related activities. The Preferential Assignment shall not include exclusive use, but merely a prior claim to the specified use (emphasis in original).

Once again, it is difficult to determine why NOS feels that the Board violated the terms of Item 310 to its detriment. The record is devoid of evidence to suggest that NOS was requesting use of Board facilities for any of the "other maritime-related activities" specified in this portion of the tariff other than possibly for container storage.

Finally, Item 312 is entitled, "Use of Marshalling *(sic)* Yards, Improved and Unimproved Lands." Those areas are designated as Class A, B, C or D based upon their, ". . . *surface preparation*, location, configuration, infrastructure improvements, etc. (emphasis supplied)." Item 312 further provides that:

> Subject to an area's availability and its classification, it may be used pursuant to a multi-year lease, one-year assignment, 60-day assignment, 30-day assignment, or per diem agreement. Multi-year lease rates are negotiable.

The clear intent of this portion of the tariff is to set forth the various arrangements and conditions under which certain facilities may be allocated. None of the language therein may be fairly construed as depriving the Board of its discretionary powers. More specifically, there is no evidence to suggest that the Board violated Item 312 in its dealings with NOS.

**NEW ORLEANS STEVEDORING CO. v. BOARD OF COMMISSIONERS, PORT OF NEW ORLEANS** 

For example, the surface preparation (or lack of same) was a legitimate factor in allocating the use of the grassy area. As stated above, the needs of lessees could be considered in determining the availability of space controlled by the Board.

In its reply brief the Board has alluded to various incidents in support of its contention that NOS was a difficult and unreliable tenant and that the Board was justified in its lack of confidence that NOS would promptly vacate any assigned space because of the needs of the construction contractor. NOS has submitted evidence to rebut those contentions and has stated that the Board expressed its concerns only during the discovery process. NOS maintains that, in view of the timing of the Board's expressions of concern, they are no more than belated attempts to justify the numerous adverse actions taken against it.

NOS is correct in its criticism of the Board's timing in raising the issue of its past record as a lessee. However, the issue is not critical inasmuch as the Board's actions were justified by legitimate concerns as to interference with the construction contractor. There is no evidence to suggest that those actions were influenced by a general animosity towards NOS.

It may be fairly assumed that various members of the Board's staff became exasperated with the repeated importuning of NOS for space along the river. It is also possible (although not directly proven) that the reputation of NOS, whether or not deserved, played a part in the refusal of the Board to grant NOS additional concessions. However, the record is replete with evidence showing that NOS was granted repeated extensions of deadlines to vacate marine terminal facilities. If, as suggested by

NOS, it was the victim of a vendetta by the Board those extensions could easily have been withheld.

It is not necessary to discuss the merits of NOS's claim for reparations in view of the fact that the Board has not been found to have acted unreasonably within the context of the Act. However, it seems appropriate to note that NOS, in spite of its concern about being forced out of a port where it had allegedly conducted business for over a hundred years, declined the opportunity to lease space at the Jourdan Road Terminal. To be sure, that space (which was along the canal) was less desirable than the space along the river which NOS had so vigorously sought. Nevertheless, the lease of that space would have allowed NOS to continue to operate in New Orleans and would, perhaps, have improved its ability to eventually return to a site along the river.

### Summary and Conclusions

It is possible to understand and to sympathize with the frustration of NOS in its eventual inability, in spite of repeated efforts, to obtain marine terminal space along the river after it had decided not to exercise the option to renew its lease at the Napoleon Avenue complex. It clearly had not, and perhaps could have not, foreseen the consequences of that decision or of the impact of the Napoleon Avenue renovation project on the availability of other space along the river. However, the weight of the evidence clearly indicates that NOS was not the victim of either an unreasonable refusal to deal or negotiate or of an unreasonable preference or privilege.

The complaint by New Orleans Stevedoring Company against the Board of Commissioners of the Port of New Orleans is dismissed.

———————

Add-35

*New Orleans Stevedoring Company v. Port of New Orleans*, 29 S.R.R. 1066 (FMC 2002), *aff'd mem.*, 80 Fed. App'x 681 (D.C. Cir. 2003)



ORDER OF FEDERAL MARITIME COMMISSION

III.

We interpret the P&I rules to provide generally for the choice of English substantive law, but to except from this choice of law the substantive issue of whether a maritime lien exists in the first place. Under the contract, that question, like the enforcement of such a lien, is to be determined by the law of the local jurisdiction. We therefore conclude that in this case the P&I rules call for the application of United States substantive law to determine the existence of maritime liens. Accordingly, we REVERSE the district court's grant of summary judgment in the QUEEN OF LEMAN case and REMAND the case for further proceedings. In the ABRA case, we AFFIRM the district court's resolution of the choice of law issue and conclude that Interforce is bound by this contractual provision.

---

**NEW ORLEANS STEVEDORING COMPANY,** *Complainant*

**v.**

**BOARD OF COMMISSIONERS OF THE PORT OF NEW ORLEANS,** *Respondent*

FMC Dkt. No. 00-11
Served: June 28, 2002

**[10:10[2]l, 10:10[4]d]  No unreasonable refusal to deal.**

The ALJ did not err in dismissing a stevedore's claims of unreasonable discrimination by a port administration. In permitting other stevedores to use certain facilities from which it had barred the complainant, which was not a leaseholder, the port acted not out of hostility but rather out of transportation-related motives, particularly the desire to avoid expensive conflicts between ongoing construction and current operations and the legal obligation to provide space to its leaseholders. Similarly, the port prevented the stevedore from operating within a free trade zone because such operations fell outside the FTZ's intended use, and the stevedore itself failed to answer the port's request for plans to improve a grassy area that the stevedore wished to use. Accordingly, the ALJ properly determined that the record demonstrated no violation of the 1984 Act. **New Orleans Stevedoring Co. v. Board of Commissioners of the Port of New Orleans, 29 SRR 1066 [FMC, 2002].**

**ORDER**

By the Commission.

I. INTRODUCTION

This proceeding was initiated by a complaint filed on September 25, 2000, by New Orleans Stevedoring Company ("NOS" or "Complainant") against the Board of Commissioners of the Port of New Orleans ("Board" or "Respondent"). In its complaint, NOS alleged that Respondent unreasonably refused to deal or negotiate with NOS in violation of section 10(d)(3)[1], and provided an unreasonable preference or advantage in violation of section 10(d)(4)[2] of the Shipping Act of 1984 ("Shipping Act"), 46 USC app. §§1709(d)(3) and (d)(4). NOS averred that Respondent refused to allow it to use certain marine terminal facilities along the Mississippi River ("River"),

---

Section 10(b)(10) provides in pertinent part that: No common carrier, either alone or in conjunction with any other person, directly or indirectly, may —

(10)  unreasonably refuse to deal or negotiate.

2.    Section 10(d)(4) provides that: No marine terminal operator may give any undue or unreasonable preference or advantage or impose any undue or unreasonable prejudice or disadvantage with respect to any person.

---

1.    Section 10(d)(3) makes the prohibition in section 10(b)(10) applicable to marine terminal operators.

and violated its tariff by refusing to consider NOS' berth application for individual vessels, thereby preventing it from obtaining terminal or stevedoring business, which ultimately led to its going out of business. Respondent filed an Answer on October 19, 2000, in which it addressed NOS' allegations.

On June 27, 2001, Administrative Law Judge Paul B. Lang ("ALJ") issued an Initial Decision ("I.D.") in which he dismissed NOS' complaint. The ALJ found that Respondent did not violate the applicable sections of the Shipping Act by refusing to deal or negotiate with Complainant or by providing an unreasonable preference or advantage to other marine terminal operators ("MTOs"). This proceeding is now before the Commission on exceptions and reply thereto. For the reasons set forth below, we affirm the ALJ's dismissal of the complaint.

## II. BACKGROUND

NOS is a division of James J. Flanagan Shipping Corporation and is franchised to do business under the laws of the state of Louisiana. Complaint at 1. NOS operated as both an MTO and stevedore in the Port of New Orleans. Respondent exercises control and authority over the port's maritime facilities, including leasing or otherwise assigning, pursuant to its tariff, the use of such facilities in the business of furnishing wharfage, dock, warehouse and other terminal facilities. *Id.*

NOS alleged that until May of 1999, it leased two adjoining wharf facilities on the River, each comprising wharf and shed space ("Napoleon A and B"), where it had conducted business for over 100 years. Upon expiration of the lease, NOS requested a new lease for only the space comprising Napoleon A's wharf and marshalling yard. At that time, Respondent allegedly indicated that it desired to lease the A and B facilities as one unit. Rather than lease both units, NOS elected to become a preferential assignee of the two facilities, under Respondent's tariff, which NOS claimed was more profitable for Respondent than a lease.

NOS contended that in August of 1999, it sought to lease Napoleon A and B. NOS claimed that, upon receiving NOS' request, Respondent indicated that due to "fairly immediate and extensive reconstruction," it did not intend to make any additional commitments for space assignments at Napoleon A and B. *Id.* at 3.

NOS further averred that Respondent indicated that the space would not be available to any party in or-

der to facilitate a "fast-track construction schedule." *Id.* at 4. NOS claimed that Respondent told NOS to vacate Napoleon A and B, as Respondent had no intentions to lease or assign any space due to construction activity. NOS claimed that after it vacated Napoleon A and B, it observed other competitors using the space for berthing vessels, unloading and storing cargo, and parking and storing equipment vehicles. NOS further claimed that it observed its competitors servicing vessels of former customers of NOS, whose business NOS claimed it lost due to its exclusion from Napoleon A and B.

Due to its exclusion from Napoleon A and B, NOS contended that it made several unsuccessful attempts to locate alternative facilities on the River, including Napoleon C, the neighboring marshalling yard, a space known as the Foreign Trade Zone ("FTZ"), and an area known as the "grassy area," which is a small area of unimproved land used to store items of relatively light weight. NOS asserted that due to Respondent's refusal to lease or assign riverfront terminal space, it has been unable to service and therefore to obtain terminal or stevedoring business and is no longer in business. NOS further asserted that as a result of Respondent's refusal to lease or assign it terminal space, NOS incurred damages, and it sought reparations in the amount of $1,000,000 plus any additional damages that may be proved, in addition to interest, attorneys' fees and any other sum as the Commission may deem appropriate.

## III. INITIAL DECISION

With respect to the allegation of a section 10(d)(3) violation, the ALJ stated that NOS was aware of Respondent's policy of not allowing either leases or short term assignments of Napoleon A and B while its decision to undertake a major renovation was still pending. I.D. at 17. The ALJ noted that Respondent had this policy in place because it did not want to risk delaying construction, but would accommodate lessees to minimize the disruption to their operations. The ALJ stated that while Respondent's policy might be characterized as "overly conservative, inflexible, and insufficiently responsive" to entities such as NOS, it could not be rationally characterized as unreasonable or as being unrelated to legitimate transportation considerations. *Id.*

The ALJ addressed NOS' argument that Respondent's policy was a guise to steer its business to another MTO, P & O Ports ("P&O"), as an enticement to make a large capital investment in the Napoleon



A and B renovation project. The ALJ found that NOS' theory failed for two reasons. First, there was no evidence indicating that Respondent did not evenly apply its policy. Second, the evidence indicated that the company to which NOS claimed it lost its business was prepared to do business with any MTO on the River that was capable of servicing its vessels. The ALJ concluded that while Respondent may have wanted another MTO to invest in the Napoleon A and B renovation project, Respondent's refusal to allow NOS to use Napoleon A was motivated by its desire to minimize any disruptions with the possible construction, and its interest in leasing the facility in its entirety, if the renovation project did not proceed.

The ALJ next addressed whether Respondent gave any undue or unreasonable preference or advantage or imposed any undue or unreasonable prejudice or disadvantage in violation of section 10(d)(4). The ALJ stated that a finding of reasonableness, whether in the context of an alleged refusal to deal or negotiate or of an alleged preference or advantage, is dependent upon specific facts rather than broad generalizations. I.D. at 20. *See All Marine Moorings, Inc. v. ITO Corp. of Baltimore*, 27 SRR 539, 545 (1996) (reviewing the factors that have been considered by the Commission when determining reasonableness).

The ALJ noted that NOS argued in its Reply Brief that certain MTOs received preferential treatment because they did not have a lease on any portion of Napoleon A and B and that Respondent owed them no legal duty to provide assigned space. *Id.* The ALJ stated that NOS' former argument ignored the fact that the assignments were intended to make up for the use of leased space affected by the construction project. The ALJ further stated that the latter argument had no relevance to the issue of whether Respondent violated the Shipping Act in granting preferential treatment to current lessees. The ALJ noted that Respondent was entitled to attempt to compensate its lessees for the loss of space and to encourage MTOs to assume the obligations associated with long term leasing. *Id.*

The ALJ next addressed the allocation of space located within the FTZ. The FTZ, which is an area specially designated with the approval of the U.S. Customs Service, is an area for the storage of cargo that would either be transshipped out of the country without customs clearance or altered before clearance. NOS had temporary access to the FTZ, which is also used for short term storage for overflow maritime cargo from lessees. The ALJ noted that while Respondent elected to modify an assignment agreement with the assignee of the FTZ, which specifically prohibited handling, storage or other activity with regard to maritime cargo, ultimately affecting NOS' usage of the FTZ for storage of its cargo, the modification was due to Respondent's desire to maintain control of the FTZ so that its special status would not be jeopardized, rather than as an act of animosity directed towards NOS. *Id.* at 22.

The ALJ next addressed NOS' allegations concerning the grassy area, an area of unimproved land, which at times cannot support heavy cargo. This area needed improvements, and because NOS expressed an interest in using this area, Respondent invited NOS to submit a detailed proposal for improving it. The ALJ stated that NOS failed to submit such a proposal and further proposed to use the grassy area in its current condition. Consequently, Respondent rejected NOS' proposal.

The ALJ noted that NOS cited certain portions of Respondent's tariff in support of its proposition that Respondent acted unreasonably in allocating marine terminal facilities. After reviewing the specific tariff items, the ALJ concluded that Respondent correctly adhered to its tariff and its actions were a result of its desire to minimize interference with construction and not out of general animosity towards NOS.

The ALJ further noted that upon the expiration of NOS' lease, NOS had received repeated extensions of deadlines to vacate the marine terminal facilities. The ALJ opined that if Respondent sought to treat NOS in an unfair or discriminatory manner, the extensions would have never been granted. The ALJ maintained that it was unnecessary to discuss the merits of NOS' claim for reparations, as he found that Respondent did not act unreasonably within the context of the Shipping Act. *Id.* at 25. The ALJ concluded that NOS had the option of leasing space along the canal that while admittedly less desirable than that along the River, would have allowed NOS to stay in business.

IV. EXCEPTIONS AND REPLY

1. *NOS' Exceptions*

NOS makes essentially three arguments in its exceptions. First, NOS claims that in 1999, Respondent refused to allow NOS, which was operating on assignment at Napoleon A and B, to continue servicing the ships of Mediterranean Shipping Company ("MSC"), one of the largest container carriers calling at the port. NOS further claims that Respondent

NEW ORLEANS STEVEDORING CO. v. BOARD OF COMMISSIONERS, PORT OF NEW ORLEANS [pf]

wanted MSC's business to go to another MTO. Second, NOS asserts that at the end of May 2000, Respondent terminated its assignment at Napoleon A and B, alleging that redevelopment plans required that the facility remain unoccupied. NOS avers that this rule was rigidly enforced against it, but not against its competitors, who were permitted to use the facility throughout the period and to date. Third, NOS argues that Respondent violated its tariff when it refused to approve NOS' applications to berth ships and marshal cargo off the facility, on the basis that NOS needed a long term solution to its space problem and that individual "ad hoc" applications would no longer be considered.

2. Respondent's Reply to NOS' Exceptions

Respondent asserts that NOS' claim that it violated the Shipping Act by unreasonably refusing to permit NOS to move MSC to the Napoleon facility is meritless, because NOS failed to note that Respondent denied another MTO, Ceres, its request for a short-term lease for the same space NOS requested. Respondent further asserts that NOS failed to mention the numerous other factors Respondent considered, including *inter alia*: the extensions and accommodations given to NOS:  the Board's history of expensive construction/cargo conflicts:  and NOS' decision not to renew its own lease.

Respondent contends that NOS has failed to demonstrate that it violated section 10(d)(4) because it has not established that NOS was unreasonably disadvantaged. Respondent further contends that in order to prove a section 10(d)(4) claim, NOS must show a triangular relationship in which it is disadvantaged relative to a competitor. In this instance, Respondent asserts that NOS must show that Respondent unreasonably disadvantaged NOS as compared to an entity that is sufficiently similarly situated to NOS to establish a valid basis for comparison. Respondent's Reply to NOS' Exceptions at 29 (*citing Ceres Marine Terminals, Inc. v. Maryland Port Admin.*, 27 SRR 1251 (1997), *aff'd in part, rev'd in part on other grounds and remanded*, 28 SRR 545 (4th Cir 1998)). Respondent further contends that the Commission has long accorded substantial deference to a public port's business decisions. *Id.* (*citing Petchem, Inc. v. Canaveral Port Authority*, 23 SRR 974, 987 (1986), *aff'd sub. nom., Petchem, Inc. v. Federal Maritime Comm'n*, 853 F2d 958 (1988)).

Respondent avers that after NOS opted not to renew its lease, it sought to lease Napoleon A only, and only after several other MTOs sought to lease the entire Napoleon complex did also NOS seek to lease the entire complex. Respondent claims that it did not lease the complex to Complainant or any other MTOs that inquired. Respondent further avers that once it decided not to lease the terminal space to any MTO pending its decision regarding the construction of a new terminal on the Napoleon A and B site, NOS was nonetheless permitted to stay in the space until May 2000, when Respondent obtained a court order to evict NOS.

Respondent contends that NOS' claim that its competitors were given an unreasonable advantage is belied by a review of the record. Respondent claims that P&O was a lessee:  therefore, Respondent was legally obligated to provide it with space either within or outside the leasehold area. As NOS was not a lessee, Respondent asserts that it had no greater legal claim to any part of Napoleon A and B than any other MTO.

Respondent further contends that NOS' assertion regarding an unreasonable advantage given to another one of its competitors, Gateway, is also flawed. Gateway was given space in Marshalling Yard C after the public belt railroad access to Gateway's terminal was cut off. *Id.* at 40. Under the terms of Gateway's lease, Respondent maintains that it guaranteed Gateway rail access via a rail spur at the rear of the Napoleon C shed. The demolition activity rendered the tracks nearest the wharf out of service. In order for Gateway to access the rail tracks near the Napoleon A and B yards, it had to load the cars from Marshalling Yard C. Respondent contends that as the lease guarantee forced it to negotiate a solution to the rail access problem, the least expensive and disruptive solution was to allow Gateway to load rail cars from Marshalling Yard C.

Respondent also addresses NOS' exception regarding one or more tariff violations by refusing berth applications and/or space. Respondent asserts that its refusal to permit use of the FTZ and grassy area was not unreasonable within the meaning of the Shipping Act.

V. DISCUSSION

The issue presented is whether the ALJ properly dismissed NOS' complaint. We find that the ALJ's decision was supported by the record and therefore affirm the dismissal of the complaint in this proceeding.



### A. Section 10(d)(3)

The ALJ found that the Shipping Act does not guarantee "the right to enter into a contract, much less a contract with any specific terms. . . . [A]ll that is required is that common carriers, ocean transportation intermediaries ("OTIs") and MTOs refrain from 'shutting out' any person for reasons having no relation to legitimate transportation-related factors." I.D. at 16. After a review of the record, we believe that although NOS was "shut out," it was done for legitimate, transportation-related reasons.

In its exceptions, NOS argues that Respondent's refusal to allow it to use Napoleon A and B to service the MSC vessels constituted an unreasonable refusal to deal, and it provides a detailed explanation supporting its contention. NOS concedes that Respondent pursued P&O as a potential lessee, but further argues that the violation occurred when MSC was forced to move to P&O, and when NOS was prohibited the interim use of the Napoleon yards, which NOS claims Respondent's own analysis revealed was feasible. NOS further contends that withholding available public facilities violated the terms of its tariff, item 312 in particular, and constituted an unjustified refusal to deal, as well as an undue preference for P&O.

Respondent argues in its reply that NOS failed to acknowledge that Ceres, another MTO, requested a short-term lease for the same space for the MSC business several weeks before NOS requested it, which request was also denied. Respondent further maintains that NOS failed to recognize that it considered numerous other factors when evaluating NOS' request, which shows that its actions were reasonable in the circumstances.

Respondent cites *Seacon Terminals v. The Port of Seattle*, 26 SRR 886 (1993), in support of its proposition that NOS must show unreasonableness with respect to Respondent's conduct. Respondent's Reply to Exceptions at 28. In *Seacon*, the MTO, Seacon, alleged that the Port of Seattle unlawfully excluded it from the port, refused to deal, and unlawfully discriminated against Seacon by giving its competitors more favorable lease terms, all in violation of the Shipping Act. *Seacon*, 26 SRR at 887. The administrative law judge found that after Seacon's original lease ended, the port continued to hold the area in question open to Seacon, hoping that Seacon would commit to a long-term lease; however, Seacon declined to enter into a long-term lease for the space it occupied. The port then sought to lease the space to

another MTO, after which time Seacon sought to lease the space. In making his determination, the administrative law judge considered testimony from various individuals and found that the port commissioners and staff all agreed that Seacon's proposal for the space was too late.

*Seacon* is factually similar to the instant case. Here, NOS had an opportunity to renew its lease for the Napoleon complex. Instead, it opted to operate on an assignment arrangement because of an anticipated decline in business. NOS' Exceptions at 3. NOS received notice from Respondent that its assignment arrangement would be subject to the terms of the tariff and to the availability of space as determined by the Board. I.D. at 8. NOS sought several times to lease only Napoleon A of the Napoleon A and B complex and was told by Respondent that it preferred to lease the entire complex. Only after Ceres expressed interest in leasing Napoleon A and B did NOS apply to lease the facility in its entirety. Furthermore, Respondent indicates that in the past, it has had construction projects that have been costly when they occur in an ongoing cargo operation area. Based on an evaluation of the facts, there is nothing to support NOS' contention that Respondent unreasonably refused to deal with it. Rather, the Board's determination not to lease the complex was a reasonable determination in view of the pending construction project. Therefore, we affirm the ALJ's finding that Respondent did not violate section 10(d)(3).

### B. Section 10(d)(4)

With respect to the alleged unreasonable preference or advantage, the ALJ stated that the threshold criterion for unreasonable preference or advantage was established in *Volkswagenwerk v. Federal Maritime Comm'n*, 390 US 261 [8 SRR 20,109] (1968). In that case, the Supreme Court stated that "discriminatory treatment will not be found to exist in the absence of a determination that a third party has enjoyed an unfair advantage over the complainant. The favored entity need not have been in direct competition with the complainant, but it must have been similarly situated in that both were seeking the benefit which was denied to the complainant." *See id.* at 19 (citing *Volkswagenwerk*, 390 US at 279).[3]

---

3.    The ALJ noted that while a competitive relationship need not be present to demonstrate an unreasonable preference or advantage, the parties must have been similarly situated. The Commission, however, has held that the parties need not be similarly situated nor does a competitive relationship need to exist to challenge alleged

NEW ORLEANS STEVEDORING CO. v. BOARD OF COMMISSIONERS, PORT OF NEW ORLEANS 

The ALJ stated that a determination of reasonableness is largely dependent upon specific facts rather than broad generalizations. The ALJ maintained further that with respect to determining a port's reasonable business decision, the Commission will not substitute its own business judgment for that of an entity that is responsible for the daily operation of a port, nor will it avoid its responsibility to determine whether a Shipping Act violation occurred. *See Id.* at 20 (citing *Petchem, Inc. v. Canaveral Port Authority*, 23 SRR 974 (1986)).

NOS asserts that upon notice of the termination of its assignment, Respondent indicated that should construction occur, the space would not be available to any party. NOS further asserts that this rule was "rigidly enforced" against it, but not against any of its competitors. NOS' Exceptions at 27. NOS contends that the vessels that it was not permitted to unload, even away from the Napoleon premises, were allowed to unload once those carriers had secured a different MTO. *Id.* at 30. NOS specifically addresses the occupation of Napoleon by MTOs P&O and Gateway, and Saudi Line's Ro-Ro ships. NOS claims that they were permitted to use space within the Napoleon complex, when it was not.

In its reply, Respondent addresses NOS' assertion that several of its competitors received an unreasonable advantage. Respondent states that because P&O was a lessee, Respondent was legally obligated to provide a certain amount of space to P&O, when the entire space contained in its lease became unavailable due to unrelated construction. Respondent provided P&O the space in Napoleon A to fulfill its obligations to its lessee. Respondent submits that NOS, which was not a lessee, was not entitled to the same consideration.

Gateway, another one of NOS' competitors, was also provided access to space that NOS requested and was not permitted to use. Respondent maintains that Gateway was allowed access to Marshalling Yard C because it needed rail access via a rail spur at the rear of the Napoleon C shed. Finally, from where the Saudi Line's Ro-Ro ship berthed, its stern gate rested on the Napoleon A wharf. Respondent notes that the wharf, which is space for the temporary placement of cargo until it is moved to a termi-

nal or shed, is controlled by the Port, even when the yard is leased. Respondent avers that NOS had nowhere to dray its cargo, and on prior occasions, it had occupied all available areas with containers and cargo that remained until May 2000. Respondent avers further that even after NOS was evicted from Napoleon A and B, its gear remained in various places in the Port.

The ALJ held that it was not unreasonable for Respondent to restrict access to Napoleon A and B to lessees whose operations had been disrupted by the construction contractor. This holding is adequately supported by the record. NOS chose not to renew its lease, thereby choosing not to avail itself of the legal obligations it would have been entitled to receive as a lessee. It was reasonable for Respondent to conclude that its lessees were entitled to the allocation of space before NOS because the lessees have made a greater commitment to the Port through their lease terms. Moreover, Respondent was contractually bound by the terms of its leases with the lessees. The Commission has previously stated, when discussing granting deference to a port's business decisions, that it will not substitute its business judgment for that of the port when the complained-of policy or practice and resulting disparate treatment are not unreasonable. *See* I.D. at 20 *citing Petchem*, 23 SRR at 989: *James J. Flanagan Shipping Corp. v. Lake Charles Harbor and Terminal District*, 27 SRR 1123 (1997). In the instant case, Respondent was not acting unreasonably by choosing to allow its lessees, rather than NOS, to use the space in the Napoleon complex. Therefore, we affirm the ALJ's conclusion that Respondent did not violate section 10(d)(4).

C. Alleged Tariff Violations

After a review of Respondent's tariff, the ALJ concluded that the alleged violations did not occur and that the record was devoid of any evidence to suggest any violations. We agree with this assessment.

On exceptions, NOS contends that Respondent refused to grant its berth applications, in violation of Respondent's tariff. Upon NOS' assignment termination in April of 2000, NOS sought alternative areas to service its customers. It inquired about using the FTZ and the grassy area. NOS asserts that it was not permitted to use these areas because of excessive restrictions and stringent time limitations.

Respondent argues that NOS was using the FTZ, which is intended for FTZ cargo, not maritime cargo. The FTZ, Respondent contends, is not to serve as a

---

unreasonable preferential or prejudicial treatment in certain situations. *See e.g., Ceres, supra*, at 7; *Credit Practices of Sea-Land Service, Inc. and Nedlloyd Lijnen, B.V.*, 25 SRR 1308 (1990): and *Valley Evaporating Co. v. Grace Line, Inc.*, 14 FMC 16 *[11 SRR 873]* (1970).


marine cargo terminal area for continuous maritime cargo operations. The grassy area space that is available for cargo is a small area of unpaved Port property, which can only be used for chassis and empty containers. In order for this area to be utilized, substantial improvements would need to be made. Respondent claims it requested that NOS submit a proposal as to how it would make the necessary improvements to the grassy area, and to date NOS has failed to submit any proposal.

Respondent avers that allowing NOS to use the FTZ for long-term cargo storage would have exposed the Port to the loss of potential future FTZ business, and furthermore, because demurrage would not accrue when containers are placed in the FTZ, the Port would also have lost revenue. Respondent's Reply at 45.

We find that NOS' contention that Respondent violated its tariff is without merit. After reviewing the

specific items in Respondent's tariff that NOS alleges were violated, the ALJ concluded that there was no evidence to indicate that any violation occurred. NOS has not demonstrated in its brief on exceptions or exhibits that any such violation occurred. Therefore, we affirm the ALJ's finding that no tariff violation occurred.

## VI. CONCLUSION

Based on the foregoing, we affirm the I.D as set forth herein. The ALJ properly found that Respondent did not violate sections 10(d)(3) and 10(d)(4) of the Shipping Act. While NOS has submitted a detailed brief on exceptions and numerous exhibits to support its argument, NOS has failed to provide any basis to warrant reversing the ALJ's initial finding. Therefore, we affirm the I.D. and dismiss NOS' complaint.

---

## EXCLUSIVE TUG ARRANGEMENTS IN PORT CANAVERAL, FLORIDA

FMC Dkt. No. 02-03
Served: February 24, 2003

**[141:13[1]] Late submission accepted.**

The ALJ accepts record references for proposed findings of fact even though they have been submitted out of time. While there is no excuse for the late filing, the ALJ will not ignore the affected findings of fact, as his Initial Decision must reflect consideration of all the evidence before him. Instead, recognizing that doing so will not unduly delay issuance of the Initial Decision, he exercises his authority to relax procedural rules when justice so requires and affords the opposing parties an opportunity to file letter briefs responding to the record references. **Exclusive Tug Arrangements in Port Canaveral, Florida, 29 SRR 1072 [ALJ, 2003].**

### PROCEDURAL RULINGS

**Michael A. Rosas, Administrative Law Judge.**

Respondent Canaveral Port Authority ("CPA") submitted a letter on February 20, 2003, which contained record references for its proposed findings of fact. Both BOE and intervenor Petchem, Inc. objected to the late submission of record references for proposed findings of fact as required at 46 CFR §502.221(d)(2). I agree that there is no excuse for CPA's lateness. However, it was not my intention to disregard CPA's proposed findings of fact, as it is

essential that the findings of fact and conclusions of law in the Initial Decision reflect a consideration of all the evidence. *Brown v. Rock Creek Min. Co., Inc.*, 996 F2d 812 (6th Cir. 1993).

It has always been within the discretion of an administrative agency to relax its procedural rules for the orderly transaction of business when, in a given case, the ends of justice require it. *Neenah Foundry Co. v. U.S.*, 142 FSupp2d 1008, opinion after remand 2001 WL 709043 (CIT 2001); *Neighborhood TV Co., Inc.*

*Chilean Nitrate Sales Corp. v. San Diego Unified Port District*, 24 S.R.R. 1314
(1988)



FMC
Dkt. No. 1582(I)

CHILEAN NITRATE SALES CORP.⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
SAN DIEGO UNIFIED PORT DISTRICT⠀⠀)⠀⠀⠀⠀Served:  September 23, 1988

[10:10[2]k, 10:10[2]l, 10:10[4]b, 141:19[1]]  **Propriety of termination of space occupancy agreement.**

There was no merit to the contention that a public port disregarded its own tariff by terminating complainant's permit to occupy a storage shed. While the tariff was silent as to how the port might terminate a space occupancy agreement, the deficiency was cured by operation of state law regarding leases and did not violate Section 10(d)(1) of the 1984 Act. However, the port would be directed to amend its tariff to incorporate the applicable state law provisions. That the port terminated the agreement in order to convert the shed into a general cargo handling facility subject to a five-year lease with another party did not constitute undue preference under Section 10(b)(11) or 10(b)(12). The relationship between complainant and the lessee was not characterized by the "competitive nexus" needed to prove such violations. Moreover, even though the port has an "absolute duty" to the public, it is permitted to engage in reasonable preferential treatment which is necessary for its economic survival. Allegations of an "unreasonable refusal to deal" were also without merit. **Chilean Nitrate Sales Corp. v. San Diego Unified Port District, 24 SRR 1314 [Sett. Off., 1988].**

DECISION OF DONALD F. NORRIS, SETTLEMENT OFFICER[1]

By its complaint filed with the Commission during Oct. 27, 1987, the Chilean Nitrate Sales Corp. ("Chilean") claims a total of $6,006.70 plus attorney's fees of the San Diego Unified Port District ("the Port") that sum reflecting damages in the form of extraordinary expenses incurred by Chilean resulting from its eviction from Transit Shed No. 1 ("the Shed"), the 10th Avenue Marine Terminal, San Diego, during the fall of 1985. The Shed is a commercial, maritime, cargo handling facility owned by the Port. It lies immediately adjacent to two deep-sea draft, general cargo vessel berths.

At the outset, the writer felt compelled to determine whether Chilean enjoyed the standing necessary to press the claim, and whether the Commission had jurisdiction over the subject matter. As his decision of Sept. 11, 1987, reflects, the writer concluded that Chilean was properly the party complainant, but that the Commission wanted jurisdiction *[24 SRR 498].* By its Order dated April 29, 1988, the Commission reversed and vacated the latter holding and remanded the proceeding for further action *[24 SRR 920].* Thus, we move to a consideration of the merits of the matter. The salient facts of that are as follow:

(1)  In conjunction with its vending ventures, Chilean is an importer of nitrate of soda transported in bulk from Chile to the United States;

(2)  By its letter dated June 21, 1977, Chilean's agent advised the Port that it had been "requested by [Chilean] to contact your office and reserve a half-section (25,000 sq. ft.) on a continuing basis for the handling and distribution of [nitrate of soda].";

---

[1]  Pursuant to Rule 304(g) of the Commission's Rules of Practice and Procedure, this decision will become final unless the Commission elects to review it within 30 days of the date of service.

CHILEAN NITRATE SALES CORP. v. SAN DIEGO UNIFIED PORT DISTRICT    

(3)  The Port's response to the agent, by its letter dated the following July 6th, read, in part: "Please be advised . . . that in accordance with your request, an appropriate one-half section will be available when this cargo arrives.  The [rental] for this one-half section will be in accordance with Item 225 of [The Port of San Diego . . . San Diego Unified Port District] Tariff 1-F ("the Tariff").  [We] will consider your letter as the formal request for this space under the terms of the above Item.";

(4)  Chilean commenced importing its nitrate into San Diego, and to the Shed in particular, about the beginning of 1978.  For the period 1981 through September 1985, Chilean's imports never exceeded 6,670 short tons (1983).  Only 3,688 short tons were received during the first nine months of 1985.  As well as a point of reception for the imported nitrate, the Shed served also as Chilean's distribution depot from whence nitrate, either bagged or in bulk, was delivered to Chilean's customers;

(5)  Usually a half-section (25,000 sq. ft.), Chilean's monthly space requirements varied from a quarter-section (12,500 sq. ft.) to three-quarters of a section (37,500 sq. ft.).  In all, the Shed encompassed some 193,700 sq. ft.  About one-half of that space was occupied and used by an importer of bulk fertilizer not affiliated with Chilean;

(6)  Chilean paid the Port rentals each month in accordance with the scale of those appearing in the Tariff's Item 225;

(7)  During the period of Chilean's occupancy, the Port entered into two long-term leases with two other importers/"handlers" of bulk commodities.  The tonnages handled by those varied from 80,000 to 400,000 metric tons annually;

(8)  While nothing appears to have precluded Chilean from doing so, Chilean never entered into any negotiations with the Port for a lease of space for a period of time certain;

(9)  During July and early August, 1985, the Port, in writing, directed the occupants of the Shed to vacate the premises by the following October 1st.  The reason advanced for the directive was, in essence, the Port's decision to convert the Shed into a general cargo handling facility as a result of "the recent interest in the movement of general cargo through San Diego."  The "regeneration of this type of cargo movement which requires transit shed space adjacent to the vessel [berth] has forced the [Port] to re-evaluate its maritime operation at [the Shed]."  As the Shed matched requirements, it was selected for conversion;

(10)  During Sept. 10, 1985, the Holt Cargo Systems of California entered into an agreement with the Port whereby it leased the Shed entirely for a period of five years commencing Jan. 1, 1986.  According to "[Article] 3. USE:  Lessee agrees that the leased premises shall be used only and exclusively for the receiving, handling, and storage of general merchandise and cargo and for no other uses or purposes whatsoever."  The receipt, handling, and storage bulk of commodities were prohibited without the express approval of the Port.  The agreement was filed with the Commission and, as Agreement No. 221-010841, became effective during Nov. 17, 1985;

(11)  By Nov. 6, 1985, Chilean arranged to have its product accommodated at the 24th Street Marine Terminal, National City, California, ("24th Street"), a facility in the San Diego area owned by the Port also.  Upon that date, Chilean transferred 1,653 short tons of bagged nitrate from the 10th Avenue Marine Terminal to 24th Street.  That operation cost Chilean $3,306.50.  Further, during Jan. 31, 1986, 19 pallets of "empty paper bagging" were shipped from the 10th Avenue Terminal to the Helena Port Terminal, Inc. of Helena, Arkansas.  The reason for that was that "(t)he type of bag used at 10th Avenue . . . was an open mouth bag which could not be used at 24th Street . . . because it is not compatible with the valve-type bagging machine used at 24th Street. . . .  For this reason, Chilean shipped its inventory of open mouth empty bags to its nearest warehouse, in Helena, Arkansas."  The cost of the transfer amounted to $2,700.20.

pf                                                        REPORT OF THE COMMISSION

Generally, Chilean asserts that the Port's conduct violated Sections 10(b)(11),[2] 10(b)(12),[3] 10(d)(1)[4] of the Shipping Act of 1984 ("the Act"). However, and as the complaint reflects clearly, it is the Port's perceived disregard for the provisions of Item 225 of the Port's Tariff that is the primary source of Chilean's distress, and it is with respect to that perception that Section 10(d)(1) is brought into play. That being the paramount issue, it will be dealt with and disposed of first.

Chilean's allegation is premised upon four propositions. The first is that Item 225 alone, and Item 225 solely, governed the relationship between the parties. The second is that the only grounds for the termination of space occupancy appearing in Item 225 are (a) if "the space is not being utilized for the express movement of water borne cargo"; (b) if "space is not being utilized in an efficient manner through the use of high piling and consolidation [of cargo]"; and (c) if less than 50% of the cargo "received into space (over 180 days) has moved out in the same period. . . ."[5]  The third proposition is that as Chilean had complied with all those requirements then the Port "failed to observe" its Item 225 regulations and Chilean's eviction was unjustified. And fourth, that the Port's reliance upon its Item 225(g) ". . . right to designate areas for space occupancy" is vulnerable because, upon analysis, the reservation is "ambiguous."  As Chilean puts it: "It neither expressly gives the Port the right to terminate space occupancy permits for this reason, nor does it expressly give the Port the right to terminate space occupancy by determining that the space will be used for a different type of cargo. . . .  Does Item 225(g) give the Port the right to determine which storage area a particular shipper will be assigned, or does it merely reserve the Port's right to determine that a given area will no longer be available for space occupancy *at all*?  Or, . . . does this provision give it the right to unilaterally terminate an occupancy permit by deciding that the space will be used for a different type of cargo?"  As these questions suggest ambiguity then Chilean contends that the reservation "must be construed strictly against the maker of the Tariff (citation omitted)."

While the Port refers to the Item 225(g) reservation as a justification for its action, it is really upon its all encompassing landlord-tenant relationship with Chilean that it relies primarily, and it is within that context that Item 225(g) and all other relevant Item 225 provisions ought to be evaluated and construed. In so doing, the writer relies upon several rules of construction "which must be used to determine whether the words of tariff provisions are to apply in any particular situation."[6]  They are summarized and appear in *Penn Cent. Co. v. General Mills, Inc.*, 439 F2d 1338, 1340-41 (8th Cir, 1971), and are as follow:

(1)  "The tariff should be construed strictly against the carrier since the carrier drafted the tariff; and consequently, any ambiguity or doubt should be decided in favor of the shipper;

(2)  "Such ambiguity or doubt must be a reasonable one and should not be the result of a straining of the language.  And, there must be a substantial and not merely an arguable basis in order to justify resolving the doubt against the carrier;

(3)  "Published rules relating to tariffs must have a reasonable construction and should be interpreted in such a way as to avoid unfair, unusual, absurd, or improbable results;

(4)  "A strict construction of a tariff against a carrier is not justified where such a construction ignores a permissible and reasonable construction which conforms to the intentions of the framers of the tariff, avoids possible violations of the law, and accords with the practical application given by shippers and carriers alike."

---

[2]  "[No marine terminal operator may] except for service contracts, make or give any undue or unreasonable preference or advantage to any particular person, locality, or description of traffic in any respect whatsoever;"

[3]  "[No marine terminal operator may] subject any particular person, locality, or description of traffic to an unreasonable refusal to deal or any undue or unreasonable prejudice or disadvantage in any respect whatsoever;"

[4]  "No . . . marine terminal operator may fail to establish, observe and enforce just and reasonable regulations and practices relating to or connected with the receiving, handling, storing, or delivering property."

[5]  The writer notes that the Port's right to revoke space occupancy privileges in all three instances is permissive rather than mandatory.

[6]  *C.M.S.P & R.R. Co. v. Pittsburg-Des Moines S. Co.*, 411 F Supp 518, 521 (1976).

CHILEAN NITRATE SALES CORP. v. SAN DIEGO UNIFIED PORT DISTRICT

The same rules, of course, apply to those tariffs published by marine terminal operators such as the Port.

Item 225 is unambiguous in stating that "space occupancy is available upon written application"; that "space occupancy must be taken for a minimum period of one month"; that "space occupancy will continue to apply unless a written request for cancellation of space reservation is received [by the Port] prior to the first of each month"; and that "increases or decreases in space occupancy [are] available in 1/4 section increments." It is within the confines of those that the writer believes that two other provisions, i.e. "(a)ll applications for space occupancy are on a space available basis" and "(t)he [Port] reserves the right to designate areas available for space occupancy," must be considered. Obviously, the former is a standard of priority and perforce refers to new applications for space occupancy and to requests for increases in space by space occupants previously accommodated. As for the latter, it means just what it says: the Port reserves the right to designate what areas are available for space occupancy arrangements as distinct from others, e.g. a lease for a term certain. In the writer's view that provision pertains only to new applications for, or for increases in, space occupancy. In the writer's estimate, that is a "reasonable" interpretation of the reservation provision in the context of Item 225 overall. Viewed in the proper context and so construed, it is unambiguous also. So limited in applicability, it avoids the "absurd" result of conferring upon Chilean a right of possession and use of the Shed paramount to the Port's. Interpreted as Chilean would have it, the result could be construed as at least the equivalent of a lease for a term of time certain, a result that the Port certainly never intended when drafting the Item.

How, then, are space occupancy permits terminated? Given our view as to the applicability of the reservation provision then it is obvious that Item 225 is silent upon the point. Thus, the abiding landlord-tenant relationship and its applicable law are brought into play and must be considered.

To reiterate somewhat, Item 225 states that "space occupancy must be taken for a minimum period of one month" and that, thereafter, "space occupancy rates will continue to apply." Further, "space occupancy is due on the first of each month and is payable in advance" in accordance with a scale of "occupancy rates per month" laid down in the Item for space ranging from "1/4 section" to "2 full sections." Space occupants are permitted to cancel "space reservation" upon submission of written notice to the Port "prior to the first of each month." What we have here, then, is an indefinite lease. "(I)n [the] case of an indefinite lease for a monthly rent, where nothing is said about a year, the tenancy is one from month to month, although the lessee may remain in possession and pay rent for more than a year."[7] That is precisely what the Port contends.

According to the law of the State of California, the Port ". . . may terminate a month-to-month tenancy by giving 30 days' written notice at any time;".[8] As both the situs of the Shed and of the "transaction," i.e. Item 225 published by the Port in San Diego, are in California then the law of that State controls here.[9] As the Port's letter to Chilean dated Aug. 13, 1985, reflects, the Port complied with State law. While Item 225 is silent as to how the Port may terminate a space occupancy arrangement, the deficiency is cured by the operation of law. The writer will hold that Section 10(d)(1) of the Act has not been violated.

As the record and the ruling here reflect, not only was Item 225(g) misconstrued by Chilean but it was misapplied by the Port as well. In order to obviate any future misunderstanding, the writer will require the Port to have published in Item 225 the following: "In Informal Docket No. 1582(I), Chilean Nitrate Sales Corp. v. San Diego Unified Port District, the Federal Maritime Commission determined that space occupancy permits may be terminated by the Port upon 30-days' written notice to the space occupant. Such written notice is in conformity with the law of the State of California." This requirement is permitted by Rule 304(g) of the Commission's Rules of Practice and Procedure. We turn now to Chilean's other alleged violations of the Act.

Sections 10(b)(11) and 10(b)(12) of the Act are, substantially, the same as, and successor to, Section 16 First of the Shipping Act, 1916 ("the 1916 Act"). Section 10(b)(12) also proscribes any marine terminal operator from subjecting ". . . any particular person, locality, or description of traffic to any unreasonable refusal to deal. . . ." That particular portion traces its origin to Section 14 Fourth of the 1916 Act, and it is that segment of Section 10(b)(12) that we will dispose of first.

---

[7] 49 Am Jur 2d, Landlord and Tenant, Section 72.

[8] See Port's Exhibit 1, and footnote 8 therein particularly, appended to its "Points and Authorities in Support of Response."

[9] Op. cit., Landlord and Tenant, Section 9.



To "deal," of course, is synonymous with to "treat," and a primary definition of the latter is to "negotiate; to consider terms of settlement, or the like."[10]  Nothing in the record recounts or reveals any negotiations about anything as between Chilean and the Port.  The space occupancy arrangement between the two was entered into pursuant to Item 225 of the Port's Tariff, as the Port's letter of July 6, 1977, clearly reflects; and relations between the two were governed by the provisions of that Item down through the years.  Further, Chilean never sought to enter into a leasing arrangement with the Port for a period of time certain although nothing precluded it from doing so.  Lastly, the Port's letter to Chilean's attorney dated Oct. 13, 1985, largely reflects its opinion that any "contractual" relationships concerning space occupancy were with Chilean's stevedores and not with Chilean, a view not shared by the writer nor by the Commission as its Order of Remand reflects.  However, such a difference of opinion is not, in the writer's view, an "unreasonable refusal to deal."  All things considered, the writer will dismiss any allegation to that effect as being unfounded.  We turn now to the heart and substance of the Section 10(b)(11) and 10(b)(12) proscriptions, those directed toward undue or unreasonable preferences or advantages, and prejudices or disadvantages.

Despite its bifurcated presence in the Act, nothing in the legislative history indicates in the slightest that those two sections are to be applied in any way other than was Section 16 First of the 1916 Act in the past. In that regard, recently the Commission reiterated a long-standing application of the latter:  "Section 16 First was substantially identical to former Section 3(1) of the Interstate Commerce Act (ICA).  Cases involving Section 3(1) of the ICA leave no doubt that the prohibition against undue or unreasonable prejudice or disadvantage was intended to deal with a situation in which two or more competitors, shipping on the same carrier over different routes to the same destination, receive different treatment which is not justified by differences in competitive or transportation conditions. . . .  The [Commission] has generally adopted the ICC's construction. . . .  Thus, [in *North Atlantic Mediterranean Freight Conference -- Rates on Household Goods*, 11 FMC 202, 209-210 *[9 SRR 775]* (1967), modified on other grounds *sub nom. American Export Isbrandtsen Lines, Inc. v. FMC*, 409 F2d 1258 *[8 SRR 20,423]* (DC Cir 1969)] it has been held that in order to establish a violation of Section 16 First, it must be shown that:  (1) two shippers are given unequal treatment; (2) the shippers are competitors; (3) the prejudice or disadvantage is the proximate cause of injury; and (4) the unequal treatment is not justified by differences in transportation circumstances."[11]  Further, "(p)roof of the character, intensity and effect of the competitive relationship is necessary to prove the amount of damages and sustain an award of reparation. . . ."[12]  "Past decisions of the Commission . . . make clear that the person claiming illegal prejudice or disadvantage must establish damage with respect to its ability to compete."[13]

Bearing in mind that it was the Port's facilities and their users involved here, the writer cast a wide net, as some of his inquiries should indicate, in order to determine if the requisite relationships obtained here.  None revealed themselves.  Moreover, Chilean never really pressed the matter home.  Thus, the writer cannot hold that Sections 10(b)(11) and 10(b)(12) of the Act have been violated in terms of those standards.

There is, however, another line of cases where the Commission has held that no competitive nexus need be established in order to sustain a violation of Section 16 First.  As summarized in *Valley Evaporating Co. v. Grace Lines, Inc.*, 14 FMC 16, 21 (1970), "(W)hile an effective competitive relationship is a necessary part of liability under Section 16 in situations where the allegedly preferential or prejudicial rates or charges are geared to transportation factors or the differing characteristics of commodities, it is not required where the carrier's obligation to render a particular service is 'absolute' and not dependent upon such factors or differences."  In practice, this approach has been applied to questions concerning such matters as terminal shoreside services, free-time terminal demurrage practices, freight forwarder practices, "monopolistic" stevedoring and tug-services agreements, and the like.

---

[10] *Webster's Third New International Dictionary.*

[11] FMC's Docket No. 86-12, *Distribution Service, Ltd. v. Trans-Pacific Freight Conference of Japan . . .*, slip decision served Jan. 6, 1988 *[24 SRR 714]*, at pp. 10-11.

[12] *West Indies Fruit Co. v. Flota Mercante*, 7 FMC 66, 70 *[1 SRR 435]* (1962).

[13] *Agreement No. 8905 -- Port of Seattle and Alaska S.S. Co.*, 7 FMC 792, 800 *[3 SRR 785]* (1964).

CHILEAN NITRATE SALES CORP. v. SAN DIEGO UNIFIED PORT DISTRICT

Here, too, one must keep in mind the Commission's holding that:

> "Terminals are for all practical purposes public utilities [citation omitted]. Thus, the operation of terminal facilities imposes upon those who furnish them the same duties and obligations as attach to any other public utility. Or as we explained in *Investigation of Free-Time Practices -- Port of San Diego*, 9 FMC 525, 547 (1966): 'While not always specifically franchised, [terminals] nevertheless are engaged in the business of regularly supplying the public with a service which is of public consequence and need and which carries with it the duty to serve the public and treat all persons alike. This is the essence of the public utility concept."[14]

The question here, then, is what "absolute duty," if any, and to what extent, was the Port compelled to observe in terms of its space occupancy relationship with Chilean?

Had Chilean been displaced in the Shed by any other importer of anything, the magnitude (requiring, normally, 25,000 sq. ft. of space per month) and nature (reception point and distribution depot) of whose operation was the same as Chilean's, and under the terms and conditions of Item 225, then the writer would have had no difficulty in holding for Chilean. However, had an entity such as Melwire, Inc., "handling bulk cement," appeared upon the scene and been accorded space occupancy in the Shed in accordance with Item 225, then, at the least, its volume (80,000 to 400,000 tons per year), berthing and space requirements would be factors one could not ignore, particularly when compared to Chilean's largest receipts, 6,670 short tons in 1983. The reason for that, of course, is that the Act ". . . does not forbid all preferential or prejudicial treatment; only that which is undue or unreasonable [citation omitted]."[15]

Here the record reflects "recent interest in the movement of general cargo through San Diego [which] has created a definite need for the transit shed space adjacent to Berths 3 and 4 . . .", *i.e.* the Shed. That interest resulted in the Port leasing the Shed in its entirety to Holt Cargo Systems". . . for the receiving, handling, and storage of general merchandise and cargo and for no other uses or purposes whatsoever" for a term of five years at a *minimum* monthly rental of $14,000.[16] That compares very favorably to the $2,500 per month which would be paid by Chilean under an agreement it was at liberty to terminate upon the dispatch of written notice to the Port prior to the "first day of each month." Despite the "absolute duty" and "public utility" conceptual specters lurking in the wings, the Port is not an eleemosynary organization. It has a corporate responsibility, and very probably a civic obligation as well, to ensure that its facilities are used in the most economically efficient manner possible. Thus, if in its business judgment it perceived the Shed and its adjacent berths as the most desirable of all available for the liner-general cargo operations contemplated by Holt then that is a decision the writer will not question. Certainly such operations have distinctive characteristics involving as they do, ideally, frequent vessel calls and the constant flow of cargo through the facility, to and from vessels, to importers and from shippers. Absent decent and adequate facilities, the ideal will be difficult, if not impossible, to achieve. It is very much an egg-and-a-chicken proposition. Consequently, the writer cannot conclude that Holt was unduly preferred. While Chilean was undoubtedly inconvenienced by its displacement, that of itself does not, in the writer's view, constitute unreasonable treatment. After all was said and done, Chilean was accommodated at another of the Port's facilities where, to the extent the record reflects, it continued its operations as before.

In conclusion, the writer cannot find that the Port failed in any "absolute duty" in any way, and that the Port violated Sections 10(b)(11) and 10(b)(12) of the Act as a consequence.

The complaints are dismissed.

---

[14] *A.P. St. Philip, Inc. v. Atlantic Land & Improvement Co., etc.*, 13 FMC 166, 174 *[11 SRR 309]* (1969).

[15] *Ibid.*

[16] *See* Agreement No. 221-101841, between the Port and Holt Cargo Systems.

*Tak Consulting Eng'rs v. Bustani*, Docket No. 98-13, 28 S.R.R. 581 (ALJ 1998)

TAK CONSULTING ENGINEERS v. BUSTANI

---

TAK CONSULTING ENGINEERS

v.

SAM BUSTANI aka SAMUEL BUSTANI aka SAEID BUSTANI
aka SAM BUSTANI MARALAN aka SAEID MARALAN aka SAM ABADI, *et al.*

FMC Dkt. No. 98-13
Served: October 1, 1998

**[141:5[1]b, 141:5[1]c, 141:5[3], 141:8]  No default despite failure to reply; motions to quash denied.**

Certain respondents in a complaint proceeding are not in default even though they have not filed timely replies. The complaint names an individual, numerous corporations alleged to be his "alter egos," and several aliases, but the situation regarding who are the properly named and served respondents and which of them has answered the complaint or objected to service of the complaint is somewhat muddled: of the five companies that have not filed replies, four have objected to the form and manner of service and have moved to quash, and only one company and two aliases have filed no response at all. Until complainant develops relevant facts to describe in greater detail exactly what all of these respondents have done, it would be imprudent and premature to dismiss any of them. Moreover, pleading technicalities are not crucial in administrative proceedings. Accordingly, the ALJ will neither quash outstanding complaints nor hold respondents in default but rather directs the parties to commence developing evidence through discovery in accordance with a schedule submitted by the complainant. **TAK Consulting Engineers v. Bustani, 28 SRR 581 [ALJ, 1998].**

## RULINGS RELATING TO COMPLAINANT'S REQUEST TO ENTER DEFAULT AGAINST CERTAIN RESPONDENTS

*[On October 2, 1998, ALJ served a Notice of Intent to Reconsider Rulings after receiving a Motion to Stay from respondents. The motion had been mailed timely but did not arrive until after issuance of the rulings below. — Ed.]*

**Norman D. Kline, Administrative Law Judge.**

Complainant Tak Consulting Engineers has filed a "Request to Enter Default" in which it asks that I enter a default against five named respondents or order four of them to file an appropriate motion concerning their allegations that service of the complaint on the four was defective. Respondents have as yet not replied to the Request, although the time for reply (15 days) appears to have expired. Accordingly, I am issuing the following rulings subject to reconsideration should respondents have timely filed their reply.[1] As

explained below, I find that the five have not filed an answer to the complaint because four of them have, in effect, moved to quash service of the complaint while has filed no response to the complaint at all. However, I find the matter to be a technical one that should be corrected by the parties during the course of their discovery as it involves, among other things, the question as to whether complainant's allegation that all the named respondents are "alter egos" of respondent "Sam" or "Samual Bustani" can be proven.

The complaint, which was served on July 17, 1998, alleges that an individual respondent named "Sam Bustani" in the complaint but, as corrected by respondents, should be named "Samual Bustani," operated some 10 companies or trade names, all of which are merely Mr. Bustani's "alter egos," and also used five aliases. Complainant alleges that these other companies or names "were used by Bustani to further acts as an unlicensed NVOCC or freight forwarder." (Complaint at para. E.) Complainant, apparently acting as some type of purchasing agent for foreign buyers, allegedly had a contract to purchase tire-recycling equipment for a foreign buyer in Dubai, U.A.E., and contacted respondent

---

1.    Pursuant to 46 CFR 502.274(a)(2), respondents were supposed to reply within 15 days, i.e., by September 29, 1998, to the Request, which was served on September 14, 1998. Pursuant to 46 CFR 502.116, a party may make service by placing a pleading in the mail, among other ways. It is possible therefore that respondents' counsel, who is located in California, has mailed a reply. However, as I have noted earlier, there is some question as to whether respondents' counsel of record continues to represent respondents and he has already failed to comply with the rules regarding his duty to confer with complainant's counsel to arrange a discovery schedule. Also, there appears to be some question about respondents' counsel's fax machine being operative. It will be necessary to clarify the status of respondents' counsel if respondents are to avoid prejudice because of inadequate legal representation. Counsel are advised to give their attention to this matter so that the proceeding can move forward properly. Because of the

geographic distances involved, I encourage counsel to fax me at (202) 566-0042 or, where appropriate, to telephone me at (202) 523-5750, so that I can be aware promptly if counsel have mailed pleadings in the future.



Sam Bustani in an effort to have one of Mr. Bustani's alleged companies transport the equipment to the foreign buyer. However, after Bustani allegedly gave a rate quotation to complainant on behalf of one of the Bustani's companies, complainant notified Bustani that it had decided not to use respondents' services. Allegedly, respondent Bustani retaliated against complainant's official with threats to inflict bodily harm on the official's person and family members and with threats to complainant's customers and others regarding possible lawsuits. In fact, it is alleged, respondents or one of them actually brought an action against complainant in a city court in Los Angeles, alleging breach of contract, which case, I am advised, has been dismissed by the city court but may be reinstated in a state Superior Court in which complainant here may file a cross-complaint. Moreover, it is alleged, respondents contacted the foreign buyer of the equipment directly in an effort to make the sale themselves, causing the foreign buyer to terminate the contract with complainant, causing complainant to suffer money damages.

The present situation regarding who are the properly named and served respondents and which of them has answered the complaint or objected to service of the complaint is somewhat muddled. There are 16 named respondents in the complaint, the individual "Sam Bustani" (and 5 AKA's) plus 10 named companies or trade names. Four of the named companies or trade names (Atlas World Line International Shipping Co.; A Atlas World Line International Shipping Co.; World Line Shipping Inc.; World Line International Shipping Co.) have objected to the "form and manner of service of the complaint . . . and move to quash the same." One of the named companies or trade names (United Traiding), which appears to be a misspelling, has filed no response to the complaint at all. Three other named respondents (Atlas World Line; United Cargo; United Cargo Global Transportation) claim that they were erroneously sued in the first and unamended answer to the complaint. Of all the 16 named respondents (and excluding the five AKA names of Sam Bustani), it appears that there are only three of the original 16 named respondents as to which there are no failures to answer or objections to the form of service of the complaint. These three are: Sam Bustani, Atlas World Line, Inc., and United Cargo International Shipping Co., and even for these, as noted above, there has been a correction to the first named respondent, Sam Bustani.

Because of the confusing pleadings, the matter as to who are the correctly served and named respondents is still not clear. The complaint alleges that three of the named respondent companies (Atlas World Line International Shipping Co., World Line International Shipping Co., World Line Shipping, Inc.) are in default, and complainant contends that they have violated law by trying to sell the subject equipment directly to the foreign buyer. The upshot of the above confusion is that I cannot determine from the faulty pleadings exactly who of the 16 originally named respondents actually exist and have allegedly violated the nine sections of the Shipping Act of 1984 cited in the complaint. Obviously until complainant develops relevant facts to describe in

greater detail exactly what all of these respondents have done, it would be imprudent and premature to dismiss any of them with the possible exception of "United Traiding," which appears to be a misspelling and filed no response to the complaint of any type.

The Federal Maritime Commission is an administrative agency, not a court, and its procedures and pleadings filed with it are not held to stricter standards observed in the courts. As long ago as 1934, a Commission predecessor observed that "a regulatory body . . . ought not to be hampered in its proceedings by the hard and fast rules as to pleading and practice which govern courts of law" and "that even when acting in a quasi-judicial capacity the strict rules which prevail in suits between private parties do not apply, and . . . inquiries should not be too narrowly constrained by technicalities." *Oakland Motor Car Co. v. Great Lakes Transit Corp.*, 1 USSBB 308, 311 (1934); see also *Pacific Coast European Conference — Limitation on Membership*, 5 FMB 39, 42 n. 8 (1956) ("The most important characteristic of pleadings in the administrative process is their unimportance."); *International Association of NVOCCs v. ACL*, 25 SRR 187, 194 (1989) (pleadings should give fair notice, should be liberally construed and be subject to liberal amendment, and decisions should be made on the merits and not on technical niceties of pleading). More recently, in discussing the rules of civil procedures that are followed by the courts (and which the Commission consults for guidance absent a specific Commission rule of procedure pursuant to 46 CFR 502.12), the Supreme Court had the following to say in *Schiavone v. Fortune*, 477 US 21, 27 (1986):

> "These rules . . . shall be construed to secure the just, speedy, an inexpensive determination of every action." Rule 8(f) says: "All pleadings shall be so construed as to do substantial justice." . . . ["T]he principal function of procedural rules should be to serve as useful guides to help, not hinder, persons who have a legal right to bring their problems before the courts." . . . [T]he spirit and inclination of the rules favored decisions on the merits, and rejected an approach that pleadings is a game of skill in which one misstep may be decisive. . . . [t [the Court in earlier days under the rules] also said that decisions on the merits are not to be avoided on the basis of "mere technicalities."

Of course Commission Rule 1, 46 CFR 502.1, the counterpart to Federal Rule 1, also states that the Commission's rules of procedure "shall be construed to secure the just, speedy, and inexpensive determination of every proceeding."

In the instant case, as discussed above, it appears that some of the respondents named in the complaint have not answered the complaint or have objected to the form and manner of service of the complaint. However, some of them have been implicated in alleged violations of law and it is complainant, who has invoked the jurisdiction of the Commission, who has the burden of proving its allegations, with evidence that will flesh out the allegations in the com-

TAK CONSULTING ENGINEERS v. BUSTANI 

plaint. See 46 CFR 502.155; cf. *FW/PBS, Inc. v. Dallas,* 493 US 215, 231 (1990) (standing cannot be inferred argumentatively from averments in the pleadings; party who seeks the exercise of jurisdiction in his favor must allege facts essential to show jurisdiction). Under the relevant Commission rule (46 CFR 502.64(b)), if a named respondent does not file an answer to a complaint, the presiding judge "may enter such rule or order as may be just . . . ." In previous cases before the Commission when a respondent or respondents have clearly failed to file any answer to a complaint or to show any inclination to participate in the proceeding at all, it is customary first to enter only a notice of default (not a default judgment) and to give such delinquent parties a second chance to answer the complaint and to explain their earlier failure or suffer default judgment. See, e.g., *Shipco Transport, Inc. v. Mr. Syed N. Shirazi, et al.,* 28 SRR 20, 21 (1998); *Shipco Transport, Inc. v. Saturn Air Sea Cargo,* 27 SRR 437, 438 (1995); same case, Notice of Default and Order to Supplement Record (ALJ, May 11, 1995) (unreported), and cases discussed therein; cf. *Johnson v. Dayton Electric Manufacturing Co.,* 140 F3d 781, 783 (8th Cir 1998); see also Federal Rule 55, FRCP. Furthermore, in case there are multiple respondents accused of participating jointly in an unlawful undertaking, a default against one respondent does not constitute final judgment even against the one defaulting respondent but merely disables the defaulting party from participating in the proceeding further. In other words, the defaulting party must await the decision as to the other respondents and be subject to the same fate as they are. See discussion and cases cited in *A/S Ivarans Rederi v. Companhia de Navegacao Lloyd Brasileiro, et al.,* 23 SRR 1273 (ALJ 1986), citing, among other authorities, *Frow v. De la Vega,* 82 US 552 (1872), and *In re Uranium Antitrust Litigation,* 617 F2d 1248, 1257 (7th Cir 1980). The reluctance to decide cases by default judgments is consistent with the underlying philosophy regarding proceedings before administrative agencies like the Commission. Under this philosophy agencies prefer to decide cases based on evidence rather than on defaults and technicalities and they consider initial pleadings to be relatively unimportant when deciding cases as compared to the evidence that the litigating parties produce. See discussion and the many cases cited in *A/S Ivarans Rederi v. Companhia de Navegacao Lloyd Brasileiro,* cited above, 23 SRR at 1274.

In the instant case there are deficiencies in the pleadings filed by both complainant and respondent. Thus, four respondents ask that service of the complaint as to them be quashed and another respondent (United Traiding) has not responded in any way. However, according to the official records of the Commission's Secretary (who corresponds to the clerk of a court) and who is responsible for service of complaints, all the named respondents signed receipts for the complaint on July 23, 1998. Therefore, something more than the naked allegation that the form and manner of service was defective would be necessary before ruling that service on some of the named respondents was defective.[2]

What is more important is whether complainant can develop and tender relevant evidence in support of its allegations that 15 respondents are "alter egos" of Sam Bustani and have all violated nine different sections of the 1984 Act. Complainant has made bare allegations that all 15 are "alter egos," i.e., that even some apparent corporate forms should be disregarded, although complainant also alleges that the respondents named in the complaint outside of Sam Bustani, Atlas World Line, Inc., and World Line Shipping, Inc. are "business entities, type unknown." (Complaint at para. 11.) Even if I were inclined to find the five respondents that complainant contends to be in default (the four discussed plus "United Traiding") and set in motion a procedure looking toward a default judgment, Rule 64(b) provides that even if a respondent falls into default by failing to file an answer to the complaint, the presiding judge "may in any case require such proof as he or she may deem proper. . . ." Furthermore, even if a respondent not only fails to file an answer to the complaint but fails to cure the resulting default and becomes subject to issuance of a default judgment, it is basic to the law that such a judgment may issue only as to the "well-pleaded" allegations in a complaint and when the claimed money damages are liquidated or can be easily fixed. See *Bermuda Container Line Ltd. v. SHG Int'l Sales, Inc., et al.,* 28 SRR 312, 314 (1998); 10 Wright, Miller, and Kane, *Federal Practice and Procedure,* sec. 2688 at 447-448; 46 Am Jur 2d, Judgments, secs. 307, 311, 321; Rule 55(b)(1), F.R.C.P. (default judgment for sum certain). I do not find that the complaint is "well-pleaded" so as to satisfy the default judgment rule even if the proceeding were at the stage when a default judgment could otherwise be considered.

Under the circumstances, I find that focusing on the question of how the complaint was served on four named respondents and whether the complaint contained the correct names of all 16 respondents is a waste of time on technicalities. What is important now is for complainant to obtain and tender evidence showing exactly how all 16 respondents conducted themselves so as to violate the nine sections of the 1984 Act that complainant cites in its complaint. At its request, complainant has been authorized to begin using the Commission's discovery rules (depositions, interrogatories, requests for production of documents, requests for admissions). See Procedural Rulings, served September 14, 1998 *[28 SRR 579].* One of the purposes of discovery is to nar-

---

2.    According to the official file maintained by the Secretary, all 16 named respondents were served with a copy of the complaint by certified mail, return receipt requested, and the receipts were all signed by the same person in the name of each respondent as shown in the complaint. Under relevant law (section 11(b) of the Shipping Act of 1984, 46 USC app. sec. 1710(b)), the Commission need only furnish a copy of a complaint to a named respondent. See also 46 CFR 502.113. Motions to quash service of process are highly technical and not usually granted when mistakes are innocent, defendants are put on notice of pending actions against them, and there is no prejudice shown. See *Crane v. Battelle,* 127 FRD 174, 177-178 (SD Cal 1989); *Boatman v. Thomas,* 320 F Supp 1079, 1080 (MD Pa 1971); *Hawkins v. Department of Mental Health,* 89 FRD 127 (D Mich 1981) (quashing service would unjustly delay proceeding); 5A Wright and Miller, *Federal Practice and Procedure,* sec. 1354 at 291, and cases cited therein.



ORDER OF ADMINISTRATIVE LAW JUDGE (FMC)

row and identify the issues. By using the Commission's discovery rules complainant ought to be able to identify the proper respondents and their particular alleged unlawful conduct. As noted earlier, it is complainant's duty to obtain the evidence necessary to support its allegations and it appears that there is no evidence to support particular allegations against particular named respondents, respondents may file appropriate motions for dismissal in the nature of summary judgment. It will then be possible for me to issue a sound and just ruling on the questions of the status of any particular respondent among the 16 named in the complaint and to do so not on the basis of bare allegations and contentions in initial pleadings but on affidavits or other evidence supporting motions for summary judgment. Cf. Federal Rule 56(e), regarding various types of evidence that may be used to support motions for summary judgment, including depositions, answers to interrogatories, and affidavits. This summary-judgment procedure, or other similar shortened procedure (see 46 CFR 502.181 *et seq.*) may also be used by complainant to seek judgment in complainant's favor assuming that an adequate evidentiary record can be developed and the issues resolved without the need for a full trial-type hearing. See 46 CFR 502.61(d), and this docket, Notice of Filing of Complaint and Assignment, served July 17, 1998, penultimate sentence, regarding the discretion of the presiding officer to decide issues on the basis of affidavits, depositions, and the like when a record can be developed adequately without the need for an oral trial-type hearing.

Complainant's Request to Enter Default is accordingly denied without prejudice as is respondents' unsupported request that service of complaint on four named respondents be quashed. The parties are directed to develop the necessary evidence in support of their claims and defenses through depositions and other discovery devices.[3]

———

3. The complaint alleges violations of nine sections of the 1984 Act while respondents raise eight affirmative defenses in their answer to the complaint and reserve the right to raise more of them "during the course of discovery." (Answer, para. 21.) Discovery and summary-judgment motions can ferret out baseless claims and defenses. Instead of focusing on service of process on four of the 16 named respondents, in my opinion, counsel should focus on the myriad claims and defenses raised in the pleadings and discuss whether there is a legal basis or evidence to support continuing litigation of such matters. For example, some of respondents' affirmative defenses, such as estoppel, laches, waiver, or unclean hands, are problematic under the Shipping Act because the Commission is a regulatory agency, not a court of equity, where such defenses might be relevant. On the other hand, complainant alleges violations of nine different sections of the 1984 Act without much factual detail as to how each of these sections were allegedly violated. Instead of requesting a conference with me to discuss such matters, counsel wish to engage in discovery even as to matters that could possibly have been eliminated or clarified by ruling at such conference. As mentioned, discovery and summary-judgment motions may serve to narrow issues and eliminate baseless allegations or defenses. However, it may also be somewhat costly to litigate a dispute them seems to involve to some considerable extent alleged bizarre physical threats which may implicate possible criminal authority not subject to an administrative regulatory statute like the Shipping Act of 1984.

———

## TAK CONSULTING ENGINEERS

v.

## SAM BUSTANI aka SAMUEL BUSTANI aka SAEID BUSTANI aka SAM BUSTANI MARALAN aka SAEID MARALAN aka SAM ABADI, *et al.*

FMC Dkt. No. 98-13
Served: October 22, 1998

**[141:1, 141:5[3], 141:10[4]]  Stay of proceedings denied.**

Respondents to a complaint before the Commission are not entitled to a stay of proceedings pending resolution of a parallel state court action arising out of the same facts and filed by one of the instant respondents against the instant complainant. The Commission, at least as much as a federal court, has an obligation to exercise the jurisdiction that it has been given, and here the factors that a court would consider all weigh against granting a stay: the state court has assumed jurisdiction over no *res*; the Commission can limit inconvenience to distant parties through such procedures as telephonic hearings; only the Commission can determine whether respondents should obtain licenses or bonds; the Commission complaint preceded commencement of proceedings in the state court; federal law controls certain critical issues regarding respondents' conduct under the 1984 Act, although certain aspects of state criminal or tort law might apply; and a state court cannot fully protect the complainant's rights or those of the public as regards the possibility that respondents might be operating illegally under the Act. Moreover, until further evidence is introduced, the Commission proceeding cannot be characterized as "vexatious" or "reactive," as the complaint alleges violations of tariff law and other shipping laws that could state a claim under the 1984 Act. **TAK Consulting Engineers v. Bustani, 28 SRR 584 [ALJ, 1998].**



**[10:10[2]n, 10:10[2]p, 141:5[1]d]  Permission to amend complaint granted.**

The complainant in a proceeding before the Commission may amend its complaint to eliminate reference to section 10(b)(14) of the 1984 Act, which clearly does not apply to its allegations, and to add a reference to section 10(b)(16). The complaint alleges that an NVOCC with which the complainant had negotiated concerning a shipment had subsequently contacted the complainant's customer and attempted to take over the underlying sales contract for its own benefit. In administrative proceedings, pleadings are not considered to be critically important; rather, they are general notice-giving instruments that allow respondents to prepare their defenses. Here, respondents have been made aware of the substance of the complainant's allegations. Accordingly, allowing the requested amendment will cause them no prejudice. The ALJ will consider that respondents deny that they violated section 10(b)(16) without requiring them to file a formal amended answer. **TAK Consulting Engineers v. Bustani, 28 SRR 584 [ALJ, 1998].**

### (1)  RESPONDENTS' MOTION TO STAY DENIED

### (2)  RULINGS AS TO SUBSEQUENT PROCEDURE

### (3)  RULING ON RESPONDENTS' COUNSEL'S MOTION TO WITHDRAW DEFERRED

### (4)  NOTICE OF AMENDMENT TO COMPLAINT

**Norman D. Kline, Administrative Law Judge.**

Respondent have filed a motion asking that I stay this proceeding because, the argue, the same matters are being litigated and will be decided in a separate state court action that began before the complaint in the instant proceeding was filed with the Commission. Respondents argue (Motion at 1):

> Only one week after filing the answer and cross-complaint in the state court action, TAK filed the instant action, alleging the same facts and seeking the same relief. TAK has instituted the present action simply to harass and intimidate Atlas [a respondent company suing in state court], to increase the costs of litigation, and to discourage Atlas from proceeding with its claim for unpaid shipping feed. Under principles of judicial administration established by the U.S. Supreme court, TAK is barred from concurrently litigating its claims in both state court and before the Federal Maritime Commission. The instant action should be stayed until the state court action is complete.

According to respondents, "[a]ll of the disputes between TAK and the Respondents relate to the Respondent's (sic) alleged misconduct in connection with a shipping contract that went awry." (Motion at 6.) The dispute between TAK and respondents allegedly began after TAK declined to use the services of one of respondent Sam Bustani's alleged alter-ego companies to transport tire-recycling equipment to Dubai, U.A.E. Allegedly, respondent Bustani retaliated against TAK's official with threats to inflict bodily harm on the official's person and family members and threatened TAK's customers and others with possible lawsuits. Moreover, one of respondent Bustani's alleged companies, Atlas World Line, brought suit against TAK seeking $12,500 in a municipal court for an alleged breach of contract. This court suit triggered an answer and cross complaint by TAK against Bustani and all his alleged alter-ego companies. In the answer to the complaint filed in court, TAK denies the material allegations and raises some 18 affirmative defenses which are often found in court cases but include several references to "the Shipping Act of 1984" without specifying any particular section of that Act. However, in its Answer in the court case, TAK avers that Atlas is seeking to recover "illegal and improper charges pursuant to the Shipping Act of 1984"; that Atlas "has failed to meet the requirements of the Shipping Act of 1984 for freight forwarders and/or non-vessel operating common carriers"; and that Atlas "has breached any alleged contract by charging fees in excess of and/or in addition to those provided under said agreement or as further alleged under the Shipping Act of 1984."

In addition to the foregoing Answer, TAK filed a cross-complaint in the municipal court, naming all 16 respondents (Sam Bustani, his various alleged AKA names, and 10 alleged alter-ego companies) as cross-defendants that are named as respondents in the instant Commission proceeding. Moreover, TAK names fifty fictitious "Doe" defendants. Except for the 50 fictitious names, TAK's cross-complaint in the state court mirrors the complaint filed in the instant proceeding, i.e., the allegations that TAK obtained a rate quotation from respondents to transport equipment which TAK had contracted to sell to a foreign buyer but after TAK declined to use respondents' services, respondents retaliated with threats as mentioned above and succeeded in having TAK's contract with its foreign buyer canceled, causing substantial monetary loss to TAK. TAK sets forth four "causes of action" in the state court against the Bustani companies, his alleged alter egos, and the 50 Does as follows: "Intentional Interference with Contractual Relations," "Negligent Interference with Contractual Relations," "Intentional Interference with Prospective Economic Advantage," "and "Negligent Interference with Prospective Economic Advantage." The only mention of the Shipping Act of 1984 in the cross-complaint occurs in paragraph 9 of the cross-complaint, in which TAK alleges that respondents violated the 1984 Act by contacting TAK's customers and vendors, telling lies about TAK, and threatening TAK's



ORDER OF ADMINISTRATIVE LAW JUDGE (FMC)

officers and business. In its cross-complaint in court, as in the instant complaint, TAK seeks money damages exceeding $900,000 plus interest, costs, and attorney's fees, although there are some particular differences in the exact relief requested as between the court cross-complaint and the instant Commission complaint.

Respondents base their argument for a stay of the instant Commission proceeding on several court cases involving stays of parallel proceedings being heard in different tribunals, which stays were ordered for the sake of judicial economy. Respondents cite five cases under this principle, three decided in the 9th Circuit Court of Appeal and two in the Supreme Court.[1] Respondents also cite three court cases, two in the Supreme Court and one in the 9th Circuit, which deal with declaratory-relief actions, respondents arguing that the instant complaint case is one in which TAK is asking the Commission to declare that respondents have violated the Shipping Act of 1984.[2] Respondents argue that, according to these three cases, the Commission has broad discretion to stay a declaratory-relief action when a parallel state court action is pending involving the same issues and parties and an overlap of factual questions between the state and Commission proceedings is sufficient to invoke the doctrine of stay even if the identity of the parties in both cases is not the same.

Complainant TAK has filed a thorough and persuasive Opposition to Respondents' Motion to Stay. TAK argues that the instant Commission proceeding should not be stayed because, it is alleged, respondents have been offering services in violation of the 1984 Act, which matters are under the exclusive and primary jurisdiction of the Commission, not state courts. Moreover, TAK asserts that it intends to ask the state court to stay its proceeding to allow the Commission to determine the Shipping Act issues.

In its Opposition, TAK explains in more detail how the instant dispute arose. According to TAK, TAK had contracted with a foreign entity to install, furnish and train personnel in regard to a used tire recycling plant in Dubai, United Arab Emirates, for a fee of at least $100,000. In this endeavor, allegedly, TAK had contracted to purchase machinery from an American supplier and contacted respondent Sam Bustani operating in the name of one of his al-

---

1. The five cases are: *Colorado River Water Cons. Dist. v. United States.* 424 US 800 (1976); *Nakash v. Marciano.* 882 F2d 1411 (9th Cir 1989); *American Internat'l Underwriters v. Continental Ins.*, 843 F2d 1253, 1258 (9th Cir 1988); *Arizona v. San Carlos Apache Tribe.* 463 US 545, 567 (1983); and *United States v. Adair.* 723 F2d 1394, 1405 n. 8 (9th Cir 1983).

2. The three cases are: *Wilton v. Seven Falls Co..* 515 US 277, 287-289 (1995); *Brillhart v. Excess Ins. Co..* 316 US 491, 495 (1942); and *Polido v. State Farm Mut. Auto. Ins. Co..* 110 F3d 1418, 1423 (9th Cir 1997). These three cases however are totally inapposite to the instant case because the instant case involves not a discretionary action by the Commission but rather a mandatory jurisdictional complaint alleging violations of law and seeking money damages. See 46 CFR 502.68 (declaratory orders).

leged alter-ego companies (United Cargo) to obtain transportation of the purchased equipment. Allegedly respondent Bustani quoted a rate in the name of another of his alleged alter-ego companies (Atlas World Line International Shipping Co.). While TAK was still negotiating with other shipping companies and attempting to obtain references and evidence of Bustani's companies' authority to act as carriers, which information Bustani allegedly initially declined to provide, respondent Bustani allegedly moved three empty containers to TAK's supplier and refused to remove them, instead sending TAK a copy of a tariff page in the name of another of Bustani's alleged alter-ego companies (World Line Shipping, Inc.). For these actions, TAK allegedly informed Bustani that TAK would not use the services of Bustani or any of his companies and, furthermore, TAK informally notified Commission personnel of Bustani's conduct and requested advice as to how to proceed further. Thereafter respondent Bustani allegedly injected himself into TAK's relationship with its American supplier and foreign buyer, using names of his alleged alter-ego companies in an attempt to sell the tire recycling machinery himself and made other intrusions, including threats to place liens on the equipment pending payment of freight charges under an alleged tariff and bill of lading, although Bustani or his companies allegedly were not carriers and did not transport the subject equipment. In any event TAK allegedly lost its contract because of Bustani's actions and was stuck with equipment that it had purchased in order to fulfill its contractual obligations with the foreign buyer. Moreover, Bustani sued TAK in Municipal Court in the name of one of his alleged alter-ego companies for payment of charges to which he was not entitled, not being a lawful carrier or freight forwarder.

After being sued in Municipal Court in Los Angeles, TAK filed an answer and cross-complaint as required by California rules of procedure concerning compulsory cross-complaints arising out of the same transactions. As mentioned above, this compulsory cross-complaint included common law claims of tortious interference with TAK's business affairs. It also referred to the Shipping Act of 1984 but did not seek specific relief under that Act. TAK argues that it would have been futile to allege specific violations of that Act in a state court anyway because the court should defer to the Commission under the doctrine of primary jurisdiction, and TAK indicates that it will ask the state court to stay the Shipping Act issues to allow the Commission to determine them. TAK also argues that its Shipping Act complaint raises separate Shipping Act issues while its cross-complaint filed in state court was required by court rules even though the state court lacks the necessary expertise to determine such issues. Moreover, TAK argues that respondent Bustani has been involved in a previous Commission investigatory proceeding concerning similar practices and his company in that case had been ordered to cease and desist from continuing its unlawful activity. TAK cites case authority supporting its argument that the Commission has the responsibility under law to determine whether respondent Bustani and his alleged alter-ego companies have violated the 1984 Act especially whether they have operated without

TAK CONSULTING ENGINEERS v. BUSTANI

the required tariffs, licenses, or bonds. If anything, it is argued, it is the state court that should stay its proceeding in deference to the Commission even if there are some issues and matters that fall within the state court's jurisdiction and case law supports the conclusion that the various factors to be considered do not warrant the Commission's staying the instant proceeding in deference to a state court.

The question presented by the instant motion is simply whether I should exercise my discretion and order the instant proceeding stayed to allow the state court proceeding to determine all the issues arising out of the same matters presented by some of the same parties and, if so, under what conditions. Although the Commission is not a court but an administrative agency, it nevertheless frequently follows court doctrines when they are based upon sound principles and do not disturb basic principles of administrative law. Cf. 46 CFR 502.12 (Commission follows federal rules of civil procedure absent specific Commission rule to the extent the federal rules are "consistent with sound administrative practice.").

As the several cases cited by the parties indicate, federal courts faced with duplicative proceedings have discretion as to whether to stay, dismiss, or abate the court proceedings, in deference to corresponding state court proceedings involving essentially the same parties and matters as those before the federal courts. The modern doctrine regarding discretion of federal courts to stay or dismiss complaints on account of parallel state court proceedings was enunciated in the case of *Colorado River Water Conservation District v. United States*, 424 US 800 (1976), and clarified in the case of *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.*, 460 US 1 (1983). These cases and the many lower court cases following them hold that federal courts faced with complaints that duplicate ones filed in state courts have the discretion to dismiss, state, or otherwise abate the federal cases pending decision in the state court cases provided the federal courts consider a number of factors concerning the wisdom of holding the federal cases in abeyance. The cases are legion in support of this proposition. See, e.g., *Fox v. Maulding*, 16 F3d 1079, 1081 (10th Cir 1994); *Attwood v. Mendocino Coast Dist. Hosp.*, 886 F2d 241 (9th Cir 1989); *Akins v. Rodriguez*, 15 F3d 883 (9th Cir 1994); *Calvert Fire Insurance Co. v. American Mutual Reinsurance Co.*, 600 F2d 1228 (7th Cir 1979); *Amer. Int'l Underwriters v. Cont. Ins.*, 843 F2d 1253 (9th Cir 1988); *Los Angeles NAACP v. Los Angeles Unified School District, et al.*, 518 F Supp 1053 (CD Cal 1981) (no stay ordered after weighing the factors set forth in *Colorado River*); see also the cases cited from all the circuit courts in *Federal Stay — State Action Pending*, 5 ALR Fed 10, 30-39.

The cases cited above involve decisions by federal courts whether to stay their proceedings in deference to parallel state court proceedings, not decisions by federal administrative agencies, such as this Commission, whether to stay their proceedings in deference to state courts. It is well to keep in mind this fact when considering the doctrine of stay followed by the federal courts. However, even when federal courts exercise their discretion to stay, they do so carefully

after considering various factors and they consider a stay of the federal proceeding to be somewhat exceptional because of what the Supreme Court has called "the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Moses H. Cone*, cited above, cited in *Attwood v. Mendocino Coast Dist. Hosp.*, cited above, 886 F2d at 243.[3] Thus, the District Court must carefully consider and weigh numerous factors so that any decision to stay or dismiss rests on "considerations of '[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.' " *Attwood*, 886 F2d at 243, citing *Colorado River*. Thus, as some authorities have noted, the Supreme Court has created a new doctrine akin to "abstention" by federal courts for the sake of avoiding duplicative litigation and conserving judicial resources. See 17A Wright, Miller, and Cooper, *Federal Practice and Procedure* (1988), sect. 4247 at 133-134, discussing *Colorado River*.

One federal circuit court, after studying *Colorado River* and *Moses H. Cone*, listed eight factors that a federal court should weigh and consider before deciding how best to deal with a complaint that had also been filed in a state court. Among the factors that the court mentioned are: the inconvenience of the federal forum; whether either court has assumed jurisdiction over a res; the desirability of avoiding piecemeal litigation; the order in which the two courts obtained jurisdiction; the vexatious or reactive nature of either the federal or the state action; whether federal law provides the rule of decision; the adequacy of the state action to protect the federal plaintiff's rights; and whether the party opposing abstention has engaged in impermissible forum-shopping. *Fox v. Maulding*, cited above, 16 F3d at 1082. See also *Nakash v. Marciano*, cited above, 882 F2d 1411 (listing six of these factors). The court in *Fox v. Maulding* opined, furthermore, that "no single factor is dispositive" and that "the weight to be given to any one factor may vary greatly from case to case, depending on the particular setting of the case" (citing *Moses H. Cone* ). Again citing *Moses H. Cone*, the court stated that the factors should not be used as a "mechanical check list" but that a court should engage in "a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." (*Id.*) See also *Nakash v. Marciano*, cited above, 882 F2d at 1411, and *American Int'l Underwriters v. Continental Ins. Co.* cited above, 843 F2d at 1257.

---

3.    Even when the federal courts decide to defer to a parallel state court proceeding, they prefer only to stay the federal complaint proceeding rather than to dismiss it so that the federal plaintiffs can reserve their rights in case the state courts fail to adjudicate all the issues. See *Attwood v. Mendocino Coast Dist. Hosp.*, 886 F2d 241, 243 (9th Cir 1989), citing *Moses H. Cone*, cited above, 16 F3d at 1083; *Akins v. Rodriguez*, cited above, 15 F3d at 888; *Mahaffey v. Bechtel Assocs. Professional Corp.*, 699 F2d 545, 546-547 (DC Cir 1983); anno: 5 ALR Fed 10, 105. Thus, in *Attwood*, the court stated:

> We hold that the district court should have stayed rather than dismissed Attwood's action. This holding ensures that the federal forum will remain open if "for some unexpected reason the state forum does turn out to be inadequate." *Cone*, 460 US at 28.



ORDER OF ADMINISTRATIVE LAW JUDGE (FMC)

As I indicated above, when weighing the various factors concerning the question whether to stay a federal proceeding, the balance is "heavily weighted in favor of the exercise of jurisdiction." Moreover, as TAK has persuasively shown, the particular factors in the equation favor denying a stay of the instant Commission proceeding. As TAK correctly argues, there is no res over which the state court has assumed jurisdiction, the Commission can utilize procedures limiting the inconvenience to distant parties, such as the telephonic hearings (or procedures allowing introduction of depositions or other written evidence into the record); only the Commission can determine whether respondents should obtain licenses or bonds; the Commission complaint was filed before the state court complaint was reinstated; federal law controls certain critical issues regarding respondents' conduct under the Shipping Act, although there are certain aspects of state criminal or tort law that might apply; and, finally, a state court cannot fully protect TAK's rights or those of the public as regards the possibility that respondents might be operating illegally under the Shipping Act. There are still further considerations militating against a stay of the instant Commission proceeding. Thus, if the Supreme Court holds that federal courts have a "virtually unflagging obligation to exercise the jurisdiction given them," as the Court stated in *Moses H. Cone*, cited above, does not this Commission, which is entrusted to protect the public against harmful practices prohibited under the Shipping Act, have a similar "unflagging obligation" to exercise the unique jurisdiction given to the agency? Can or should the Commission or TAK rely on the experience of a state court to evaluate conduct of persons or companies operating in the shipping industry under peculiar restraints imposed by a federal regulatory statute when the court is dealing with common law torts and quasi-criminal threats? In a recent case, for instance, the Commission rejected the argument that a dispute involving only a commercial disagreement between a regulated ocean carrier and a shipper should be resolved in a local court because, among other reasons, the Commission, being located in Washington, D.C., was allegedly not a convenient forum. The Commission, however, held that it has national jurisdiction and a responsibility to enforce the Shipping Act. See *Waterman Steamship Corp. v. General Foundries, Inc.*, 26 SRR 1424 (1994).

Another factor to be considered is that relating to respondents' allegation that TAK has filed its complaint with the Commission as a retaliatory measure because respondents have sued TAK in state court. Whether the instant complaint constitutes a "vexatious" or "reactive" action is a question that cannot be decided until all the evidence is introduced into the record on the merits of the complaint. However, TAK's complaint apparently alleges that respondents have, among other things, violated tariff law and other shipping laws by demanding payment of allegedly unlawful untariffed charges and have otherwise acted unreasonably. If proven, such conduct could possibly violate sections 10(b)(1) and 10(d)(1) of the 1984 Act, as well as other sections of that Act. Also, TAK's allegation that respondents might have used information about TAK's business dealings to TAK's detriment could constitute violation of section

10(b)(16) of the Act, if proven.[4] Hence TAK's complaint before the Commission cannot be characterized at this time as one merely brought to vex or harass respondents, as respondents are contending. See, e.g., *Bloomers of California, Inc. v. Ariel Maritime Group, Inc., et al.*, 26 SRR 72 (1991), 26 SRR 183 (1992) (NVOCC's lawsuit against shipper in court seeking to collect freight money found to have violated Shipping Act and to justify shipper's complaint against the carrier filed with the Commission).

As I mentioned earlier, federal courts sometimes stay their proceedings in deference to parallel state court proceedings but such action is unusual. When a case has begun in a federal court which seems able to resolve the dispute completely and the court case has proceeded efficiently, this Commission has stayed its proceedings to await the court decision. See, e.g., *Ataei v. Barber Blue Sea Line*, 24 SRR 647, 648 (ALJ, FMC notice of finality, January 12, 1988); *Venemar Line, Inc. v. Crowley Caribbean Transport, Inc.*, 25 SRR 1175, 1179 (ALJ 1990) (Order Staying Proceeding for 60 Days Pending advice, etc.). However, these cases did not primarily implicate questions of the Commission's jurisdiction and the disputes arose primarily in admiralty or commercial law. However, when a complaint sought relief under the Shipping Act against an NVOCC (non-vessel operating common carrier) who had abused tariff law and acted unreasonably in its dealings with a shipper customer the Commission did not stay or otherwise defer to court proceedings. See *Bloomers of California, Inc.*, cited above. *See also White-Westinghouse Int'l Co. v. Trans Africa Line/Ariel/Maritime (U.S.A.), Inc.*, 25 SRR 1615 (1991), in which the Commission reversed a presiding judge who had stayed a complaint case brought by a shipper against an NVOCC, thereby unduly deferring to a court conducting a parallel proceeding in which critical issues involving the Commission's jurisdiction were involved.

I therefore agree with TAK that this proceeding should not be stayed because "it is the FMC, not the civil courts, which have a vested interest in adjudicating these claims." Opposition to Respondents' Motion to Stay at 9. It is so ordered. Although there are issues involving tortious interference with TAK's alleged contract and similar common law matters before the state court, there are many more matters involving respondents' conduct and operations as allegedly untariffed and unbonded NVOCCs which directly concern the Commission rather than a state court. Indeed, as TAK states, respondent Bustani has been involved in a previous Commission proceeding as Vice President of an NVOCC named Pacific International Shipping, which was found to have operated unlawfully without a tariff, bond, or license, although he was not named personally as a respondent. See Docket No. 97-01, *Alex Parsinia dba Pacific International Shipping and Cargo Express*, 27 SRR 1335 (1997). The remaining problem is therefore not whether this proceeding should be

---

4.   As discussed below, TAK has requested permission to amend its complaint so as to specify that section 10(b)(16) of the Act was violated by respondents, rather than section 10(b)(14), as originally alleged. I have granted this request.

stayed but how it should proceed, assuming that the parallel state court case continues to be litigated.

### Rulings as to Subsequent Procedure

As discussed above, the reason why courts have developed the doctrine of staying their proceedings in deference to parallel state court proceedings is to conserve judicial resources and avoiding duplicative litigation. It is, of course, a worthwhile objective to seek to reduce the costs and burdens of litigation to the benefit of the litigating parties as well as the Commission. I have previously granted TAK's request to follow a discovery schedule which has commenced and is to be concluded by November 16, 1998. See Procedural Rulings, September 14, 1998 *[28 SRR 579]*. The Commission has various shortened and summary-type procedures that can be used to develop a written evidentiary record with materials obtained in discovery, including depositions that can be used by TAK when seeking to prove its allegations. See Rulings Relating to Complainant's Request to Enter Default against Certain Respondents, October 1, 1998 *[28 SRR 581]*, at 8-9. I therefore encourage TAK to make full use of the Commission's discovery rules in its efforts to develop the evidentiary record. Moreover, if TAK is also continuing to litigate its cross-complaint in state court, it may be possible to use any discovery materials obtained in the court litigation in the instant Commission proceeding to the extent that such materials are relevant to the Shipping Act issues. If there is any problem because of respondents' current unclear legal representation and possible lack of cooperation, I am amenable to signing appropriate subpoenas or to issuing other suitable orders under the circumstances. Moreover, if the Commission decides to take formal action to investigate respondents after its Bureau of Enforcement has decided what action it should recommend, any such investigation could be consolidated with the instant proceeding if such consolidation would be appropriate. In any event I will monitor the situation and expect TAK to proceed diligently.[5]

### The Matter of Respondents' Legal Representation

Respondents' counsel, Mr. Peter E. Cohan, has filed a motion asking permission to withdraw as counsel. The time for reply to this motion expires on October 29, 1998, and a reply has not yet been received. Accordingly, I will defer ruling on the motion at this time. If the motion is granted, such ruling might affect the schedule and require modification to it. Moreover, if Mr. Cohan is allowed to withdraw and respondents fail to appoint new counsel or if they decline to participate in the proceeding, they may fall into default and could ultimately suffer a default judgment, at least

as to some of the matters in issue relating to their alleged violations of the Shipping Act, if not to the claim for money damages. It is obviously premature to comment further on these matters.

### Notice of Amendment to Complaint

In the original complaint, TAK alleges that respondents violated nine different sections of the Shipping Act of 1984 (sections 10(b)(1), 10(b)(5), 10(b)(6), 10(b)(10), 10(b)(12), 10(b)(14), 10(d), 19(a), and 23(a)). However, one of these sections clearly does not apply to the allegations, namely, section 10(b)(14). That section prohibits carriers from dealing with NVOCCs who do not have tariffs or bonds. However, as TAK explains, the 1984 Act was amended to insert section 10(b)(16) into the Act, which TAK had overlooked. Section 10(b)(16) prohibits a carrier from knowingly disclosing, receiving, etc. information concerning a shipper's business to the detriment of the shipper. TAK alleges that respondents have so used such information to injure TAK and requests that its complaint be amended accordingly. (Opposition to Stay at 8. N. 4.)

Section 10(b)(16) provides in relevant part:

> (b) No common carrier, either alone or in conjunction with any other person, directly or indirectly, may — (16) knowingly disclose, offer, solicit, or receive any information concerning the nature, kind, quantity, destination, consignee, or routing of any property tendered or delivered to a common carrier without the consent of the shipper or consignee if that information — (A) may be used to the detriment or prejudice of the shipper or consignee; (B) may improperly disclose its business transaction to a competitor; . . .

Pursuant to 46 CFR 502.70, I am authorized to permit or direct a party to amend its complaint if necessary to clarify or correct the complaint. Pleadings in administrative proceedings are easily amendable, even more so than in federal courts, and are not considered to be critically important. Rather they are generally notice-giving instruments that allow respondents to prepare their defenses. See, e.g., *International Association of NVOCCs v. ACL*, 25 SRR 187, 194 (1989); *Interonex, Inc. v. F.M.C.*, 572 F2d 27 (2d Cir 1978); cf. Rule 15(a), F.R.C.P.

This proceeding is in its early stages, well before the presentation of evidence or hearing has commenced. Respondents have been made aware of the substance of TAK's allegations regarding TAK's claim that respondents used information obtained from TAK to attempt to sell tire recycling machinery to TAK's detriment. Accordingly, I find no prejudice to respondents by allowing TAK to amend its complaint to specify the correct section of the 1984 Act allegedly violated and will consider that respondents deny that they violated section 10(b)(16) of the Act without respondents having to file a formal amended answer. It will not be TAK's task to develop the evidence and prove its allegation.

---

5.   I am aware that TAK has served 39 interrogatories on respondents, a copy of which was filed with the Commission's Secretary. If TAK has used, is using, or will be using other discovery under the Commission's rules, such as requests for production, depositions, or requests for admissions, TAK shall furnish copies to the Secretary and to me so that I can monitor the case.



ORDER OF ADMINISTRATIVE LAW JUDGE (FMC)

## TAK CONSULTING ENGINEERS

v.

## SAM BUSTANI aka SAMUEL BUSTANI aka SAEID BUSTANI
## aka SAM BUSTANI MARALAN aka SAEID MARALAN aka SAM ABADI, *et al.*

FMC Dkt. No. 98-13
Served: October 28, 1998

**[141:1, 141:12[1]]  Permission to withdraw granted.**

In a complaint proceeding before the Commission, respondents' counsel may withdraw with the ALJ's permission.  To require the counsel to continue representing respondents in the present circumstances would be unusual and require extraordinary reasons:  not only has he not been paid for his services, but there are serious disagreements between him and respondents regarding how to proceed.  No extraordinary reasons to forbid withdrawal appear, as the case is still in its early stages, and respondents have been on notice that their counsel disagrees with them and that they can seek new counsel.  Moreover, the counsel has served respondents with a copy of his Motion to Withdraw and has warned them of pending discovery requests made against them and of possible adverse consequences if they fail to respond.  Accordingly, the counsel has taken the necessary steps to avoid prejudicing the respondents through his withdrawal as provided by the ABA Model Rules of Professional Conduct.  In view of the respondents' apparent dilatory conduct and the potential of harm to the complainant from further delay, however, discovery will proceed according to the existing schedule, although further and new discovery may be permitted in the future if necessary.  **TAK Consulting Engineers v. Bustani, 28 SRR 590 [ALJ, 1998].**

## (1)  RESPONDENTS' COUNSEL'S MOTION TO WITHDRAW GRANTED

## (2)  RULINGS ON FUTURE PROCEDURE

**Norman D. Kline, Administrative Law Judge.**

Peter E. Cohan, Esq., counsel for respondents, has filed a motion seeking permission to withdraw as respondents' counsel.  The grounds for the motion are the fact that respondents have not paid counsel's legal bills nor cooperated with counsel, and have instructed their counsel to conduct himself in inappropriate ways.

Counsel explains that after the complaint in this proceeding was served on respondents, counsel was retained by respondents pursuant to an agreement obligating respondents to pay Mr. Cohan for his services at the beginning of each month at a certain rate plus costs.  However, disagreement between respondents and Mr. Cohan began whereby respondents directed Mr. Cohan to take little or no action instead of authorizing Mr. Cohan to mount a vigorous defense as Mr. Cohan had recommended.  Respondents continued expressing their dissatisfaction with Mr. Cohan's services and refused to pay him under their original agreement.  Consequently, Mr. Cohan attempted to have respondents execute an instrument entitling Mr. Cohan to withdraw from the proceeding, which instrument respondents have continually refused to execute while also refusing to pay Mr. Cohan for his services or costs.  Moreover, in seeking to have respondents execute the withdrawal instrument, Mr. Cohan specifically warned them that their failure to retain another attorney could lead to serious adverse consequences and he repeated this warning in a later letter to respondents.  Fur-

thermore, respondents have continued to fail to cooperate with Mr. Cohan specifically by refusing to answer interrogatories propounded to respondents by complainant.  Respondents have still failed to pay Mr. Cohan for his services and costs and presently owe Mr. Cohan approximately $6,000.  Mr. Cohan summarizes the unfortunate situation by stating that "[r]espondents continue to criticize Cohan for his course of representation in this matter, and demand that Cohan take little or no further action in this matter." (Motion to Withdraw at 5.)

TAK has filed a reply to respondents' counsel's motion.  Although entitled Opposition to Peter E. Cohan's Motion to Withdraw as Counsel, TAK does not object to such withdrawal but expresses concern about the future progress of this case and expressly argues that "no further delays are warranted" if Mr. Cohan is allowed to withdraw.  Furthermore, TAK also asks that "discovery should not be continued unless good cause is shown by any party." (Opposition at 3.)  TAK contends that respondent has made someone else his "victim," namely, Mr. Cohan, and that it is "apparent" that respondents do not wish to defend themselves in the FMC action and that their "only goal in the action herein was to delay the prosecution of the claims at the FMC in an attempt to extort funds from Complainant in the Municipal Court Action." (Opposition at 2.)  TAK also argues that respondents have now had ample time to find new counsel, dating from September 10, 1998, when disagreements between respondents and their counsel emerged.

TAK CONSULTING ENGINEERS v. BUSTANI                                    [pf]

The Motion and Opposition present two questions to re-
solve: 1) should Mr. Cohan be permitted to withdraw as
counsel for respondents?; and 2) how should the case pro-
ceed in the absence of counsel for respondents? I rule in
the affirmative on question no. 1 and issue certain rulings as
to the second question.

*Applicable Principles of Law Regarding an Attorney's Withdrawal*

The Commission, although being an administrative agency,
generally follows the rules and principles that federal courts
follow in civil cases absent a specific Commission rule. See
46 CFR 502.12 (federal rules of civil procedure followed to
extent consistent with sound administrative practice). The
instant motion does not expressly involve a rule of proce-
dure but rather involves the proper role of an attorney prac-
ticing before the Commission and such attorney's obliga-
tions to his client. Although there is no specific Commis-
sion rule governing an attorney's request to withdraw from
representing his client, in previous cases involving attorneys'
ethical obligations, the Commission has looked to the rules
established by the American Bar Association (ABA) in effect
at the time of the situation presented. See *International Asso-
ciation of NVOCCs v. ACL, et al.*, 25 SRR 292 (ALJ 1989),
and Docket No. 74-33 — *Amendments to Rules of Practice and
Procedure*, reported as an attachment to the ruling in the cited
case at 25 SRR 303 (FMC 1975); see also Geoffrey C. Haz-
ard, Jr. and W. William Hodes, *The Law of Lawyering* 483 (2d
ed. 1990) (ABA Rule 1.16(c) not limited to court cases and
can apply to proceeding before administrative agencies).

The applicable ABA Model Rule of Professional Conduct is
Rule 1.16. This Rule provides as follows:

Rule 1.16

*Declining or Terminating Representation*

(a) Except as stated in paragraph (c), a lawyer shall not
represent a client or, when representation has com-
menced, shall withdraw from the representation if:

(1) the representation will result in violation of
the rules of professional conduct or other law;

(2) the lawyer's physical or mental condition
materially impairs the lawyer's ability to represent the
client; or

(3) the law is discharged.

(b) Except as stated in paragraph (c), a lawyer may
withdraw from representing a client if withdrawal can
be accomplished without material adverse effect on
the interests of the client, or if:

(1) the client persists in a course of action in-
volving the lawyer's service that the lawyer reasonably
believes is criminal or fraudulent;

(2) the client has used the lawyer's services to
perpetrate a crime or fraud;

(3) a client insists upon pursuing an objective
that the lawyer considers repugnant or imprudent;

(4) the client fails substantially to fulfill an obli-
gation to the lawyer regarding the lawyer's services and
has been given reasonable warning that the lawyer will
withdraw unless the obligation is fulfilled;

(5) the representation will result in an unreason-
able financial burden on the lawyer or has been ren-
dered unreasonably difficult by the client; or

(6) other good cause for withdrawal exists.

(c) When ordered to do so by a tribunal, a lawyer shall
continue representation notwithstanding good cause
for terminating the representation.

(d) Upon termination of representation, a lawyer shall
take steps to the extent reasonably practicable to pro-
tect a client's interests, such as giving reasonable no-
tice to the client, allowing time for employment of
other counsel, surrendering papers and property to
which the client is entitled and refunding any advance
payment of fee that has not been earned. The lawyer
may retain papers relating to the client to the extent
permitted by other law.

Rule 1.16 has been adopted in many jurisdictions and by
local rules in various federal district courts. See the discus-
sion and cases cited in 7 Am Jur 2d, Attorneys at Law, secs.
188-190; 7A Corpus Juris Secundum, Attorney and Client,
secs. 221-222; *Darby v. City of Torrance*, 810 F Supp 275, 276-
277 (CD Cal 1992); *U.S. ex rel. Cherry Hill Convalescent Center,
Inc. v. Healthcare Rehab Systems, Inc.*, 994 F Supp 244, 252 (D
NJ 1997). Under Rule 1.16 and the court rulings, an attor-
ney may be permitted to withdraw from representing his
client for a variety of reasons, including failure of the client
to pay the attorney's fees and failure to cooperate with or
follow the advice of counsel. See 7 Am Jur 2d, Attorneys at
Law, cited above, sec. 189; *Lindsey v. Admiral Ins. Co.*, 804 F
Supp 47, 52 (ND Cal 1992); *Liberty-Ellis Island Foundation, Inc:
v. International United Industries, Inc.*, 110 FRD 395, 297 (SD
NY 1986); *Ashker v. Int'l Business Mach. Corp.*, 607 NYS2d
488 (App Div 1994) (client's threats, accusations, and refusal
to accept attorney's advice made representation unreason-
able difficult; Rule 1.16(b)(5). Nevertheless, the decision
whether to allow an attorney to withdraw lies within the
sound discretion of the trial judge and may be withheld un-
der some circumstances when such withdrawal would preju-
dice the client or unduly burden the court or the proceeding.
See, e.g., *Federal Trade Commission v. Intellipay, Inc.*, 828 F Supp
33 (SD Tex 1993); *Darby v. City of Torrance*, cited above, 810
F Supp 275; *In re Lands End Leasing, Inc.* 20 BR 226 (Bank-
ruptcy D NJ 1998); *United States v. Pointer*, 17 F3d 1070, 1073
(7th Cir 1994). Thus, as these cases show, a court may not



ORDER OF ADMINISTRATIVE LAW JUDGE (FMC)

permit an attorney to withdraw if the case has proceeded nearly to trial and the client would have difficulty in obtaining new counsel. Also, it is expected of the attorney that he will give due notice to his client of his desire to withdraw so that the client may protect his interests and seek to obtain new counsel if he so desires. See 7 Am Jur 2d, Attorneys at Law, cited above, sec. 188 at 220 (attorney may not withdraw until he or she has taken reasonable steps to avoid foreseeable prejudice to the rights of the client, including giving due notice to the client); *Ibid.,* sec. 190 (Notice to Client); 7A Corpus Juris Secundum, cited above, sec. 221 at 399 (attorney must give client due and reasonable warning or notice so that client has opportunity to be heard and to obtain new counsel). Whether the notice given to the client is reasonable depends upon the circumstances of the case. 7 Am Jur 2d, Attorneys at Law, cited above, sec. 190; Rule 1.16(d).

To require Mr. Cohan to continue to represent respondents under the circumstances of this case would be unusual and require extraordinary reasons. Not only has Mr. Cohan has not been paid for his services but there are serious disagreement between Mr. Cohan and respondents regarding how Mr. Cohan should proceed. I conclude that Mr. Cohan cannot effectively represent respondents under such conditions. Moreover, there are no extraordinary circumstances that would warrant ordering Mr. Cohan to continue as respondents' counsel. The proceeding is in its early stages and respondents have been on notice that their counsel disagrees with them and can seek new counsel. Moreover, Mr. Cohan has served respondents with a copy of his Motion to Withdraw and has warned respondents of the pending discovery requests made against them and of possible adverse consequences if they fail to respond. This is not a case in which respondents are left in the lurch just prior to trial or are deprived of the opportunity to defend themselves or to obtain new counsel. Mr. Cohan has taken the necessary steps to warn respondents of his desire to withdraw so that respondents will not be prejudiced. Mr. Cohan has even provided respondents' current business address so that he need not even be retained in the case for purpose of receiving services of process or of forwarding rulings to respondents because the instant ruling will be served both on Mr. Cohan and on respondents directly. The only other factor that might warrant retention of Mr. Cohan in the case is the consideration that Mr. Cohan's withdrawal might unduly delay the proceeding or unduly burden the tribunal. However, as noted, the proceeding is still in its early stages, respondents have been aware of the need to seek counsel for some time, and the proceeding need not be unduly delayed so that respondents can "attempt to extort funds from Complainant in the Municipal Court Action," as complainant contends is respondents' objective. (Opposition at 2.) The problem involves the second question, namely, how best to proceed in the absence of Mr. Cohan.

### The Future Course of the Proceeding

In previous rulings I have advised the parties that complainant has the burden of proving its various allegations and that complainant should use the Commission's discovery rules to seek to elicit the necessary evidence to prove its various allegations. The complaint alleges rather generally that some nine different sections of the Shipping Act of 1984 have been violated by one or more of some 16 named respondents. At the heart of the complaint are allegations that respondents have operated without tariffs, bonds, or licenses, have sought collection of certain unauthorized charges from complainant, and have interfered with complainant's contractual relationship with its customer. If proven, such conduct could conceivably be found to violate one or more of the laws cited in the complaint. However, if TAK is to obtain the relief it requests, primarily protection against the state court suit being prosecuted against it, plus obtain money damages for a lost contract, it must be prepared to pursue its claims and elicit the necessary evidence. In this regard, TAK has requested establishment of a discovery schedule and has commenced using the Commission's discovery rules by serving interrogatories and requests for production, and has served a notice of deposition scheduled for November 13, 1998. All of this activity is not only proper but is necessary for TAK to prove its case together with independent evidence that it may have from its own or other sources that can prove its allegations.

In its Opposition, TAK contends that if Mr. Cohan is allowed to withdraw, such withdrawal "should not be predicated on any further delay of these proceedings." (Opposition at 3.) Moreover, TAK states that "discovery should not be continued unless good cause is shown by any party." (Opposition at 3.) Literally this could mean that TAK is requesting that its own pending discovery requests should not be allowed to continue without a showing of good cause. However, such an interpretation is totally inconsistent with TAK's claimed desire to have the proceeding move forward promptly toward decision so that it can be protected against respondents' suit being prosecuted against TAK in court, a suit which TAK characterizes as an "attempt to extort funds from Complainant . . . ." Thus, I interpret TAK's statement to mean that it wishes its own discovery to continue, including the deposition proceeding scheduled for November 13, 1998, but that any further discovery by TAK or new or initial discovery by respondents should not be permitted without a showing of good cause. In view of respondents' apparent dilatory conduct, the possible risk of harm to TAK if respondents seek to delay the instant FMC proceeding, and the need for TAK to seek to elicit relevant evidence through discovery, I find that TAK should be allowed to vigorously continue its present discovery efforts. It is possible that TAK can develop an adequate evidentiary record in this way that can enable the Commission to issue a sound decision. Should it appear in the future that further and new discovery is necessary, however, I will allow it if good cause is shown in order not to deprive any party of due process. I also advise respondents that if they fail to reply to TAK's discovery requests or to appear at the deposition proceeding on November 13, 1998, they are subject to appropriate sanctions, possibly including even default judgments under extreme circumstances, or TAK is entitled to seek enforce-



ment of my discovery orders against respondents in U.S. District Court in Los Angeles.[1]

I will expect TAK to continue with its outstanding discovery requests and, barring any need to adjust the schedule caused

by the withdrawal of Mr. Cohan, expect respondents to comply with TAK's discovery requests as required by the Commission's rules. I remain ready to issue suitable orders if necessary to adjust the schedule or ensure that no party is deprived of due process of law.[2]

---

1.    By law the Commission's discovery rules must conform to the corresponding rules followed in the U.S. District Court. See section 12(a), 1984 Act, 46 USC app. sec 1711(a). Thus, Commission rules 46 CFR 502.201 through 502.210 are generally patterned after Federal Rules 26 through 37, F.R.C.P. Enforcement of Commission discovery orders, if necessary, is made in the appropriate U.S. District Court in Los Angeles. See section 14, 1984 Act, 46 USC app. sec. 1713(c); 46 CFR 502.210(b). The Ninth Circuit Court of Appeals has upheld default judgments as sanctions for failure to comply with proper discovery under certain circumstances. See, e.g., *Adriana International Corp. v. Thoeren.* 913 F2d 1406 (9th Cir 1990); *Stars' Desert Inn Hotel & Country Club v. Hwang.* 105 F3d 521 (9th Cir 1997); *Wanderer v. Johnston,* 910 F2d 652 (9th Cir 1990). The Commission's rule regarding sanctions for failure to respond to discovery orders is 46 CFR 502.110, which corresponds to Federal Rule 37(b)(2). Nevertheless, I caution TAK that the Commission, as well as the courts, would prefer to decide cases on their merits and avoid extreme sanctions like default judgments or dismissals if there are less drastic alternatives that can be employed, for example, an order to appear at depositions or to answer questions. See, e.g., *Estrada v. Rowland,* 69 F3d 405, 406 (9th Cir 1995).

2.    As I indicated in an earlier ruling, the Commission may institute its own proceeding against respondents if the Commission's Bureau of Enforcement so recommends. If such proceeding is instituted, it may be necessary to consider adjustments to the schedule or consolidation of the two proceedings. If necessary and upon request, I may also adjust the discovery schedule if respondents obtain new counsel who may need time to assist respondents in replying to TAK's discovery requests, including appearing at the scheduled deposition. However, if respondents are seeking new counsel, their search cannot be allowed to delay the proceeding unduly. Finally, I advise TAK who evidently believes that respondents are stalling in this FMC proceeding in order to help them proceed in their court suit, that even with the best of intentions, the instant administrative proceeding will consume time before the Commission can issue a decision on the merits of the complaint. If TAK feels that it needs more prompt relief, the law authorizes TAK to seek a preliminary injunction against respondents in the U.S. District Court in Los Angeles as an aid to TAK's administrative complaint case. See section 11(h)(2), 46 USC app. sec. 1710(h)(2).

---

### SAEID B. MARALAN (aka SAM BUSTANI),
### WORLD LINE SHIPPING, INC. d/b/a WORLD LINE SHIPPING and
### WORLD LINE SHIPPING INTERNATIONAL SHIPPING CO.
### and ATLAS WORLD LINE INC. d/b/a ATLAS WORLD LINE and
### ATLAS WORLD LINE INTERNATIONAL SHIPPING CO. —
### POSSIBLE VIOLATIONS OF SECTIONS 8(a)(1), 10(b)(1), 19(a) and 23(a) OF THE SHIPPING ACT OF 1984

FMC Dkt. No. 98-19
Served:  November 2, 1998
63 FR 60345 (November 9, 1998)

**[10:8[1]e, 10:10[2]a, 10:13, 10:19, 10:23]  Apparent failure obtain forwarder license and to file and conform to tariffs.**

Two businesses and their owner and sole stockholder appear to have violated the 1984 Act. One company appears to have engaged in business as an NVOCC without having a bond or tariff on file, the other appears to have transported goods at other than its filed tariff rates, and the owner appears to have acted as a freight forwarder without a license. Accordingly, the Commission institutes an investigation to determine whether the apparent violations in fact occurred and, if so, whether it should assess civil penalties, suspend those tariffs that are on file, and enter cease and desist orders. **Saeid B. Maralan (aka Sam Bustani),** *et al.* — **Possible Violations of Sections 8(a)(1), 10(b)(1), 19(a) and 23(a) of the Shipping Act of 1984, 28 SRR 593 [FMC, 1998].**

### ORDER OF INVESTIGATION AND HEARING

**By the Commission.**

World Line Shipping, Inc., also doing business as World Line Shipping and World Line Shipping International Shipping Co., is a tariffed and bonded non-vessel-operating

common carrier ("NVOCC"), and holds itself out as an NVOCC pursuant to its ATFI tariff FMC No. 015099-001, effective November 20, 1997. World Line Shipping, Inc. currently maintains an NVOCC bond, No. 8941513, in the amount of $50,000 with Washington International Insurance

## CERTIFICATE OF SERVICE

I certify that on December 18, 2024, I filed the foregoing Brief for Petitioner with the Clerk of the United States Court of Appeals for the D.C. Circuit via the CM/ECF system, which will notify all participants in the case who are registered CM/ECF users.


*/s/ John Longstreth*